**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, <br><br> PLAINTIFFS, <br><br> -against- <br><br> ISAAC SHAPSON, YURI NISNEVICH a/k/a YURY NISNEVICH, SERGE DELALEU, M.D., PERVAIZ IQBAL QURESHI M.D., HELEN SHIRAZI, D.C., ARKADY KINER, L.AC., TIMOTHY MORLEY, M.D., JOSEPH C. YELLIN, D.O., SHELDON PIKE, M.D., SD MEDICAL P.C., P.R. MEDICAL, P.C., HS DIAGNOSTIC CHIROPRACTIC P.C., GENTLE CARE ACUPUNCTURE, P.C., MORLEY MEDICAL SERVICES, P.C., SAGE MEDICAL, P.C., SPIKE MEDICAL P.C., JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20, <br><br> DEFENDANTS. | CIVIL ACTION <br><br> 22-CV-7125 <br><br><br> COMPLAINT <br><br><br> (TRIAL BY JURY DEMANDED) |

Allstate Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Indemnity Company and Allstate Property & Casualty Insurance Company (collectively "Plaintiffs" or "Allstate"), by their attorneys, Morrison Mahoney LLP, for their Complaint against Defendants Isaac Shapson ("Shapson"), Yuri Nisnevich a/k/a Yury Nisnevich ("Nisnevich"), Serge Delaleu, M.D. ("Delaleu"), Pervaiz Iqbal Qureshi, M.D. ("Qureshi"), Helen Shirazi, D.C. ("Shirazi"), Arkady Kiner, L.Ac. ("Kiner"), Timothy Morley, M.D. ("Morley"), Joseph C. Yellin, D.O. ("Yellin"), Sheldon Pike, M.D. ("Pike"), SD Medical P.C. ("SD Medical"), P.R. Medical, P.C. ("PR Medical"), HS Diagnostic Chiropractic P.C. ("HS Diagnostic Chiro"), Gentle Care Acupuncture, P.C. ("Gentle Care Acupuncture"), Morley Medical Services, P.C. ("Morley Medical"), Sage Medical, P.C. ("Sage Medical"), Spike Medical P.C. ("Spike Medical"), John Does 1 through 20 and ABC Corporations 1 through 20 (collectively "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.      On information and belief, from in or about December 2003, through the date of the filing of this Complaint, Defendants Shapson, Nisnevich, and/or others unknown to Plaintiffs (individually referred to by name and collectively referred to as the "Controllers") presided over an organization that systematically stole millions of dollars from automobile insurance companies, including Plaintiffs, through New York State's No-fault system via the submission of fraudulent claims for medical services submitted by SD Medical and PR Medical (hereinafter also referred to collectively as the "Fraudulently Owned PCs"), each an entity formed and operated in violation of Article 15 of the Business Corporation Law ("B.C.L."), Article 65 of the Education Law and the implementing regulations promulgated by the New York State Department of Insurance concerning the eligibility requirements of health care providers seeking reimbursement under the No-fault law.

2.      Defendants Shapson and Nisnevich, who are laypersons, not licensed to practice any healthcare profession in the State of New York, and/or others unknown to Plaintiffs, orchestrated the fraud alleged herein, with the assistance, participation and agreement of Defendants Delaleu and Qureshi (hereinafter also collectively referred to as the "Paper Owners"), and the creation of illegally owned, fraudulently incorporated and improperly licensed professional corporations that were used to fraudulently bill insurance companies in general, and Plaintiffs, in particular.

3.      Each of the Paper Owners knowingly allowed fictitious bills to be submitted under their names, in their individual capacity, as well as in association with one or more of the Fraudulently Owned PCs named herein, each of which is a fraudulently owned and improperly licensed medical professional corporation that was used to fraudulently bill insurance companies

in general, and Allstate in particular, for services purportedly rendered at 79-09B Northern Boulevard, Jackson Heights, New York ("79-09B Northern Boulevard"), and/or other locations.

4.        In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005), the New York Court of Appeals held, in part, that: (1) a professional corporation not licensed in accordance with applicable New York State law is not entitled to recover benefits under the New York State No-fault Law and implementing regulations irrespective of the date of service; and (2) an insurer is entitled to recover payments made to such an entity on or after April 4, 2002, the effective date of the amended No-fault regulations.

5.        In carrying out their fraudulent scheme, one or more of the Controllers used the names of one or more of the Paper Owners to fraudulently incorporate and/or own professional service corporations in which they engaged in the unlicensed practice of health care services and held out the Fraudulently Owned PCs to be legitimate professional service corporations that were properly licensed in accordance with applicable New York State and local law when in fact they were not.

6.        Each of the Fraudulently Owned PCs was established as a separate entity doing business under its own individual corporate name but rendered its services at the physical locations of 79-09B Northern Boulevard and/or other locations.

7.        In addition to billing for services purportedly provided by fraudulently incorporated and improperly licensed PCs, in furtherance of the scheme to defraud alleged herein, Defendants also engaged in unlawful referral, kickback and/or illegal fee-splitting schemes with a number of transient health care providers that the Controllers did not own, operate or control, including Defendants HS Diagnostic Chiro, Gentle Care Acupuncture, Morley Medical, Sage Medical and Spike Medical (collectively referred to as the "Ancillary Providers"), and their respective record

owners, Defendants Shirazi, Kiner, Morley, Yellin and Pike (collectively referred to as the "Licensed Healthcare Professionals").

8.      In exchange for the kickbacks paid by the Licensed Healthcare Professionals and/or others unknown to Plaintiffs, the Controllers and/or others unknown to Plaintiffs, directly and indirectly referred, or caused to be referred, for chiropractic services, physical therapy, acupuncture and diagnostic testing (collectively referred to herein as "Fraudulent Services"), Covered Persons who were purportedly receiving treatment at PR Medical, as part of a medical protocol that the Controllers determined, without regard to medical necessity.

9.      This action seeks to prevent the Defendants from continuing to illegally seek reimbursement of benefits under New York State's No-fault system through fraudulently incorporated professional corporations and/or pursuant to unlawful referral, fraudulent billing and illegal fee-splitting schemes that are prohibited by New York's B.C.L. and Education Law.

10.      In violation of Article 15 of the B.C.L. and the stringent eligibility and reimbursement requirements mandated under the No-fault Law and implementing regulations, one or more of the Controllers are and have been the illegal owners of one or more of the Fraudulently Owned PCs, which are purportedly professional corporations, owned on paper by the Paper Owners.

11.      In violation of Article 15 of the B.C.L., one or more of the Controllers purchased or otherwise were permitted to use the name and license of the Paper Owners to fraudulently incorporate, own, control and/or operate the Fraudulently Owned PCs, professional corporations that were used to bill insurance companies, in general, and Plaintiffs in particular.

12.      At all relevant times mentioned herein, one or more of the Controllers were the true beneficial owners of one or more of the Fraudulently Owned PCs, which they owned, controlled and operated.

13.     At all relevant times mentioned herein, the Fraudulently Owned PCs submitted and/or continue to submit bills for payment, and/or have sought and/or continue to seek collection on such bills from No-fault insurers in general, and Plaintiffs in particular, for healthcare services.

14.     At all relevant times mentioned herein, although the Paper Owners were listed as the sole shareholders, officers, and directors of their respective Fraudulently Owned PCs on the certificates of incorporation filed with the Department of State pursuant to and in purported compliance with Section 1503 of the B.C.L., in fact the Paper Owners were nominal owners, who abdicated and/or ceded any and all of their ownership interests therein and control to one or more of the Controllers who are not licensed to practice medicine or own medical professional corporations in the State of New York.

15.     In violation of Article 15 of the B.C.L., the Controllers purchased or otherwise were permitted to use the name and license of Defendant Delaleu to fraudulently incorporate, own, control and/or operate SD Medical, a professional corporation that was used to bill insurance companies, in general, and Plaintiffs in particular.

16.     In violation of Article 15 of the B.C.L., the Controllers also purchased or otherwise were permitted to use the name and license of Defendant Qureshi to fraudulently incorporate, own, control and/or operate PR Medical, a professional corporation, incorporated as a successor to SD Medical, that was used to bill insurance companies, in general, and Plaintiffs in particular.

17.     Although new corporate papers were filed on behalf of PR Medical, it was established as a successor to SD Medical to carry on the scheme to defraud alleged herein through a new illegal corporate structure as evident by the fact that virtually every aspect of PR Medical's operations was identical to SD Medical, from the "office managers" to office personnel to billing procedures to office phone numbers to medical and office equipment used.  By way of example

and not limitation that PR Medical was incorporated as a successor to SD Medical, other than the change in the professional corporation's name, PR Medical:

- Continued to operate out of 79-09B Northern Boulevard;
- Continued to use the phone number previously associated with SD Medical;
- Maintained the same professional and non-professional employees;
- Continued to use the same medical equipment and office furniture; and
- Continued to bill for the same services.

18.     Although PR Medical was incorporated on May 22, 2009, it was not until the Controllers gradually phased out SD Medical and stopped billing insurance companies, in general, and Plaintiffs, in particular, for services purportedly performed by SD Medical in or about June of 2009, that PR Medical first began to submit bills to insurance companies in general, and Plaintiffs, in particular. By way of example and not limitation, SD Medical submitted bills to Plaintiffs for reimbursement from approximately December 1, 2003 through June 19, 2009.  Within days after SD Medical had ceased billing Plaintiffs, PR Medical began to submit bills to Plaintiffs.

19.     Under the fraudulent scheme described herein, the Fraudulently Owned PCs billed for professional services provided to persons who allegedly sustained injuries covered under the No-fault Law (hereinafter referred to as "Covered Persons") in violation of Article 15 of the B.C.L., which governs the corporate practice of medicine in New York State and requires any corporation that provides medical services to do so as a professional corporation, owned and controlled exclusively by licensed physicians.  The practice of medicine by one who is not a physician, as well as the sale of a medical license by a physician, are felonies pursuant to New York Education Law § 6512.

20.     In violation of Article 15 of the B.C.L., pursuant to the fraudulent scheme described herein, the Paper Owners abdicated and were divested of any and all attributes of true ownership

6

and control, which were then diverted by the Controllers to themselves and/or management companies including but not limited to non-party Nortmed Management, Inc. ("Nortmed"), in which the Controllers, and/or others unknown to Plaintiffs, also maintained a similar ownership and financial interest.

21.     The Controllers and/or Nortmed submitted claims through one or more of the Fraudulently Owned PCs for healthcare services purportedly rendered to Covered Persons.  Under the No-fault law, policyholders and others who sustain injuries in automobile accidents can obtain payments from the policyholders' automobile insurance companies for necessary medical care, including treatments, tests and medical equipment ordered by the Covered Persons' physicians.

22.     Under the No-fault Law, Covered Persons can only assign those benefits directly to doctors and other licensed healthcare providers, enabling them to bill insurance companies directly for their services.  Defendants exploited the No-fault system by obtaining such assignments, and billing insurers for healthcare services rendered by the Fraudulently Owned PCs in violation of the No-fault Law.

23.     On information and belief, at all relevant times mentioned herein, the cash or other proceeds of Defendants' schemes was either funneled directly to the Controllers or to Nortmed and one or more of the ABC Corporations, through which such proceeds were then funneled to the Controllers.

24.     At all relevant times mentioned herein, Shapson and Nisnevich co-owned and controlled Nortmed, which operated out of 79-09B Northern Boulevard, the address it shared with the Fraudulently Owned PCs.

25.     At all relevant times mentioned herein, Nortmed entered into one or more agreements with SD Medical to ostensibly provide management and administrative services, office space, and medical and office equipment and/or other supplies.  In fact, these purported agreements

were used to funnel hundreds of thousands of dollars in fraudulently obtained insurance payments to the Controllers through Nortmed.

26.     Upon PR Medical's incorporation, the Controllers installed themselves as purported employees of PR Medical to ostensibly provide management, administrative and bookkeeping services to PR Medical.

27.     In furtherance of the fraudulent scheme, the Controllers' purported employee arrangement was used to conceal their illegal ownership interest in, and control and operation of, PR Medical, the successor fraudulently incorporated professional corporation to SD Medical, through which hundreds of thousands of dollars in fraudulently obtained insurance payments were funneled to the Controllers.

28.     The sham employee relationship between the Controllers and PR Medical was intended to create the misimpression that the Controllers had entered into a legitimate employment arrangement with PR Medical when, in fact, they had not.  Instead, the arrangement serving two distinct, illicit purposes. First, through the arrangement with PR Medical, the Controllers were permitted to illegally maintain a financial interest with Qureshi (to the extent he had any interest at all) in PR Medical, and control and operate PR Medical in violation of New York State law. Second, in exchange for being illegal co-owners with Qureshi in PR Medical, Qureshi provided the essential means and facilitated the Controllers' ability to illegally own, control and operate the Ancillary Providers that were billing for services at the 79-09B Northern Boulevard location, and with which Qureshi has no financial or ownership interest.  At all relevant times mentioned herein, PR Medical was used to provide referrals to the Ancillary Providers for medically unnecessary services and treatments, pursuant to a predetermined protocol.

29.     At all relevant times mentioned herein, the Controllers have presided over a scheme intended to circumvent, and in fact, violate Article 15 of the B.C.L. and its proscription against the corporate practice of medicine, as well as Article 65 of the Education Law.

30.     By using the names and licenses of the Paper Owners to fraudulently incorporate, own, operate and control the Fraudulently Owned PCs, the Controllers held out the Fraudulently Owned PCs to be legitimate professional corporations in compliance with core licensing requirements when in fact they were not.  In doing so, the Controllers perpetrated a fraud upon the public and the Plaintiffs, among others.

31.     By allowing their names and licenses to be used to fraudulently incorporate and/or vest in one or more of the Controllers ownership, control and operation of the Fraudulently Owned PCs, the Paper Owners held out their respective Fraudulently Owned PCs to be legitimate professional corporations in compliance with core licensing requirements when in fact they were not.  In doing so, the Paper Owners perpetrated a fraud upon the public and the Plaintiffs, among others.

32.     In contravention of the strong public policy concerns of the New York State Legislature in regulating the licensing of, and limiting the practice of medicine to, qualified professionals, the Controllers have circumvented the laws of the State and imperiled the welfare of the public by engaging in the wholesale purchase and misuse of the Paper Owners' professional licenses.

33.     On information and belief, the Fraudulently Owned PCs were created for the singular purpose of fraudulently billing insurance companies under the No-fault Law and funneling the illicit profits gained therefrom to one or more of the Controllers through substantial, regular payments made by the Fraudulently Owned PCs, to among others, Nortmed and/or the

ABC Corporations, which were owned and operated by one or more of the Controllers and/or others unknown to Plaintiffs.

34.     By submitting fraudulent claims for medical services through the Fraudulently Owned PCs, each of which were owned and operated in violation of Article 15 of the B.C.L., Article 65 of the Education Law and the implementing regulations promulgated by the New York State Department of Financial Services, repeatedly violated the laws established by the State of New York to protect the public from the unlicensed practice of medicine for the purpose of converting money, in disregard of its impact on the premium-paying public.

35.     Separate and apart from their fraudulent corporate structure rendering the Fraudulently Owned PCs ineligible for reimbursement under the No-fault Laws, in furtherance of their scheme to defraud, the Controllers forged relationships with one or more transient and/or nomadic healthcare providers that they did not own, operate or control, including the Ancillary Providers, to which, in exchange for a kickback and/or other financial compensation, Defendants Shapson and Nisnevich ensured that the doctor(s) associated with PR Medical referred their patient population for Fraudulent Services, pursuant to a predetermined course of treatment, irrespective of medical necessity.

36.     Pursuant to New York's Education Law, the payment by a healthcare practitioner or professional corporation to another party for the referral of a patient is prohibited.

37.     The Ancillary Providers, and/or their respective Licensed Healthcare Professionals and/or others unknown to Plaintiffs acting at their direction and/or under their control, paid kickbacks disguised as "rent" and/or other payments to PR Medical in order to receive referrals from PR Medical and be able to "treat" patients at 79-09B Northern Boulevard, where the Fraudulently Owned PCs maintained their operations.

38.     In exchange for the kickbacks paid by the Ancillary Providers, and/or their respective Licensed Healthcare Professionals, the Controllers, and/or others unknown to Plaintiffs, directly and indirectly, referred or caused Covered Persons purportedly receiving treatment at PR Medical to be referred for Fraudulent Services as part of a medical protocol that the Controllers determined, without regard to medical necessity.

39.     Once the referral was made by PR Medical, the Licensed Healthcare Professionals, through their respective Ancillary Providers, billed insurance companies, in general, and Plaintiffs, in particular, for Fraudulent Services purportedly rendered to the Covered Persons based on the referral by PR Medical.

40.     At all relevant times mentioned herein, the Licensed Healthcare Professionals knew that the referrals for Fraudulent Services were made pursuant a medical protocol, irrespective of medical necessity, that resulted from the financial arrangement or kickback scheme they negotiated with the Controllers, and/or others unknown to Plaintiffs.

41.     Because the Covered Persons purportedly treated by the Ancillary Providers were referred for Fraudulent Services as a result of unlawful referral, kickback and/or illegal fee-splitting schemes in furtherance of Defendants' scheme to defraud, any bills submitted to Plaintiffs for such services were fraudulent and, as such, never eligible for reimbursement.

42.     Separate and apart from his participation in the unlawful referral, kickback and illegal fee-splitting schemes alleged herein, Defendant Pike also allowed his name and license to be used to pursue fraudulent claims on behalf of Spike Medical, a transient medical practice which was unlawfully formed and operated by one or more individuals who are presently unknown to Plaintiffs (hereinafter referred to as the "John Doe Controllers"), and which performed services at various medical clinics throughout the New York Metropolitan area, including at 79-09B Northern Boulevard.  In that regard, the John Doe Controllers presided over a separate and related enterprise

that systematically stole tens of thousands of dollars from automobile insurance companies, including Allstate, through New York State's No-fault system via the submission of fraudulent claims for medical services submitted by Spike Medical.

43.     At all relevant time mentioned herein, one or more of the John Doe Controllers, laypersons, not licensed and/or authorized to operate and/or own a medical professional corporation in the State of New York, were the true beneficial owners of Spike Medical.  With the assistance, participation and agreement of Defendant Pike, the John Doe Controllers purchased or otherwise were permitted to use Pike's name and license to fraudulently incorporate, and illegally own, control and/or operate Spike Medical, an improperly licensed professional corporation that was used to fraudulently bill insurance companies in general and Allstate, in particular.

44.     In violation of Article 15 of New York's B.C.L. and the stringent eligibility and reimbursement requirements mandated under the New York State No-fault Law and implementing regulations, at all times relevant herein, one or more of the John Doe Controllers have been the illegal owners of Spike Medical, which is purportedly a professional corporation, owned on paper by Defendant Pike.

45.     At all relevant times mentioned herein, although pursuant to, and in purported compliance with, Section 1503 of the B.C.L., Defendant Pike has been listed as the sole shareholder, officer and director of Spike Medical on corporate documentation filed with the Departments of State and/or Education, when he was, in fact, a nominal, paper owner, who, upon obtaining his interest in Spike Medical, abdicated any true ownership interest therein and control to the one of more of the John Doe Controllers, who are not physicians.

46.     Defendant Pike violated the laws established by the State of New York to protect the public from the unlicensed practice of medicine for the purpose of converting money, in disregard of its impact on the premium-paying public.

47.     By allowing his name and license to be used to fraudulently vest ownership, control and operation of Spike Medical to the John Doe Controllers, Defendant Pike held out Spike Medical to be legitimate professional corporation in compliance with core licensing requirements when, in fact, it was not.  In doing so, Defendant Pike, together with the John Doe Controllers, perpetrated a fraud upon the public and Allstate, among others.

48.     At all relevant times mentioned herein, Defendant Pike entered into and/or arranged for the John Doe Controllers to enter into fake agreements with one or more of the Defendant John Does and/or ABC Corporations to ostensibly provide management, marketing, billing and/or other services.   In fact, these purported agreements were used to funnel thousands of dollars in fraudulently obtained insurance payments to the John Doe Controllers.

49.     Spike Medical has already been found to be fraudulently incorporated, in violation of Article 15 of the B.C.L. and Article 65 of the Education Law, in at least 13 arbitrations before the American Arbitration Association ("AAA"). *See* AAA Decisions 17-14-9049-0917 – Spike v. State Farm (12/4/2014) (Heidi Obiajulu); 17-14-9049-6038 – Spike v. State Farm Fire and Cas. Co. (2/18/2015) (Lisa Capruso); 17-15-1006-1066 – Spike v. USAA Insurance Co. (9/7/2015) (Susan Mandiberg); 17-15-1006-0579 – Spike v. USAA Insurance Co. (10/14/2015) (Eylan Schulman); 17-14-1006-1391 – Spike v. USAA Insurance Co. (10/14/2015) (Eylan Schulman); 17-15-1006-1339 – Spike v. USAA Cas. Ins. Co. (11/18/2015) (Ann Lorraine Russo); 17-15-1006-0819 – Spike v. Allstate Ins. Co. (3/30/2016) (Howard Jacob); 17-15-1016-3277 – Spike v. Allstate Ins. Co. (9/20/2016) (Howard Jacob); 17-16-1036-4200 – Spike v. USAA General Indemnity Co. (7/6/2017) (Shawn Kelleher); 17-15-1-16-2818 – Spike v. Allstate (8/7/2017) (Charles Blattberg); 17-15-1016-3177 – Spike v. Allstate Ins. Co. (9/5/2017) (Charles Blattberg); 17-15-1016-2917 – Spike v. Allstate Ins. Co. (9/5/2017) (Charles Blattberg); 17-15-1006-1399 – Spike v. Allstate Fire & Cas. Ins. Co. (9/5/2017) (Charles Blattberg), *See infra* Exhibit "11".

50.     In particular, several arbitrators determined that Spike Medical was fraudulently incorporated because Defendant Pike testified that he was not involved in any activities constituting the practice of medicine at Spike Medical, did not supervise the individuals performing those services, and only occasionally reviewed medical reports from Spike Medical. *See, e.g.*, 17-15-1-16-2818 – Spike v. Allstate (8/7/2017) (Charles Blattberg); 17-15-1016-3177 – Spike v. Allstate Ins. Co. (9/5/2017) (Charles Blattberg); 17-15-1016-2917 – Spike v. Allstate Ins. Co. (9/5/2017) (Charles Blattberg); 17-15-1006-1399 – Spike v. Allstate Fire & Cas. Ins. Co. (9/5/2017) (Charles Blattberg).

51.     Likewise, in *Progressive Cas. Ins. Co., et al. v. 1220 East New York Realty Co., LLC, et al.*, No. 603445/2019 (Nassau Cnty. Sup. Ct.), the insurer credibly alleged, among other things, that Spike Medical was owned and controlled by laypersons, not licensed to practice any healthcare profession in the State of New York, through their shell companies. In *Liberty Mutual Ins. Co., et al. v. Spike Medical, P.C., et al.*, No. 53549-2014 (Westchester Cnty. Sup. Ct.), in addition to alleging that Spike Medical was fraudulently incorporated, the insurer credibly alleged, among other things, that Spike Medical operated as a "transient provider out of multiple questionable medical clinics."  Additionally, in *Country-Wide Ins. Co. v. Spike Medical P.C.*, 159790/2014 (N.Y. Cnty. Sup. Ct.), the insurer credibly alleged, among other things, that Spike Medical was paying money, under the guise of rent, to other medical facilities in exchange for patient referrals in direct violation of the Education Law.

52.     At all relevant times mentioned herein, the John Doe Controllers presided over a scheme intended to circumvent, and in fact, violate Article 15 of the B.C.L. and its proscription against the corporate practice of medicine, as well as Article 65 of the Education Law.

53.     In contravention of the strong public policy concerns of the New York State Legislature in regulating the licensing of, and limiting the practice of medicine to, qualified

professionals, the John Doe Controllers circumvented the laws of the State and imperiled the welfare of the public by engaging in the wholesale purchase and misuse of Defendant Pike's medical license.

54.     By submitting fraudulent claims for medical services through Spike Medical, an entity formed and operated in violation of Article 15 of the B.C.L., Article 65 of the Education Law and the implementing regulations promulgated by the New York State Department of Financial Services, the Controllers violated the laws established by the State of New York to protect the public from the unlicensed practice of medicine, for the purpose of converting money, in disregard of its impact on the premium-paying public.

55.     Such claims continue to be submitted by and/or in the name of Spike Medical, and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Allstate.

56.     Separate and apart from their illegal corporate structure, the Defendants, who were transient providers not tied to a specific clinic location, participated in massive billing fraud operations at the clinics located at 79-09B Northern Boulevard, as well as at other locations throughout the New York Metropolitan area, routinely submitting bills to insurers, in general, and Allstate in particular, for services that were never rendered, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary.

57.     In furtherance of their scheme to defraud, Defendants concocted and/or participated in a sophisticated fraudulent billing and medical documentation scheme that created the impression that Covered Persons had serious injuries and medical conditions that required, among other things, the Fraudulent Services, when in fact no such injuries and/or conditions existed.

58.     At all relevant times mentioned herein, one or more of the Controllers, directed and/or steered Covered Persons to one or more of the Fraudulently Owned PCs as part of an illegal referral arrangement without regard to medical necessity.

59.     Covered Persons' initial consultations and follow-up visits at the Fraudulently Owned PCs and/or other medical clinics not named as defendants herein, created and maintained the illusion of serious injuries, a misrepresented fact that was used to justify further consultations, testing, treatment, and referrals to other related providers operating out of the same location as the Fraudulently Owned PCs and/or other medical clinics at which the Ancillary Providers purportedly provided services. By the conclusion of their treatment, many Covered Persons would receive virtually identical examinations and unwarranted referrals for, among other things, chiropractic services, physical therapy, acupuncture and diagnostic testing.

60.     In furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure, and protocol, one or more of the Defendants also billed Plaintiffs for unnecessary diagnostic tests, including digital range of motion tests ("ROM Tests"), computerized muscle strength tests ("Muscle Tests"), nerve conduction velocity tests ("NCVs"), electromyography tests ("EMGs"), pain fiber nerve conduction studies ("pf-NCS") and outcome assessment testing (collectively "Diagnostic Testing").

61.     By submitting fictitious bills and reports for Diagnostic Testing, Defendants misrepresented the actual medical status of the Covered Persons and the services purportedly rendered, which were not provided as billed, if provided at all.

62.     Once the Controllers and/or other individuals not named as defendants herein, directed and/or steered Covered Persons to the Fraudulently Owned PCs and Ancillary Providers, Defendants billed No-fault insurers, in general, and Plaintiffs, in particular, for medical services,

including but not limited to chiropractic services, physical therapy, acupuncture and diagnostic testing, purportedly rendered to the Covered Persons.

63. At all relevant times mentioned herein, the Defendants knew or should have known that the Covered Persons who were directed and/or steered to the Fraudulently Owned PCs and/or Ancillary Providers would be used to obtain payment from insurers in general, and Plaintiffs in particular, in connection with fraudulent claims.

64. At all relevant times mentioned herein, the Defendant Paper Owners and/or Licensed Healthcare Professionals knew that the Covered Persons were directed for treatment and/or testing pursuant to a predetermined medical protocol, irrespective of medical necessity, that resulted from the financial arrangement or referral scheme they negotiated with one or more of the Controllers and/or others not named as defendants herein.

65. Because the Covered Persons purportedly treated by the Fraudulently Owned PCs and/or the Ancillary Providers had been directed and/or steered for services as a result of an unlawful referral scheme for treatment and/or testing pursuant to a predetermined medical protocol, irrespective of medical necessity, any bills submitted to Plaintiffs for such services were fraudulent and, as such, never eligible for reimbursement.

66. The No-fault Law is a statutory creation, in derogation of the common law, and must be strictly construed. This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and the implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to properly licensed professional corporations. In doing so, Plaintiffs seek compensatory damages and declaratory judgments that Plaintiffs are not required to pay any No-fault claims from the Fraudulently Owned PCs or the Ancillary Providers (the Fraudulently Owned PCs and Ancillary Providers are collectively referred to as the "PC Defendants") that seek reimbursement for any medical services that are: (1) due to the

Fraudulently Owned PCs' fraudulent incorporation and/or control/ownership by a layperson, and/or (2) the result from an unlawful kickback scheme.

67.     Such claims continue to be submitted by and/or in the name of the Fraudulently Owned PCs and are or can be the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus constitute a continuing harm to Plaintiffs.

68.     By way of example and not limitation, annexed hereto as Exhibit "1" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs to the Fraudulently Owned PCs, to which they are not entitled because of their fraudulent corporate structure; and annexed hereto as Exhibit "2" in the accompanying Compendium of Exhibits is a representative sample of claims submitted by the Fraudulently Owned PCs that form the basis of Plaintiffs' request for declaratory relief.  By way of further example but not limitation, annexed hereto as Exhibit "3" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs to Spike Medical, to which it is not entitled because of its fraudulent corporate structure; and annexed hereto as Exhibit "4" in the accompanying Compendium of Exhibits is a representative sample of claims submitted by Spike Medical that form the basis of Plaintiffs' request for declaratory relief. By way of further example but not limitation, annexed hereto as Exhibit "5" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs to the Ancillary Providers submitted pursuant to an illegal referral, unlawful kickback and/or illegal fee-splitting scheme; and annexed hereto as Exhibit "6" in the accompanying Compendium of Exhibits is a representative sample of such claims submitted by the Ancillary Providers that form the basis of Plaintiffs' request for declaratory relief.  Finally, by way of further example but not limitation, annexed hereto as Exhibit "7" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs to the Defendants submitted for services provided pursuant to a protocol of treatment, never rendered, not of any

diagnostic or treatment value and/or reflecting a pattern of billing for services that were medically unnecessary; and annexed hereto as Exhibit "8" in the accompanying Compendium of Exhibits is a representative sample of such claims submitted by the Defendants, that form the basis of Plaintiffs' request for declaratory relief.

69.     The practices alleged herein were conducted willfully, with the sole objective of converting money, in utter disregard of their impact on the premium-paying public and in flagrant disregard of the rules and laws governing provision of services under the No-fault Law.

70.     The duration, scope and nature of all Defendants' illegal conduct brings this case well within the realm of criminal conduct to which the Racketeering Influenced and Corrupt Organization Act ("RICO") applies.  Defendants did not engage in sporadic acts of fraud -- although that would be troubling enough -- they adopted a fraudulent blueprint as their business plan and used it to participate in a systematic pattern of racketeering activity.  Every facet of Defendants' operations, from generating fraudulent supporting medical documents to record keeping, to billing, was carried out for the purpose of committing fraud.

## **NATURE OF THE ACTION**

71.     This action is brought pursuant to:

> i)      The United States Racketeer Influenced and Corrupt Organizations
>         Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);
>
> ii)     New York State common law; and
>
> iii)    Federal Declaratory Judgment Act.

## **NATURE OF RELIEF SOUGHT**

72.     Plaintiffs seek treble damages that they sustained as a result of the Defendants' schemes and artifices to defraud, and acts of mail fraud (pursuant to 18 U.S.C. § 1341) in connection with their use of the facilities of the No-fault system and its assignment of benefits

mechanism to fraudulently obtain payments from Plaintiffs for medical services they allegedly rendered to individuals covered by Plaintiffs under New York State's No-fault Law.

73. Plaintiffs seek compensatory damages to recover all payments made to the Fraudulently Owned PCs since their dates of incorporation and punitive damages that they sustained as a result of Defendants fraudulently obtaining payments from Plaintiffs for purported medical services rendered by fraudulently incorporated professional corporations to individuals covered by Plaintiffs under New York State's No-fault Law.

74. Plaintiffs also seek compensatory damages to recover all payments made to the Ancillary Providers because they fraudulently obtained payments from Plaintiffs for purported medical services rendered pursuant to unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes.

75. Plaintiffs further seek recovery of the No-fault claim payments made under the independent theory of unjust enrichment.

76. Plaintiffs also seek a Judgment declaring:

   a. That Plaintiffs are under no obligation to pay any of the Fraudulently Owned PCs' No-fault claims due to their fraudulent corporate structure;

   b. That the Fraudulently Owned PCs never had, and do not now have, standing to prosecute any claim for first-party No-fault benefits as an assignee of Covered Persons in any arbitration proceeding or lawsuit commenced in state or federal court due to their fraudulent corporate structure; and

   c. That Plaintiffs are under no obligation to pay any of the Ancillary Providers' No-fault claims because the billed for services were performed as a result of unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes and/or were medically unnecessary and performed pursuant to a predetermined protocol.

77. As a result of Defendants' actions alleged below, Plaintiffs were defrauded of an amount in excess of $1,600,000.00, the exact amount to be determined at trial, in payments which

Defendants received for billing Plaintiffs for purported medical services provided by fraudulently

incorporated professional corporations and/or as a result of an unlawful kickback scheme.

## THE PARTIES

A.    **Plaintiffs**

78.    Plaintiff Allstate Insurance Company is a corporation duly organized and existing

under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

79.    Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly

organized and existing under the laws of the State of Illinois, having its principal place of business

in Northbrook, Illinois.

80.    Plaintiff Allstate Indemnity Company is a corporation duly organized and existing

under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

81.    Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly

organized and existing under the laws of the State of Illinois, having its principal place of business

in Northbrook, Illinois.

82.    Plaintiffs are duly organized and licensed to engage in the writing of automobile

insurance policies in the State of New York and provide automobile insurance coverage to their

policyholders under and in accordance with New York State law.

B.    **The Controllers**

83.    Defendant Isaac Shapson is a natural person residing in the State of New York who

co-owned, controlled and operated, and is an undisclosed principal and owner of, the Fraudulently

Owned PCs.

84.    At all times mentioned herein, Shapson was one of the masterminds of the

Defendants' elaborate scheme to defraud Plaintiffs, entered into agreements on behalf of PR

Medical to engage in unlawful referral, kickback and illegal fee-splitting schemes and ensure that

the profits from PR Medical were funneled to him, solicited the Paper Owners to form the Fraudulently Owned PCs in violation of the B.C.L., and operated, controlled and was one of the true beneficial owners of the Fraudulently Owned PCs.

85.     At all relevant times herein, Shapson co-owned, operated and controlled Nortmed.

86.     Shapson is also one of the true Controllers and owners of the Fraudulently Owned PCs and/or maintains a controlling financial interest therein.

87.     Defendant Yuri Nisnevich a/k/a Yury Nisnevich is a natural person residing in the State of New York who co-owned, controlled and operated, and is an undisclosed principal and owner of, the Fraudulently Owned PCs.

88.     At all times mentioned herein, Nisnevich was one of the masterminds of the Defendants' elaborate scheme to defraud Plaintiffs, entered into agreements on behalf of PR Medical to engage in unlawful referral, kickback and illegal fee-splitting schemes and ensure that the profits from PR Medical were funneled to him, solicited the Paper Owners to form the Fraudulently Owned PCs in violation of the B.C.L., and operated, controlled and was one of the true beneficial owners of the Fraudulently Owned PCs.

89.     At all relevant times herein, Nisnevich co-owned, operated and controlled Nortmed.

90.     Nisnevich is also one of the true Controllers and owners of the Fraudulently Owned PCs and/or maintains a controlling financial interest therein.

**C.      The Paper Owners**

91.     Defendant Serge Delaleu, M.D. is a natural person residing in the State of New York and has practiced medicine in the State of New York under license number 123061, issued by the New York State Education Department on or about March 7, 1975.  On or about September 16, 2009, Defendant Delaleu permanently surrendered his New York medical license. Defendant

Delaleu is listed with the Departments of State and Education as the sole owner of SD Medical, and is the owner on paper of that professional corporation.

92.     To facilitate the fraudulent incorporation and/or illegal corporate structure of SD Medical, Defendant Delaleu sold his name and/or the use of his license for a fee and/or other compensation to the Controllers and provided the essential means for the Controllers to fraudulently incorporate and/or operate SD Medical and/or bill for purported medical services through SD Medical in violation of applicable New York State law.

93.     Defendant Pervaiz Iqbal Qureshi, M.D. is a natural person residing in the State of New York and has practiced medicine in the State of New York under license number 196325, issued by the New York State Education Department on or about July 1, 1994.  Defendant Qureshi is listed with the Departments of State and Education as the sole owner of PR Medical, and is the owner on paper of that professional corporation.

94.     To facilitate the fraudulent incorporation and/or illegal corporate structure of PR Medical, as well as unlawful referral, fraudulent billing, and/or illegal fee-splitting schemes, Defendant Qureshi sold his name and/or the use of his license for a fee and/or other compensation to the Controllers and provided the essential means for the Controllers to fraudulently incorporate and/or operate PR Medical and/or bill for purported medical services through PR Medical in violation of applicable New York State law.

**D.**     **The Licensed Healthcare Professionals**

95.     Defendant Helen Shirazi, D.C. is a natural person residing in the State of New York and has practiced chiropractic medicine in the State of New York under license number 009552, issued by the New York State Education Department on or about December 3, 1999.  Defendant Shirazi is listed with the Departments of State and Education as the sole owner of HS Diagnostic Chiro, and is the owner on paper of that professional corporation.

96.     At all relevant times mentioned herein, Defendant Shirazi knowingly participated in the scheme to defraud, including, but not limited to, paying kickbacks, billing for services that were not medically necessary and employing the Defendants' office personnel to prepare bills submitted to Plaintiffs for services that were the result of unlawful referral, kickback and illegal fee-splitting schemes.

97.     Defendant Arkady Kiner, L.Ac. is a natural person residing in the State of New Jersey and has practiced acupuncture medicine in the State of New York under license number 001320, issued by the New York State Education Department on or about October 26, 1999. Defendant Kiner is listed with the Departments of State and Education as the sole owner of Gentle Care Acupuncture, and is the owner on paper of that professional corporation.

98.     At all relevant times mentioned herein, Defendant Kiner knowingly participated in the scheme to defraud, including, but not limited to, paying kickbacks, billing for services that were not medically necessary and employing the Defendants' office personnel to prepare bills submitted to Plaintiffs for services that were the result of unlawful referral, kickback and illegal fee-splitting schemes.

99.     Defendant Timothy Morley, M.D. is a natural person residing in the State of Connecticut and has practiced medicine in the State of New York under license number 263342, issued by the New York State Education Department on or about October 20, 2011.  Defendant Morley is listed with the Departments of State and Education as the sole owner of Morley Medical, and is the owner on paper of that professional corporation.

100.     On or about September 8, 2017, the New York State Board for Professional Misconduct (the "New York State Board") suspended Defendant Morley's license to practice medicine in New York.  Specifically, the New York State Board found that Defendant Morley committed professional misconduct by failing to comply with several precautions and practices

regarding hygiene, and medication preservation, handling and administration, which results in at least four patients contracting the Hepatitis C virus (HCV).  In addition, after the suspension was lifted on October 27, 2021, Defendant Morley was immediately placed on 36-months' probation and was only permitted practice medicine under the supervision of another appropriately board-certified physician (in addition to other probationary terms) during that time.  Defendant Morley was also placed on probation by the State Medical Board of Ohio (the "Ohio State Board").  A copy of the New York State Board's Orders as to Defendant Morley are annexed hereto collectively as Exhibit "9". A copy of the Ohio State Board's Order as to Defendant Morley is annexed hereto as Exhibit "10".

101.    At all relevant times mentioned herein, Defendant Morley knowingly participated in the scheme to defraud, including, but not limited to, paying kickbacks, billing for services that were not medically necessary and employing the Defendants' office personnel to prepare bills submitted to Plaintiffs for services that were the result of unlawful referral, kickback and illegal fee-splitting schemes.

102.    Defendant Joseph C. Yellin, D.O. is a natural person residing in the State of New Jersey and has practiced medicine in the State of New York under license number 140551, issued by the New York State Education Department on or about October 26, 1979.  Defendant Yellin is listed with the Departments of State and Education as the sole owner of Sage Medical, and is the owner on paper of that professional corporation.

103.    At all relevant times mentioned herein, Defendant Yellin knowingly participated in the scheme to defraud, including, but not limited to, paying kickbacks, billing for services that were not medically necessary and employing the Defendants' office personnel to prepare bills submitted to Plaintiffs for services that were the result of unlawful referral, kickback and illegal fee-splitting schemes.

104.    Defendant Sheldon Pike, M.D. is a natural person residing in the State of New York and has practiced medicine in the State of New York under license number 168657, issued by the New York State Education Department on or about November 17, 1986.  Defendant Pike is listed with the Departments of State and Education as the sole owner of Spike, and is the owner on paper of that professional corporation.

105.    At all relevant times mentioned herein, Defendant Pike knowingly participated in the scheme to defraud, including, but not limited to, paying kickbacks, billing for services that were not medically necessary and employing the Defendants' office personnel to prepare bills submitted to Plaintiffs for services that were the result of unlawful referral, kickback and illegal fee-splitting schemes.

106.    In addition to engaging in the unlawful referral, kickback and illegal fee-splitting schemes alleged herein, to facilitate the fraudulent incorporation and/or illegal corporate structure of Spike Medical, Defendant Pike sold his name and/or the use of his license for a fee and/or other compensation to one or more unlicensed individuals not named as defendants herein, and provided the essential means for those individual(s) to fraudulently incorporate and/or operate Spike Medical and/or bill for purported medical services through Spike Medical in violation of applicable New York State Law.

**E.    The Ancillary Providers**

107.    Defendant HS Diagnostic Chiropractic P.C. was incorporated on or about August 15, 2012, and is a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York.  Defendant Shirazi is listed as the owner of HS Diagnostic Chiropractic P.C. and in exchange for kickbacks paid by Defendant Shirazi, one or more of the Controllers and/or others unknown to Plaintiffs, directly and/or indirectly, referred or caused to be referred for medical services Covered Persons who were purportedly receiving

treatment at HS Diagnostic Chiropractic P.C. as part of an unlawful referral, kickback and/or illegal fee-splitting scheme, without regard to medical necessity.

108.     Defendant Gentle Care Acupuncture, P.C. was incorporated on or about January 8, 2001, and is a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York.  Defendant Kiner is listed as the owner of Gentle Care Acupuncture, P.C. and in exchange for kickbacks paid by Defendant Kiner, one or more of the Controllers and/or others unknown to Plaintiffs, directly and/or indirectly, referred or caused to be referred for medical services Covered Persons who were purportedly receiving treatment at Gentle Care Acupuncture, P.C. as part of an unlawful referral, kickback and/or illegal fee-splitting scheme, without regard to medical necessity.

109.     Defendant Morley Medical Services, P.C. was incorporated on or about September 28, 2016, and is a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York.  Defendant Morley is listed as the owner of Morley Medical Services, P.C. and in exchange for kickbacks paid by Defendant Morley, one or more of the Controllers and/or others unknown to Plaintiffs, directly and/or indirectly, referred or caused to be referred for medical services Covered Persons who were purportedly receiving treatment at Morley Medical Services, P.C. as part of an unlawful referral, kickback and/or illegal fee-splitting scheme, without regard to medical necessity.

110.     Defendant Sage Medical, P.C. was incorporated on or about December 14, 2015, and is a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York.  Defendant Yellin is listed as the owner of Sage Medical, P.C. and in exchange for kickbacks paid by Defendant Yellin, one or more of the Controllers and/or others unknown to Plaintiffs, directly and/or indirectly, referred or caused to be referred for medical services Covered Persons who were purportedly receiving treatment at Sage

Medical, P.C. as part of an unlawful referral, kickback and/or illegal fee-splitting scheme, without regard to medical necessity.

111.    Defendant Spike Medical P.C. was incorporated on or about August 30, 2011, and is purportedly a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York.  Defendant Pike is the nominal owner of Spike Medical P.C., and received a fee and/or other compensation for doing so from one or more unlicensed individuals and/or other entities owned, controlled and operated by them, in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of Spike Medical P.C.

112.    At all relevant times mentioned herein, Pike, in furtherance of the scheme to defraud, ceded control and ownership of Spike Medical P.C. to one or more unlicensed individuals, who are the true beneficial owners of that entity.

113.    In exchange for kickbacks paid by Defendant Pike, one or more of the Controllers and/or others unknown to Plaintiffs, directly and/or indirectly, referred or caused to be referred for medical services Covered Persons who were purportedly receiving treatment at Spike Medical P.C. as part of an unlawful referral, kickback and/or illegal fee-splitting scheme, without regard to medical necessity.

**F.    The Fraudulently Owned PCs**

114.    Defendant SD Medical P.C. was incorporated on or about October 27, 2003 and is a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York.  Defendant Delaleu is the nominal paper owner of SD Medical P.C. and received an agreed upon salary and/or other compensation for doing so from the Controllers and/or Nortmed and/or entities owned, controlled and operated by one or more of the

Controllers, in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of SD Medical P.C.

115.    At all relevant times mentioned herein, the Controllers were the true beneficial owners of SD Medical P.C., in control of the professional corporation.

116.    Defendant P.R. Medical, P.C. was incorporated on or about May 22, 2009, and is a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York.  Defendant Qureshi is the nominal paper owner of P.R. Medical, P.C. and received an agreed upon salary and/or other compensation for doing so from the Controllers and/or Nortmed and/or entities owned, controlled and operated by one or more of the Controllers, in exchange for allowing his name and license to be used on corporate filings made with the New York State Departments of State and Education on behalf of P.R. Medical, P.C.

117.    At all relevant times mentioned herein, the Controllers were the true beneficial owners of P.R. Medical, P.C., in control of the professional corporation.

118.    The Controllers created P.R. Medical, P.C. as a successor corporation to Defendant SD Medical, with Defendant Qureshi listed as its purported owner on the certificate of incorporation filed with the Department of State.

119.    Although P.R. Medical, P.C. was ostensibly incorporated as a new professional corporation, in actuality it was a successor professional corporation to Defendant SD Medical, from which it merely assumed and essentially continued virtually identical operations as a fraudulently incorporated professional corporation.

**G.    The John Doe Defendants**

120.    Defendants John Does 1 through 20 (collectively referred to as "John Does") are individuals who conspired, participated, conducted and assisted in the fraudulent and unlawful

conduct alleged herein.  These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**H.    The ABC Corporations**

121.    Defendant ABC Corporations 1 through 20 are additional companies that are unknown to Plaintiffs, and are owned, controlled and operated by Shapson, Nisnevich, and/or others unknown to Plaintiffs, and which entered into ostensible agreements and other contracts with the Fraudulently Owned PCs and were used to funnel money to one or more of the Controllers. On information and belief, the ABC Corporations also are the alter egos of Shapson, Nisnevich, and/or others unknown to Plaintiffs and conspired and assisted in the fraudulent and unlawful conduct alleged herein.  These corporations will be added as defendants when their names and the extent of their participation become known through discovery.

**JURISDICTION AND VENUE**

122.    The jurisdiction of the Court arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*.; 28 U.S.C. §§ 1331; and principles of pendent jurisdiction.

123.    The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a) and under the Declaratory Judgment Act, 28 U.S.C. § 2201 and § 2202.

124.    Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

125.    Venue lies in this district court under the provisions of 28 U.S.C. § 1391, as the Eastern District of New York is the district where one or more of the defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

126.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

127.     Under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law (popularly known as the "No-fault Law") §§ 5101, *et seq.*, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians ("Covered Persons") that arise from the use or operation of such motor vehicles in the State of New York.

128.     Each of the PC Defendants is ostensibly a healthcare provider that bills for treatments to, among others, individuals covered under the No-fault Law.  In exchange for their services, the PC Defendants accept assignments of benefits from their patients covered under the No-fault Law (the "No-fault claimants" or "claimants") and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

129.     Under the No-fault Law and implementing regulations, a provider of healthcare services is not eligible for reimbursement under Section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

**A.     Control / Ownership of Professional Corporations**

130.     Pursuant to Section 1504(a) of the B.C.L. and regulations promulgated by the New York State Department of Health, professional service corporations may only render professional services through individuals authorized by law to render such professional services.

131.     Section 1504(c) of the B.C.L. requires, among other things, that:

> each report, diagnosis, prognosis, and prescription made or issued
> by a corporation practicing medicine, ... physiotherapy or
> chiropractic shall bear the signature of one or more physicians, ...
> physiotherapists, or chiropractors, respectively, who are in
> responsible charge of such report, diagnosis, prognosis, or
> prescription.

132.    Section 1507 of the B.C.L. prohibits a shareholder of a professional service

corporation from issuing shares, entering into an agreement, granting proxies or transferring

control to individuals who are not authorized by law to practice the profession for which the

professional corporation is authorized to practice. "All shares issued, agreements made or proxies

granted in violation of this section [1507] are void."

133.    Similarly, under section 1508 of the B.C.L., no individual may be a director or

officer of a professional service corporation unless that individual is authorized by law to practice

in the same profession that the corporation is authorized to practice.

134.    Section 1503(b) of the B.C.L. requires that the certificates of incorporation for an

entity seeking to practice as a professional service corporation state the profession to be practiced

by such corporation and the names and resident addresses of all individuals who are to be the

original shareholders, directors and officers of such corporation.

135.    The restrictions contained in Article 15 of the B.C.L. were meant to "ensure that a

professional service corporation renders professional services only through qualified members of

the professions and are *in fact controlled only by qualified members*."  New York Legislative

Annual 1970, p. 129 (emphasis added).  Restrictions in B.C.L. § 1507 in particular were designed

to "insure that a professional service corporation [such as the Fraudulently Owned PCs here] *could

not be* controlled by a layperson". *See* New York State Legislative Annual 1971, p. 130 (emphasis

added).  These are not mere technical requirements, but are part of an important and long-

established regulatory scheme specifically designed by the Legislature to protect patients' health

and safety and to insure the ethical and competent practice of the profession of medicine. *See*

*People v. Cole*, 219 N.Y. 98 (1916) (purpose of licensing provisions governing practice of medicine is to protect the public. Indeed, Section 6512 of the Education Law makes it a Class E felony to "fraudulently sell ... any ... license ... purporting to authorize the practice of a profession." Moreover, the New York State Department of Health has determined that violating these important provisions constitutes "professional misconduct" that can result in the revocation of a physician's medical license. Moreover, the statutory scheme "prohibits a licensed physician from allowing a non-licensed person to form a service corporation, to be a shareholder of a professional service corporation, *or to control a professional service corporation*." *See* 9/5/00 DOH Opinion (emphasis added).

136.    The implementing No-fault regulation promulgated by the Superintendent of Financial Services states, in relevant part, that "a provider of health care services is not eligible for reimbursement under section 5102(a)(l) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York…." 11 NYCRR § 65-3.16(a)(12).

**B.    Kickback Scheme Involving Unlawful Referrals**

137.    Section 6530(18) of New York's Education Law prohibits "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services…" N.Y. Educ. Law § 6530(18), (19); *see also* 8 NYCRR § 29.1(b)(3), (4).

138.    The payment by a healthcare practitioner or professional corporation to another party for the referral of a patient is a practice prohibited by New York State Law.

**C.    Unlawful Fee Splitting with Non-Professionals**

139.    Pursuant to Sections 6509-a, 6530, and 6531 of the Education Law, neither a professional corporation nor its record owner may permit any person to share in fees that are

generated by other than a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

140.    Under Section 6530(19), the prohibition against the sharing of fees also applies to any arrangement or agreement with non-physicians involving the furnishing of space, equipment and/or services to the medical professional corporation.

141.    Section 6530(19) of New York's Education Law prohibits "[p]ermitting any person to share in the fees for professional services, other than: a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee. This prohibition shall include any arrangement or agreement whereby the amount received in payment for furnishing space, facilities, equipment or personnel services used by a licensee constitutes a percentage of, or is otherwise dependent upon, the income or receipts of the licensee from such practice, except as otherwise provided by law with respect to a facility licensed pursuant to article twenty-eight of the public health law or article thirteen of the mental hygiene law."

142.    Under Section 6530 of the Education Law and N.Y. Pub. Health Law § 230-a, fee splitting practices constitute professional misconduct and subjects a physician to serious penalties, including sanctions against a physician's medical license. New York's Business Corporation Law 1503(d) applies the Education Law's professional misconduct provisions to professional services corporations, which may have their certificates of incorporation suspended, revoked or annulled "for cause, in the same manner and to the same extent as is provided with respect to individuals and their licenses, certificates and registrations."

143.    Under 11 NYCRR § 65-3.16(a)(l2), a physician or professional incorporation engaged in fee-splitting is ineligible for reimbursement because such conduct constitutes a violation of a core licensing requirement.

144.    The splitting of professional fees by a physician, chiropractor, acupuncturist, or physical therapist, including any arrangement or agreement in which the amount received as payment for furnishing space, facilities, equipment, or personal services is dependent upon the income or receipts of the licensee from such practice, is a practice prohibited by New York state law.

**D.    Backdrop and the PC Defendants' Submission of Fraudulent Bills**

145.    In purported compliance with the No-fault Law and 11 NYCRR 65, *et seq*., the PC Defendants submitted proof of their claims to Plaintiffs, using the claim form prescribed by the New York State Department of Insurance (known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3").

146.    Pursuant to Section 403 of the New York State Insurance Law, the claim forms (NF-3s) submitted to Plaintiffs by the PC Defendants contained the following warning at the foot of the page:

> "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime."

147.    To process and verify claims submitted by the PC Defendants, Plaintiffs required, and the PC Defendants submitted, to the extent applicable, narrative reports and other medical records relative to the alleged medical care and treatment rendered to Covered Persons, for which the PC Defendants were seeking payment from Plaintiffs.

148.    Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are generally required to process claims for which a professional corporation has standing to submit, within 30 days of receipt of proof of claim.

149.    To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Defendants in support of their claims, and have paid Defendants based on the representations and information that Defendants mailed to Plaintiffs.

150.    Under the scheme to defraud alleged herein, the Controllers used the names and licenses of the Paper Owners to enable the Fraudulently Owned PCs to bill for healthcare services throughout the metropolitan area of New York City.

151.    The Controllers, through their control, ownership and operation of the Fraudulently Owned PCs, became the centerpieces of schemes to fraudulently bill No-fault insurance carriers for services which were rendered by fraudulently owned and operated professional corporations.

152.    The Controllers are laypersons, not licensed to practice any profession in the State of New York, who purchased and/or otherwise were permitted to use the name and license(s) of the Paper Owners to fraudulently incorporate and/or otherwise own, control and operate the Fraudulently Owned PCs in violation of applicable New York State law, including Article 15 of the B.C.L., which prohibits layperson ownership of a professional corporation.  By doing so, the Controllers concealed that they are the "true owners" of the Fraudulently Owned PCs and Defendants Shapson, Nisnevich, Delaleu, Qureshi, SD Medical, and PR Medical, and/or others unknown to Plaintiffs fraudulently represented that the Fraudulently Owned PCs are legitimate professional corporations in compliance with core licensing requirements, when in fact they are not.

153.    The Controllers created and/or used the Fraudulently Owned PCs and medical practice(s) ostensibly owned by Defendants Delaleu or Qureshi to bill No-fault insurance carriers

for healthcare services that were provided by fraudulently incorporated professional corporations and/or professional corporations owned, controlled and operated in violation of New York State Law, and by virtue thereof, were not and are not entitled to reimbursement of No-fault benefits.

154.    In violation of Article 15 of the B.C.L. and Article 65 of the Education Law, Defendants Delaleu and Qureshi, medical doctors, had no control and/or ownership interest in the professional corporations that they purportedly owned, the proceeds of which were diverted from Plaintiffs by and to the Controllers and to Nortmed, in which the Controllers maintained an ownership and financial interest.

155.    At the time that the Fraudulently Owned PCs were incorporated in the State of New York, the Paper Owners were divested and/or ceded all ownership and control of the Fraudulently Owned PCs.

156.    The Fraudulently Owned PCs were owned and operated by the same layperson Controllers, including Defendants Shapson and Nisnevich, and did not adhere to separate and distinct functions or corporate structures that would entitle them to be recognized as legitimate corporate entities.

157.    By selling and/or permitting the use of their name and license, the Paper Owners knowingly provided the essential means by which the Controllers, who were laypersons, were able to own and control that in which they are prohibited by law from maintaining a financial interest in, to wit: a professional corporation that must be owned exclusively by a licensed professional or like professionals acting within the scope of the professional corporation's authorized practice.

158.    Defendants Nisnevich, Shapson, Delaleu, Qureshi, SD Medical and PR Medical knew or should have known that medical records, reports, and bills would be submitted to insurers, in general and Plaintiffs, in particular, on behalf of the Fraudulently Owned PCs: entities that

were not licensed in accordance with applicable New York State Law; were imbued with an illegal corporate structure; and were not eligible to recover No-fault benefits.

159.    In violation of the B.C.L. and Education Law, the Paper Owners maintained no control over how the Fraudulently Owned PCs were operated and managed.

160.    To ensure that ownership and complete control of SD Medical remained with the Controllers, SD Medical's true owners, the Controllers caused the SD Medical to enter into one or more agreements with Nortmed, which Defendants Shapson and Nisnevich also controlled and owned.

161.    On information and belief, the Controllers used Nortmed as the vehicle to control all of SD Medical's operations and to funnel fraudulently obtained insurance payments to themselves.

162.    SD Medical was required to pay management fees, rents and other fees that ensured that Delaleu had no beneficial ownership interest in SD Medical and the proceeds derived therefrom were diverted to Nortmed and the Controllers, SD Medical's true owners.

163.    SD Medical continued to pay tens of thousands of dollars to Nortmed and directly to the Controllers even after SD Medical ceased operations.

164.    On information and belief, between December 2003 and the date of the filing of this Complaint, SD Medical paid over to Nortmed hundreds of thousands of dollars in fees, essentially representing the gross billings that the Fraudulently Owned PCs collected.

165.    On information and belief, the hundreds of thousands of dollars that were diverted from SD Medical to Nortmed were ultimately funneled to the Controllers.

166.    Upon incorporating PR Medical, to conceal their true beneficial ownership over PR Medical and to ensure that control of PR Medical remained with the Controllers, the Controllers installed themselves as employees of PR Medical.

167.    The Controllers used their purported positions as employees of PR Medical to retain their illegal ownership interest in, and control and operation of, PR Medical in exchange for a share of the profits.  The sham employee relationship further enabled the Controllers to continue, establish and/or and expand the true beneficial ownership of, and control over, the Fraudulently Owned PCs at the 79-09B Northern Boulevard location, through which the Controllers funneled hundreds of thousands of dollars in fraudulently obtained insurance payments to themselves.

168.    In accordance with the illegal transfer of ownership and control by the Defendant Doctor, and in contravention of Sections 1503, 1504(a) and (c) and 1508 of the B.C.L., the Controllers exercised control over all aspects of the Fraudulently Owned PCs, from billing, to preparing and creating medical reports; to signing medical records, to hiring all physical therapists, medical doctors, chiropractors, and other employees and support staff to work for the Fraudulently Owned PCs; to collecting on the medical bills submitted to insurance companies, to scheduling the purported services the Paper Owners would provide that were billed to insurance companies, to making personnel decisions, to retaining attorneys to pursue No-fault collections on behalf of the Fraudulently Owned PCs; to retaining other professionals such as accountants, to establishing relationships with the providers to whom the Fraudulently Owned PCs referred their "patients" for health services, to controlling the bank account(s) opened in the name of the Fraudulently Owned PCs; to determining what disbursements would be made from the Fraudulently Owned PCs' accounts and to whom and for how much; to determining what agreements would be entered into on behalf and/or in the name of the Fraudulently Owned PCs; and to controlling and managing all other aspects of the finances of the Fraudulently Owned PCs.

169.    On information and belief, consistent with the fact that the Fraudulently Owned PCs were actually owned by the Controllers, the Controllers were not accountable to the Paper Owners with respect to the finances of the Fraudulently Owned PCs.

170.    On information and belief, the Controllers and/or Nortmed did not provide, nor did the Paper Owners require or ever request, the Fraudulently Owned PCs with daily, weekly, monthly or annual reports as to the Fraudulently Owned PCs' income and disbursements.  In that regard, the interests of the Paper Owners in the Fraudulently Owned PCs were, at best, that of mere employees with no ownership or financial interest tied into the profits of the Fraudulently Owned PCs and the finances of the Fraudulently Owned PCs were irrelevant to them as long as they received their salary and/or any other agreed upon compensation.

171.    Under the scheme to defraud alleged herein, the Controllers used the name and license of the Paper Owners to enable the Fraudulently Owned PCs to bill for healthcare services throughout the metropolitan area of New York City.

172.    The Fraudulently Owned PCs' billing and collection activities were firmly controlled by the Controllers, and others under their direction, supervision and control.  Through the Fraudulently Owned PCs, the Controllers prepared and caused to be mailed insurance claim forms in the Fraudulently Owned PCs' name.  The claim forms prepared by the Controllers and/or Nortmed directed insurers to mail checks to locations that were designated by the Controllers and the proceeds of those claims were either deposited in bank accounts under their control and/or later transferred to accounts under the control of the Controllers or Nortmed.

173.    At all relevant times mentioned herein, the Fraudulently Owned PCs were medical offices in name only.  In fact, the Fraudulently Owned PCs served as the alter ego for the Controllers and/or Nortmed, and did not adhere to a separate and distinct function or corporate structure that would entitle them to be recognized as legitimate corporate entities.  For all practical and legal purposes, the Fraudulently Owned PCs were- created and used for the sole purpose of defrauding insurers into paying No-fault claims to fraudulently incorporated professional corporations and/or professional corporations that were not licensed in accordance with applicable

New York State Law.   For example, although purportedly separate entities, the Fraudulently Owned PCs and Nortmed share the same address and phone number at 79-09B Northern Boulevard.  By way of further example, and not limitation, Nortmed employed one or more of the licensed professionals who purportedly rendered health services on behalf of the Fraudulently Owned PCs, including but not limited to a physical therapist named Michael Mangubat, who is not a party to this action.

174.     The Controllers and Nortmed, through their control, ownership and operation of the Fraudulently Owned PCs became the centerpiece of an elaborate scheme to fraudulently bill No-fault insurance carriers for services, which were rendered by fraudulently incorporated and operated professional corporations engaging in unlawful fee-splitting.

175.     Defendants were part of well-organized illegal enterprises that engaged in systematic and fraudulent practices that distinguished them from legitimate healthcare providers. For instance, the components of each enterprise followed practices that were part of a racketeering scheme dictated by the Controllers:

- Unlike legitimate providers, the Controllers, through the Fraudulently Owned PCs, submitted bills to insurers, in general, and Plaintiffs, in particular, that represented that the Fraudulently Owned PCs were professional corporations owned by medical doctors when, in fact, they were not;

- Unlike legitimate providers, the Controllers, through the Fraudulently Owned PCs, made false and misleading statements and/or provided false information regarding who owned, controlled and operated the Fraudulently Owned PCs;

- Unlike legitimate providers, the Controllers, through SD Medical, made false and misleading statements and/or provided false information intended to mislead Plaintiffs into believing that SD Medical was being operated by Defendant Delaleu, whose name was listed on the certificate of incorporation when, in fact, it was not;

- Unlike legitimate providers, the Controllers, through PR Medical, made false and misleading statements and/or provided false information intended to mislead Plaintiffs into believing that PR Medical was being operated by Defendant Qureshi, whose name was listed on the certificate of incorporation, when, in fact, it was not;

- Unlike legitimate providers, the Controllers, through the Fraudulently Owned PCs, made false and misleading statements and/or provided false information intended to circumvent Article 15 of the B.C.L., which prohibits ownership by individuals not licensed to practice the profession for which a professional corporation was incorporated;

- Unlike legitimate providers, the Controllers, through the Fraudulently Owned PCs, concealed the fact that the Fraudulently Owned PCs were engaged in the illegal corporate practice of medicine in contravention of New York State law, and that they were billing for physician services through fraudulently incorporated professional corporations;

- Unlike legitimate medical practices, Defendants accepted kickbacks in exchange for providing a steady stream of persons who allegedly had been involved in traffic accidents to associated healthcare providers, including but not limited to the Ancillary Providers.  Defendants paid the kickbacks knowing that they could recover the amount of the kickbacks many times over through fraudulent billing;

- Unlike legitimate medical practices, the Ancillary Providers paid kickbacks to the Defendant Controllers and PR Medical so that PR Medical would supply a steady stream of persons who allegedly had been involved in traffic accidents and were in need of medical services, including acupuncture and chiropractic treatment. The Ancillary Providers and/or their respective Licensed Healthcare Professionals paid kickbacks knowing that they could recover the amount of the kickbacks many times over through fraudulent billing submitted to insurers, including Plaintiffs;

- Unlike legitimate providers, the Fraudulently Owned PCs misrepresented the existence or severity of any injuries that Covered Persons may have had and the course of any treatments;

- Unlike legitimate providers, the Fraudulently Owned PCs routinely submitted claims for Fraudulent Services that were medically unnecessary and/or performed in a sub-standard manner from which no useful medical information could be derived, and submitted false medical reports in support of those services;

- Unlike legitimate providers, the Fraudulently Owned PCs submitted claims for Fraudulent Services pursuant to a fraudulent protocol of treatment established by the Controllers;

- Unlike legitimate providers, rather than perform a valid test according to prevailing standards of medical care as they must, or refer to a legitimate practitioner, the Fraudulently Owned PCs performed invalid, medically unnecessary and bogus diagnostic tests that willfully misrepresented medical facts and potentially endangered the Covered Persons; and

- Unlike legitimate providers, the Fraudulently Owned PCs submitted bills, using the prescribed "NF-3" forms entitled "Verification of Treatment by Attending Physician or Other Provider of Health Services" wherein Defendants knowingly, with intent to deceive Allstate and induce payment as a result thereof, and falsely misrepresented the services reflected therein, when in fact the services were of no diagnostic or treatment value.

176. Each member of the enterprises alleged herein played a well-defined and essential role in the Defendants' scheme to defraud and in directing the affairs of the enterprise. By way of example and not limitation, in furtherance of the scheme to defraud alleged herein, Shapson and/or Nisnevich:

- Recruited the Paper Owners to serve as the nominal owners of the Fraudulently Owned PCs, divesting them immediately of any attributes of ownership in the professional corporations;

- Managed the day to day operations of the Fraudulently Owned PCs, including but not limited to hiring professional medical and non-medical staff and personnel;

- Provided a turnkey operation to Defendants Delaleu and Qureshi ostensibly to provide management and administrative services, office space, medical and office equipment and/or other supplies, as well as billing and collection services. In fact, the turnkey agreement or agreements were used to funnel large sums of money in fraudulently obtained insurance payments to Shapson, Nisnevich, and/or others unknown to Plaintiffs;

- Entered into and executed office and equipment lease agreements on behalf of the Fraudulently Owned PCs;

- Leased and/or subleased the office space to the Fraudulently Owned PCs at the same location where the Fraudulently Owned PCs purportedly rendered services;

- Opened, maintained and controlled the Fraudulently Owned PCs' bank accounts;

- Entered into agreements with different No-fault Clinics to secure a referral source and patient base for the Fraudulently Owned PCs;

- Determined the physical space from which the Fraudulently Owned PCs would (and did) purportedly maintain their operations;

- Prepared or caused to be prepared fraudulent bills and/or medical reports and sent them to Plaintiffs;

- Participated, or caused those acting under their direction, in the preparation and mailing of bogus claims, knowing that they contained materially false and misleading information;

- Ensured that the profits from their criminal enterprise were funneled to him and others unknown to Plaintiffs;

- Entered into separate financial arrangements with the Ancillary Providers and/or their respective Licensed Healthcare Professionals which operated out of the same location as PR Medical to provide a referral source and patient population in exchange for a kickback;

- Unilaterally selected and retained the attorney(s) to pursue collection matters, including litigation and/or arbitration on behalf of the Fraudulently Owned PCs;

- Unilaterally selected and retained the billing company with which the Fraudulently Owned PCs entered into an agreement binding them to use such billing company for the submission of all bills and related documents on behalf of the Fraudulently Owned PCs; and

- Directed and/or caused to be directed and/or steered patients to the Fraudulently Owned PCs pursuant to a treatment protocol, irrespective of medical necessity in exchange for a kickback, fee or other financial incentive from the Fraudulently Owned PCs and/or the Paper Owners.

177. By way of further example, in furtherance of the scheme to defraud alleged herein, the Paper Owners:

- Allowed the use of his name and license by the Controllers to fraudulently incorporate the Fraudulently Owned PCs;

- Provided the essential means through which the Controllers (laypersons) were able to own the Fraudulently Owned PCs in contravention of New York State Law;

- Ceded ownership and control of the Fraudulently Owned PCs;

- Abdicated any and all attributes of ownership and control to the Controllers;

- Maintained no control over how the Fraudulently Owned PCs were operated and managed;

- Allowed their name and license to be used to pursue fraudulent claims on behalf of the Fraudulently Owned PCs -- which were unlawfully formed and operated by the Controllers;

- Allowed and facilitated the generation of fictitious medical records and bills that were submitted to Allstate under their names in association with the Fraudulently Owned PCs;

- Signed HCFA, NF-3 Forms and/or narrative reports, which falsely represented that they, or someone at their direction, actually rendered the health services for which the Fraudulently Owned PCs submitted bills, when in fact the services were medically unnecessary and/or of no diagnostic or treatment value; and

- Ordered Fraudulent Services for Covered Persons that were materially misrepresented, medically unnecessary and/or of no diagnostic or treatment value.

178.   At all relevant times mentioned herein, the Paper Owners knew or should have known that the Fraudulent Services for which the Fraudulently Owned PCs billed Plaintiffs were not performed as billed, were fabricated, were of no diagnostic value and/or were provided pursuant to a pre-determined fraudulent protocol, irrespective of medical necessity.

179.   At all relevant times mentioned herein, the Controllers, through the Fraudulently Owned PCs, directly or through others acting under and pursuant to their directions, instructions and control, submitted or caused to be submitted fraudulent bills for the Fraudulent Services, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

180.   Separate and apart from the foregoing, in furtherance of their scheme to defraud, in addition to seeking reimbursement for services provided by fraudulently incorporated professional corporations to which they were not entitled, the Controllers implemented a scheme through which, in exchange for funneling monies out of the Fraudulently Owned PCs, the Controllers

directed and/or steered a patient population to the Licensed Healthcare Professionals and/or their respective Ancillary Providers for Fraudulent Services pursuant to a predetermined course of treatment, irrespective of medical necessity.

181.    On information and belief, the Ancillary Providers who billed out of the 79-09B Northern Boulevard location, and/or other addresses, could only gain access to Covered Persons at that location by allowing the proceeds of their fraudulent billing scheme to be funneled to the Controllers, who the Ancillary Providers and/or their respective Licensed Healthcare Professionals knew or should have known were laypersons, were not licensed medical professionals, and who were not legally permitted to receive those proceeds.

182.    The Licensed Healthcare Professionals allowed their respective Ancillary Providers to illicitly funnel the proceeds to one or more of the Controllers by making payments, disguised as rent, utilities and/or other payments, to one or more of the Controllers and/or other individuals or entities under the Controllers' supervision and/or control, in order to continue to receive a patient source from the Controllers and to "treat" patients at 79-09B Northern Boulevard, where one or more of the Ancillary Providers maintained their operations, and/or at one of their practice locations.

183.    Together, the Controllers and/or their respective Licensed Healthcare Professionals devised a scheme in which, in exchange for funneling the proceeds generated by the Ancillary Providers, the Controllers would systematically direct, or cause to be directed, Covered Persons to one or more of the Ancillary Providers and/or their respective Licensed Healthcare Professionals. Thereafter, the Ancillary Providers and/or their respective Licensed Healthcare Professionals would purportedly render Fraudulent Services to as many Covered Persons as possible that were purportedly directed and/or steered to them by the Controllers and/or other individuals and/or entities under the Controllers' supervision and/or control.

184.    The Controllers, directly and/or indirectly, steered the Covered Persons to the Ancillary Providers and/or their respective Licensed Healthcare Professionals as part of a medical protocol that they determined, without regard to medical necessity.

185.    Once the Covered Persons were directed and/or steered to the Ancillary Providers and/or their respective Licensed Healthcare Professionals, the providers would bill insurance companies in general, and Plaintiffs in particular, for, among other things, Fraudulent Services rendered through the Ancillary Providers and/or their respective Licensed Healthcare Professionals to the Covered Persons that had been directed and/or steered to them.

186.    At all relevant times mentioned herein, the Licensed Healthcare Professionals conspired with one or more of the Controllers and knowingly participated in the scheme to defraud. By way of example and not limitation, the Licensed Healthcare Professionals knowingly billed for services that were not medically necessary, submitted bills to insurers for services that were the result of the unlawful referral/illegal fee-splitting scheme, and allowed the proceeds of billings for services that were not medically necessary to be disguised as payments for rent, utilities, or other purported expenses, and thereby funneled to one or more of the Controllers and/or others under the Controllers' supervision and control.

187.    At all relevant times mentioned herein, the Licensed Healthcare Professionals knew or should have known that Covered Persons were directed and/or steered to them pursuant to a medical protocol that resulted from the financial arrangement or unlawful referral and illegal fee-splitting scheme they agreed to participate in with one or more of the Controllers, irrespective of medical necessity.

188.    At all relevant times mentioned herein, the Controllers knowingly caused the Ancillary Providers to submit bills seeking reimbursement for services purportedly rendered to the Covered Persons that the Controllers (and/or others acting pursuant to their directions, instructions

and/or control) directed and/or steered to the Ancillary Providers and/or their respective Licensed Healthcare Professionals in furtherance of the scheme to defraud alleged herein.

189.    At all relevant times mentioned herein, the Controllers knew or should have known that the Covered Persons that were being directed and/or steered to the Ancillary Providers would be used by the Ancillary Providers to obtain payment from insurers in general, and Plaintiffs in particular, in connection with fraudulent claims.

190.    At all relevant times mentioned herein, the Controllers, acting in concert with the Ancillary Providers and/or their respective Licensed Healthcare Professionals, participated in, conducted, controlled, conspired together, aided and abetted and/or furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers in general, and Plaintiffs in particular, of money.

191.    At all relevant times mentioned herein, by directing and/or steering their patient population to the Ancillary Providers and/or their respective Licensed Healthcare Professionals in exchange for unlawful receipt of proceeds of medical billing to which the Controllers were not legally entitled, the Controllers, through one or more of the Ancillary Providers, provided the essential means for the Ancillary Providers (and their respective Licensed Healthcare Professionals) to submit fraudulent claims in furtherance of the scheme to defraud alleged in this Complaint.

192.    At all relevant times mentioned herein, the Licensed Healthcare Professionals knew or should have known that the services they provided to the Covered Persons, referred to the Ancillary Providers by one or more of the Controllers and/or others under the Controllers' supervision and control, were rendered pursuant to an unlawful referral and illegal fee-splitting scheme.

193.     At all relevant times mentioned herein, the Licensed Healthcare Professionals, through their respective Ancillary Providers, knowingly allowed the Controllers to submit or cause to be submitted fraudulent bills for medically unnecessary services rendered as a result of an unlawful referral and illegal fee-splitting scheme, in furtherance of the scheme to defraud alleged herein, in order to obtain payment in connection with fraudulent claims.

194.     At all relevant times mentioned herein, the Licensed Healthcare Professionals— acting in concert with their respective Ancillary Providers, and the Controllers and/or others unknown to Plaintiffs—participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers in general, and Plaintiffs in particular, of money.

195.     At all relevant times mentioned herein, the unlawful referral and illegal fee-splitting scheme pursuant to which the Controllers, through the Ancillary Providers, directed and/or steered their patient population to the Ancillary Providers, provided the essential means by which the Licensed Healthcare Professionals, through their respective Ancillary Providers, were able to further their scheme to defraud as alleged in this Complaint.

## CENTRALIZED SCHEME TO DEFRAUD/MECHANICS OF THE SCHEME TO DEFRAUD

### A.     The 79-09B Northern Boulevard Enterprise

196.     On information and belief, the Controllers conducted their business, affairs and operations through various entities, known and unknown to Plaintiffs.

197.     Though the Controllers attempted to conceal their ownership of the Fraudulently Owned PCs, they did in fact use Defendants Delaleu and Qureshi as the Paper Owners of the Fraudulently Owned PCs over which they exercised control.

198.     From their respective dates of incorporation through the date of the filing of this Complaint, the Controllers hid their beneficial ownership in the Fraudulently Owned PCs in order

to falsely lead No-fault insurance carriers, in general, and the Plaintiffs, in particular, to believe that the Fraudulently Owned PCs were lawfully incorporated and legitimate professional corporations when in fact they were not.

199.    Defendants Shapson, Nisnevich, Delaleu, Qureshi, SD Medical, PR Medical, and/or others unknown to Plaintiffs also concealed the fact that the Controllers were the true beneficial owners and pecuniary beneficiaries of the Fraudulently Owned PCs in order to circumvent the B.C.L., which prohibits individuals who are not licensed to practice medicine from owning professional corporations in the medical field.  Specifically, Section 1507 of the B.C.L. permits the ownership of a professional corporation by only those "individuals who are authorized by law to practice in this state [New York] a profession which such corporation is authorized to practice...."

200.    By concealing the fact that the Controllers were the true beneficial owners and pecuniary beneficiaries of the Fraudulently Owned PCs, Defendants Shapson, Nisnevich, Delaleu, Qureshi, SD Medical, PR Medical, and/or others unknown to Plaintiffs circumvented the restrictions contained in Article 15 of the B.C.L., which are designed to "ensure that a professional service corporation renders professional services only through qualified members of the professions and are *in fact controlled only by qualified members*."  New York Legislative Annual 1970, p. 129 (emphasis added).

201.    As such, the Controllers created Nortmed which served as an alter ego for the purpose of concealing that the Controllers were the true, beneficial owners of the Fraudulently Owned PCs.

202.    The Controllers determined the terms and/or unilaterally established the manner and means through which the Controllers and/or Nortmed would purportedly manage the Fraudulently Owned PCs' practice, as well as the manner and means through which the Controllers

and/or Nortmed would control the billing and collection services rendered to the Fraudulently Owned PCs, through a billing company the Controllers and/or Nortmed retained.  As a result, the Controllers controlled and operated every aspect of the Fraudulently Owned PCs' business.

203.   On information and belief, the fee(s) or other financial arrangements under these agreements were set by the Controllers.  Pursuant to the arrangements, the monies that the Fraudulently Owned PCs paid to the Controllers and/or Nortmed were never pursuant to a set salary, fee, percentage or other financial arrangement, but increased and/or decreased year to year to ensure that the Fraudulently Owned PCs' gross billings were paid to the Controllers, or paid to Nortmed, and eventually funneled to the Controllers.

204.   The Controllers provided all start-up costs, capital and investment in the Fraudulently Owned PCs.  The Paper Owners did not incur any costs to establish the Fraudulently Owned PCs' practice nor invest any money in the practice they purportedly owned.  By way of example and not limitation, Defendant Qureshi, who was an employee of SD Medical until it ceased operating, purportedly began operating PR Medical immediately following SD Medical without making any capital contributions or investing any money in PR Medical.

205.   On information and belief, under the arrangement established with the Controllers and/or Nortmed, the Paper Owners' draw and/or other compensation from the Fraudulently Owned PCs, which were established by the Controllers, remained fairly constant regardless of the amounts collected by the Fraudulently Owned PCs.

206.   Moreover, the compensation the Paper Owners received would not change based on the services the Controllers and/or Nortmed purportedly provided, the revenue that was generated, or expenses incurred, by the Fraudulently Owned PCs, but rather remained the same regardless of the financial condition or profitability of the Fraudulently Owned PCs.  As a result,

the Paper Owners did not have an ownership or pecuniary interest in the profits of the business they purportedly owned.

207.    On information and belief, the sole purpose of the relationship between the Fraudulently Owned PCs, the Controllers and/or Nortmed, after paying the Paper Owners their set draw, was to funnel the money from the Fraudulently Owned PCs to the Controllers and/or entities controlled by the Controllers, including but not limited to Nortmed.

208.    Once the Fraudulently Owned PCs were created, the Controllers caused to be generated medical records, reports and bills for services purportedly provided by legitimate professional corporations, when in fact they were not.

209.    The Fraudulently Owned PCs provided the vehicle through which the Controllers were able to engage in a systematic, billing scheme premised entirely on their ability to pass hundreds of thousands of dollars through fraudulently incorporated professional corporations.

210.    As part of the scheme to defraud, the Controllers individually and/or through Nortmed, operated, controlled and managed the Fraudulently Owned PCs, and employed personnel who were responsible for creating and generating their fraudulent bills, medical records, and No-fault forms to be submitted to insurance carriers.

211.    The Paper Owners did not exercise control nor maintain the Fraudulently Owned PCs' books and records, including accounting, financial records, bank statements and reports relating to the Fraudulently Owned PCs, all of which were controlled and maintained by the Controllers and/or others acting under their direction and control.

212.    By way of further example and not limitation that the Paper Owners did not exercise control over the Fraudulently Owned PCs, the Paper Owners did not:

- Maintain a substantial physical presence at the Fraudulently Owned PCs;

- Supervise the activities of the Fraudulently Owned PCs' practice;

- Control the Fraudulently Owned PCs' money and other assets;

- Contribute any capital to the Fraudulently Owned PC;

- Negotiate any lease agreements relating to the physical premises and equipment for the Fraudulently Owned PCs;

- Retain the attorney and/or accountant that drafted the incorporation papers for the Fraudulently Owned PCs;

- Have access to any corporate books, bank accounts, financial or business ledgers, or other related documents;

- Receive any profits or percentage of profit, revenue or other income from the Fraudulently Owned PCs, except for his set salary;

- Receive any profits, distributions or dividends;

- Receive any type of written daily, weekly, monthly or annual accounting or financial ledger or accounts receivable report of the Fraudulently Owned PCs' account receivables;

- Receive any type of written daily, weekly, monthly or annual accounting or financial ledger of the Fraudulently Owned PCs' cash receipts;

- Receive any type of written daily, weekly, monthly or annual accounting of receipts and disbursements;

- Manage the daily operations of the Fraudulently Owned PCs' business;

- Hire any employees, professional or non-professional;

- Negotiate or determine the salaries for any employees, professional or non-professional;

- Retain the accountants and/or accounting firm that managed the Fraudulently Owned PCs' financial affairs;

- Purchase, lease, select, order, arrange to maintain or repair any of the equipment housed at the Fraudulently Owned PCs' location; or

- Decide when the professional corporation which they purportedly owned would cease its operations.

213. On information and belief, the Controllers managed, supervised, participated in, conducted and oversaw the day-to-day billing and operations of the Fraudulently Owned PCs.

214.   The Controllers further exercised control over the Fraudulently Owned PCs individually and/or through Nortmed by, among other things:

- Causing the Fraudulently Owned PCs to enter into management, billing, equipment and/or other service agreements all for the purpose of diverting insurance payments received by the Fraudulently Owned PCs to the Controllers, individually and/or through Nortmed, an entity the Controllers owned and controlled;

- Retaining accountants and lawyers to represent the Fraudulently Owned PCs and preparation of all paperwork for lawsuits and/or arbitration proceedings seeking to collect payment for medical services purportedly provided by the Fraudulently Owned PCs;

- Making personnel decisions on behalf of the Fraudulently Owned PCs, including hiring medical personnel and support staff and establishing their salaries;

- Managing, operating and supervising the affairs of the Fraudulently Owned PCs;

- Preparing and generating medical records and bills for submission to insurers that fraudulently represented that the services were rendered by properly licensed providers of healthcare services when in fact they were not;

- Negotiating settlements with insurance carriers on behalf of the Fraudulently Owned PCs;

- Falsifying information contained in the New York State NF-3 forms submitted by the Fraudulently Owned PCs to No-fault insurance carriers, in general, and Plaintiffs, in particular, and by preparing fraudulent supporting documentation;

- Establishing the office location for the Fraudulently Owned PCs;

- Establishing, supervising and controlling the Fraudulently Owned PCs' payroll; and

- Establishing, supervising and controlling the Fraudulently Owned PCs' finances and bank accounts; including issuing and/or causing to be issued checks and disbursements out of the Fraudulently Owned PCs' bank accounts.

215.   Through the agreements described above, the Controllers purchased the right to use the names and licenses of the Paper Owners for the purpose of submitting claims to No-fault

carriers, in general, and Plaintiffs, in particular for services provided by fraudulently incorporated professional corporations that are not entitled to reimbursement under New York State Law.

216.    In furtherance of their scheme to defraud, in addition to seeking reimbursement for services provided by fraudulently incorporated professional corporations, to which they were not entitled, Defendants Shapson, Nisnevich, and others unknown to Plaintiffs entered into separate arrangements with one or more transient healthcare providers, including the Ancillary Providers and/or their respective Licensed Healthcare Professionals, through which, in exchange for a kickback and/or other financial compensation, Defendants Shapson and Nisnevich ensured that the doctors and/or chiropractors associated with PR Medical referred their patient population to the Ancillary Providers for Fraudulent Services, pursuant to a predetermined course of treatment, irrespective of medical necessity.

217.    In exchange for kickbacks and/or other financial compensation, irrespective of the purported complaints of pain or type of injury documented in connection with a particular claim, PR Medical, through its associated doctors, referred Covered Persons for Fraudulent Services pursuant to a predetermined course of treatment dictated by Defendants Shapson, Nisnevich, and others unknown to Plaintiffs. Annexed hereto as Exhibits "5" and "6" are representative samples of claims submitted by the Ancillary Providers pursuant to an illegal referral, unlawful kickback and/or illegal fee-splitting scheme.

218.    The Licensed Healthcare Professionals and others unknown to Plaintiffs paid kickbacks disguised as "rent" to Nortmed, and later to PR Medical after Normed was closed, and Shapson and Nisnevich installed themselves as employees of PR Medical, in order to receive referrals from PR Medical and be able to "treat" patients at 79-09B Northern Boulevard, where the Fraudulently Owned PCs maintained their operations.

219.    In exchange for paying kickbacks, the Licensed Healthcare Professionals and others unknown to Plaintiffs were granted access to 79-09B Northern Boulevard, and Defendants Shapson, Nisnevich, and/or others unknown to Plaintiffs would systematically direct or cause to be directed any Covered Person visiting PR Medical on those days to the Licensed Healthcare Professionals and/or others unknown to Plaintiffs. Thereafter, the Licensed Healthcare Professionals and others unknown to Plaintiffs would purportedly render Fraudulent Services to as many Covered Persons as possible that were purportedly referred by PR Medical.

220.    Defendants Shapson, Nisnevich, and/or others unknown to Plaintiffs, directly and indirectly, automatically referred or caused Covered Persons to be referred to the Licensed Healthcare Professionals and/or others unknown to Plaintiffs during the course of their treatment at PR Medical, as part of a medical protocol that Defendants Shapson, Nisnevich, and/or others unknown to Plaintiffs determined, without regard to medical necessity.

221.    Once the referral was made by PR Medical, the Ancillary Providers and their respective Licensed Healthcare Professionals would bill insurance companies, in general, and Plaintiffs, in particular, for Fraudulent Services purportedly rendered to the referred Covered Persons.

222.    At all relevant times mentioned herein, the Licensed Healthcare Professionals and/or others unknown to Plaintiffs knowingly participated in the scheme to defraud, including, but not limited to, paying kickbacks, billing for services that were not medically necessary and employing the Defendants' office personnel to prepare bills submitted to Plaintiffs for services that were the result of a kickback scheme.

223.    At all relevant times mentioned herein, the Licensed Healthcare Professionals and/or others unknown to Plaintiffs knew that the Covered Persons referred to them were referred pursuant to a medical protocol that resulted from the financial arrangement or kickback scheme they negotiated with Defendants Shapson and Nisnevich, irrespective of medical necessity.

**B.    The Spike Medical Enterprise**

224.    In addition to Spike Medical's participation in the illegal kickback/referral arrangement with PR Medical, Defendant Pike's interest in Spike Medical was, at best, that of a mere employee with no ownership or financial interest tied to its profits.

225.    Spike Medical has a long history of being owned, operated and controlled by one or more unlicensed individuals.  Spike Medical, a specialty provider ostensibly engaged in providing, *inter alia*, nerve conduction velocity tests ("NCV") and electromyograms ("EMG") (the foregoing tests are generically and collectively referred to as "Electrodiagnostic Testing") did not have a principal office address, since its services were provided through independent contractors who reported to various multidisciplinary practice clinics, including PR Medical, that Spike Medical paid kickbacks to, in exchange for providing such services at various facilities that Spike Medical did not own.

226.    On information and belief, Spike Medical was formed for the purpose of committing insurance fraud.

227.    At all times relevant herein, one or more of the John Doe Defendants, who are laypersons, not licensed to practice any healthcare profession in the State of New York (also referred to as the Controllers), maintained true beneficial ownership and control over Spike Medical by, *inter alia*, causing Spike Medical to enter into agreements with various entities which were owned and controlled by the Controllers and which purported to provide various services to

Spike Medical.  Through these entities, the Controllers, who were the true beneficial owners of Spike Medical, divested Pike of any and all attributes of true ownership and control of Spike Medical, which were then diverted by the Controllers to themselves and other entities.

228.   Spike Medical has been used in various ways to fraudulently bill insurance companies, in general, and Allstate, in particular.  In that regard, on information and belief, and at all relevant times herein, Spike Medical's billing and collection activities were firmly controlled by the Controllers, who were not medical doctors, and others under their direction, supervision and control.

229.   At all relevant times mentioned herein, Spike Medical was a medical office in name only.  For all practical and legal purposes, Spike Medical was used for the sole purpose of defrauding insurers into paying No-fault claims to a fraudulently incorporated professional corporation and/or professional corporation that was (a) not licensed in accordance with applicable New York State Law; (b) and/or engaged in an unlawful kickback scheme that is prohibited by the New York Education Law.

230.   Spike Medical is an illegal enterprise that engaged in systematic and fraudulent practices that distinguish it from legitimate healthcare providers.  For instance, the components of each enterprise followed practices that were part of a racketeering scheme dictated by the Controllers:

- Unlike legitimate providers, the Controllers, through Spike Medical, submitted or caused to be submitted bills to insurers, in general, and Allstate, in particular, that represented that Spike Medical was a professional corporation owned by a medical doctor when, in fact, it was not;

- Unlike legitimate providers, the Controllers, through Spike Medical, made false and misleading statements and/or provided false information regarding who owned, controlled and operated Spike Medical;

- Unlike legitimate providers, the Controllers, through Spike Medical, made false and misleading statements and/or provided false information intended

to mislead Allstate into believing that Spike Medical was being operated by Defendant Pike, whose name was listed on the certificate of incorporation when, in fact, it was not;

- Unlike legitimate providers, the Controllers, through Spike Medical, made false and misleading statements and/or provided false information intended to circumvent Article 15 of the B.C.L., which prohibits ownership by individuals not licensed to practice the profession for which a professional corporation was incorporated; and

- Unlike legitimate providers, the Controllers, through Spike Medical, concealed the fact that Spike Medical was engaged in the illegal corporate practice of medicine in contravention of New York State law, and that they were billing for physician services through a fraudulently incorporated PC.

231. In these and numerous other ways, Defendant Pike, and the Controllers sought to deceive Allstate into paying fraudulent claims that typically exceeded hundreds of dollars per Covered Person.

232. Each member of the Spike Medical enterprise played a well-defined and essential role in its scheme to defraud and in directing the affairs of the enterprise. By way of example and not limitation, in furtherance of their scheme to defraud, the Controllers:

- Recruited Defendant Pike to serve as the nominal owner of Spike Medical, divesting Pike of any attributes of ownership in the professional corporation;

- Managed the day to day operations of Spike Medical;

- Recruited, hired and trained the professional medical and non-medical staff, including technicians employed by and/or used by Spike Medical; and

- Recruited, hired and trained personnel employed by and/or used by Spike Medical for, among other things, billing, marketing, and administrative services.

233. By way of further example, in furtherance of the scheme to defraud alleged herein, Defendant Pike:

- Allowed the use of his name and license by the Controllers to fraudulently incorporate Spike Medical;

- Provided the essential means through which the Controllers were able to own Spike Medical in contravention of New York State Law;

- Ceded ownership and control of Spike Medical;

- Abdicated any and all attributes of ownership and control to the Controllers;

- Maintained no control over how Spike Medical was operated and managed; and

- Allowed his name and license to be used to pursue fraudulent claims on behalf of Spike Medical, which was unlawfully formed and operated by the Controllers.

234. The Controllers purchased the right to use the name and license of Defendant Pike for the purpose of submitting claims to No-fault carriers, in general, and Allstate, in particular, for services provided by a fraudulently incorporated professional corporation that is not entitled to reimbursement under New York State Law.

235. At all relevant times mentioned herein, Spike Medical was in violation of Article 15 of the B.C.L. and Article 65 of the Education Law, and has been found to be fraudulent incorporated in at least 13 arbitrations before the American Arbitration Association ("AAA"). *See* AAA Awards: 17-14-9049-0917 – Spike Medical v. State Farm Fire and Cas. Co. (Heidi Obiajulu, 12/4/2014); 17-14-9049-6038 – Spike Medical v. State Farm Mut. Auto. Ins. Co. (Lisa Capruso, 3/2/2015); 17-15-1006-1066 – Spike Medical v. USAA Ins. Co. (Susan Mandiberg, 9/7/2015); 17-15-1006-0579 – Spike Medical v. USAA Ins. Co. (Eylan Schulman, 10/20/2015); 17-15-1006-1391 – Spike Medical v. USAA Cas. Ins. Co. (Eylan Schulman, 10/20/2015); 17-15-1006-1339 – Spike Medical v. USAA Cas. Ins. Co. (Ann Lorraine Russo, 11/18/2015); 17-15-1006-0819 – Spike Medical v. Allstate Ins. Co. (Howard Jacob, 3/30/2016); 17-15-1016-3277 – Spike Medical v. Allstate Ins. Co. (Howard Jacob, 9/20/2016); 17-16-1036-4200 – Spike Medical v. USAA Gen. Indem. Co. (Shawn Kelleher, 7/6/2017); 17-15-1016-2818 – Spike Medical v. Allstate Ins. Co. (Charles Blattberg, 9/5/2017); 17-15-1016-3177 – Spike Medical v. Allstate Ins. Co. (9/5/2017)

(Charles Blattberg, 9/5/2017); 17-15-1016-2917 – Spike Medical v. Allstate Ins. Co. (Charles Blattberg, 9/5/2017); 17-15-1006-1399 – Spike Medical v. Allstate Fire & Cas. Ins. Co. (Charles Blattberg, 9/5/2017), copies of which are annexed hereto as Exhibit "11".

236.   In particular, several arbitrators determined that Spike Medical was fraudulently incorporated because Defendant Pike testified that he was not involved in any activities constituting the practice of medicine at Spike Medical, did not supervise the individuals performing those services, and only occasionally reviewed medical reports from Spike Medical. *See, e.g.*, 17-15-1-16-2818 – Spike v. Allstate (8/7/2017) (Charles Blattberg); 17-15-1016-3177 – Spike v. Allstate Ins. Co. (9/5/2017) (Charles Blattberg); 17-15-1016-2917 – Spike v. Allstate Ins. Co. (9/5/2017) (Charles Blattberg); 17-15-1006-1399 – Spike v. Allstate Fire & Cas. Ins. Co. (9/5/2017) (Charles Blattberg).

237.   Likewise, in *Progressive Cas. Ins. Co., et al. v. 1220 East New York Realty Co., LLC, et al.*, No. 603445/2019 (Nassau Cnty. Sup. Ct.), the insurer credibly alleged, among other things, that Spike Medical was owned and controlled by laypersons, not licensed to practice any healthcare profession in the State of New York, through their shell companies. In *Liberty Mutual Ins. Co., et al. v. Spike Medical, P.C., et al.*, No. 53549-2014 (Westchester Cnty. Sup. Ct.), in addition to alleging that Spike Medical was fraudulently incorporated, the insurer credibly alleged, among other things, that Spike Medical operated as a "transient provider out of multiple questionable medical clinics."  Additionally, in *Country-Wide Ins. Co. v. Spike Medical P.C.*, 159790/2014 (N.Y. Cnty. Sup. Ct.), the insurer credibly alleged, among other things, that Spike Medical was paying money, under the guise of rent, to other medical facilities in exchange for patient referrals in direct violation of the Education Law.

C.      **The Fraudulent Treatment Protocol**

238.    In furtherance of the scheme to defraud alleged herein, individuals who were purportedly involved in automobile accidents in New York and purportedly sustained soft-tissue injuries would present to the 79-09B Northern Boulevard clinic location, as well as numerous other clinic locations throughout the New York metropolitan area (hereinafter "Medical Mill Clinics"), which would automatically trigger a treatment protocol designed to fraudulently bill insurance companies, in general, and Allstate, in particular, for *inter alia,* medical evaluations, diagnostic tests, chiropractic treatment, acupuncture treatment and physical therapy, irrespective of medical necessity.

239.    To the extent any Covered Person was examined at all by the providers operating out of the Medical Mill Clinics, they were each diagnosed with conditions that varied little from Covered Person to Covered Person, allowing for the same predetermined protocol of treatment for each Covered Person.

240.    Notwithstanding that legitimate treatment plans for patients with non-specific neck and back pain, such as those purportedly treated at the 79-09B Northern Boulevard and/or Medical Mill Clinics may be limited to rest, over-the-counter pain medications, and application of heat or cold packs, or involve no treatment at all, Covered Persons purportedly treated at the 79-09B Northern Boulevard and/or Medical Mill Clinics were routinely assessed the same general diagnoses and subjected to the same pre-determined treatment protocol irrespective of medical necessity, including but not limited to diagnostic services purportedly provided by the transient medical providers HS Diagnostic Chiro, Morley Medical, Sage Medical, and Spike Medical; physical therapy services purportedly provided by PR Medical; chiropractic services purportedly provided by HS Diagnostic Chiro; and acupuncture services purportedly provided by Gentle Care Acupuncture.

241.   The protocol of treatment by each of the providers operating out of the 79-09B Northern Boulevard and/or Medical Mill Clinics, regardless of location, involved virtually the same services purportedly performed for nearly every Covered Person on each visit and continued irrespective of any documented changes in the Covered Person's condition.

242.   On information and belief, regardless of clinic location, the protocol of treatment by each of the providers operating out of the 79-09B Northern Boulevard and/or Medical Mill Clinics failed to take into account the needs of any particular Covered Person, and rarely, if ever, varied based upon a Covered Person's age, medical history, circumstances of alleged accident, physical condition, symptoms, prior treatment or severity or location of alleged injury and/or the treatment provided was medically unnecessary, improperly performed, and/or was of diagnostic and/or treatment value.

243.   Rather than taking into account the needs of individual Covered Persons, Defendants implemented and/or participated in a fraudulent treatment apparatus through which, they, as a matter of pattern, practice and protocol, provided Covered Persons with, and billed Allstate for, among other things, initial and follow-up examinations, Electrodiagnostic Testing, Diagnostic Testing, chiropractic services, physical therapy treatment, and acupuncture services, irrespective of medical necessity (the "Fraudulent Treatment Protocol").

244.   Regardless of whether a No-fault Claimant was seen by a doctor on the date of the initial office visit, a No-fault Claimant's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault claimants would receive the same course of treatment, typically consisting of physical therapy, chiropractic services and acupuncture, as well as NCVs and EMGs, pursuant to a standard treatment protocol regardless of whether such treatment was medically necessary.

245.     In particular, by way of example and not limitation, of the No-fault claimants who treated at the 79-09B Northern Boulevard clinic and for whom claims were submitted to Plaintiff for reimbursement: more than 93 percent of the No-fault Claimants received physical therapy; more than 85 percent of No-fault Claimants received acupuncture; more than 85 percent of No-fault Claimants received chiropractic manipulation; more than 60 percent of No-fault Claimants received NCV and/or EMG; and more than 53 percent of No-fault Claimants received and/or injections (e.g., trigger point, epidural, facet, nerve block, etc.).

1.     **The Fraudulent Initial and Follow-Up Examinations**

246.     On information and belief, pursuant to the Fraudulent Treatment Protocol, a Covered Person's initial visit to the 79-09B Northern Boulevard Clinic would involve a purported examination by a healthcare provider who would virtually always diagnose the Covered Person with soft tissue injuries, including but not limited to cervical and lower back strains, for no other purpose than to justify further treatment and testing by the providers operating out of the 79-09B Northern Boulevard Clinic.

247.     Pursuant to the Fraudulent Treatment Protocol, once the bogus diagnosis was made, Covered Persons would be referred for Fraudulent Services by the providers operating out of the 79-09B Northern Boulevard Clinic, who would then fraudulently bill Allstate for medically unnecessary treatment and testing.

248.     In furtherance of the scheme to defraud alleged herein and demonstrative of the lack of oversight and control over the treatment provided at PR Medical, Qureshi, through PR Medical utilized the same or similar boilerplate, pre-printed initial evaluation forms for each Covered Person, often containing numerous typographical errors, to document Covered Persons' initial evaluations (the "Initial Evaluation Forms").

249.     The Initial Evaluation Forms were utilized by PR Medical for no other purpose than to "document" the purported injuries of Covered Persons in a manner which would fraudulently induce payment from insurers in general, and Allstate in particular, as well as to feign the existence of injuries which could justify further testing and treatment by other providers operating out of the 79-09B Northern Boulevard Clinic.

250.     Rather than being utilized in a manner which could document specific findings relating to an individual Covered Person required by the level 4 and level 5 billing codes used by Defendants, the Initial Evaluation Forms contained pre-printed findings and narratives which Qureshi could check off, circle or underline, and Qureshi rarely, if ever, documented any substantive diagnosis which was specific to a particular Covered Person, resulting in fraudulently inflated evaluations billed under codes that do not correspond to the purported service provided.

251.     In furtherance of the scheme to defraud alleged herein, Qureshi, through PR Medical, would, as a matter of pattern, practice and protocol, routinely document the same or similar findings, patient complaints and diagnoses on virtually every Initial Evaluation Form, including but not limited to finding that a majority of Covered Persons (i) complained of neck pain; (ii) complained of lower back pain; (iii) complained of pain on a frequent and/or daily basis; (iv) had abnormal range of motion; and (v) had a cervical sprain, strain cervicalgia, or myofascitis [sic] and/or lumbar sprain, strain, myofascitis [sic], or conditions in one or more other regions.

252.     Based upon the fraudulent diagnoses documented on the Initial Evaluation Forms, Qureshi, through PR Medical, virtually always recommended the Fraudulent Treatment Protocol for all Covered Persons, notwithstanding that Qureshi knew or should have known that such services were medically unnecessary and fraudulent.    A representative sample of the aforementioned Initial Evaluation Forms is annexed hereto as Exhibit "12".

253.     In addition to the fraudulent initial evaluations, Qureshi, through PR Medical, routinely billed Allstate for periodic level 4 or 5 re-evaluations, which like their initial examinations, involved, at most, cursory, exams of Covered Persons, consisting of boilerplate findings and no significant change in treatment plan as a result of the re-evaluation, to support the continuation of billing for medically unnecessary services purportedly provided to Covered Persons at the 79-09B Northern Boulevard Clinic.  A representative sample of re-evaluation reports is annexed hereto as Exhibit "13".

254.     On information and belief, as with Qureshi's fraudulent initial examinations, Qureshi, through PR Medical, similarly failed to tailor his re-evaluations to the unique circumstances of each Covered Person.

255.     In addition to the fraudulent initial evaluations, Qureshi, through PR Medical, as a matter of pattern, practice and protocol, routinely scheduled Covered Person follow-up examinations approximately four weeks after their initial examination.

256.     Irrespective of whether a particular Covered Person's condition was documented to have improved, remained the same, or worsened, nearly every follow-up examination report recommends the same and/or continuation of treatment and testing from the various providers that operated from the 79-09B Northern Boulevard Clinic. *See* Exhibit "13".

### 2.     <u>The Fraudulent Physical Therapy Services</u>

257.     On information and belief, in furtherance of the Fraudulent Treatment Protocol, physical therapists purportedly employed by Defendant Qureshi, through PR Medical, performed physical therapy on virtually all Covered Persons that were treated by PR Medical as part of the Fraudulent Treatment Protocol, irrespective of medical necessity.

258.     The physical therapy services purportedly performed through PR Medical, rarely varied from patient to patient, nor did any particular Covered Person's physical therapy change based upon an alleged worsening or improving of the Covered Person's condition.

259.     The physical therapy services purportedly performed through PR Medical, virtually always, if not always, involved from three to five passive modalities, which would occur on every Covered Person, and were rarely identified or documented, to the extent that they were performed at all.

260.     In order to support the phony physical therapy treatment, PR Medical included in its Initial Examination and Follow-up Reports a boilerplate referral for physical therapy services, which through Fall 2016, included a pre-printed sentence "Treatment [or Case] discussed with physical therapist," and following Fall 2016, also included one of the following pre-printed list of treatment modalities within a section entitled "Treatment Plan."

| | | | |
|---|---|---|---|
| • ES | • ES / US | • Electrical Stimulation/Ultrasound | • Electrical Stimulation |
| • HMP / COLD | • HMP / Cold | • Hot / Cold Packs | • Ultrasound |
| • Massage | • NMR | • Massage | • Hot/Cold Packs |
| • Thera—Ex | • JT. Mobilization | • Manuel Therapy | • JT. Mobilization |
| • HEP | • Therpa Ex | • Therapeutic Exercise | • Therapeutic Exercise |
| | • HEP | • Home Exercise Plane | • Home Exercise Plan |

261.     The abbreviations pre-printed on PR Medical's Initial and Follow-up Examination Reports stood for the following:

- **ES:** Electrical Stimulation
- **HMP / Cold:** Hot Pack/Cold Pack
- **Massage:** Therapeutic Massage
- **Thera—Ex:** Therapeutic Exercises
- **HEP:** Home Exercise Plan
- **NMR:** Neuromuscular Reeducation
- **JT. Mobilization:** Joint Mobilization
- **Therpa Ex:** Therapeutic Exercises

262.     On nearly every one of PR Medical's Initial and Follow-up Examination Reports, the pre-printed sentence "Treatment [or Case] discussed with physical therapist," and the entire

list of modalities were circled as part of a predetermined protocol of treatment, irrespective of the Covered Person's physical condition, medical necessity, or whether such services would actually be performed. *See* Exhibits "12" and "13."

263.    Once the bogus justification for the commencement of unnecessary physical therapy was documented in PR Medical's Initial Examination Report, all Covered Persons would purportedly receive the same physical therapy services on virtually every physical therapy visit, consisting of hot packs, electrical stimulation, and either or both therapeutic massage and exercise.

264.    In order to justify continued physical therapy services, as well as to substantiate the purported physical therapy services in claims for reimbursement submitted to Allstate, employee physical therapists, through PR Medical, documented the purported treatment of patients on boilerplate forms ("Daily Notes"), which consisted of nothing more than pre-printed check boxes, and rarely, if ever, documented any substantive description of the services purportedly performed.

265.    By way of example and not limitation, the Daily Notes rarely, if ever, documented the nature of therapeutic exercises performed, the duration of such exercises, or Covered Persons' responses to such exercises.   A representative sample of the aforementioned Daily Notes is annexed hereto as Exhibit "14".

### 3.    The Fraudulent Chiropractic Services

266.    In furtherance of the Fraudulent Treatment Protocol, Defendant Shirazi, through HS Diagnostic Chiro, submitted bills to Plaintiffs for chiropractic services purportedly performed on virtually all Covered Persons that were treated at the 79-09B Northern Boulevard and/or Medical Mill Clinics irrespective of medical necessity, and despite chiropractic treatment rarely being medically necessary for motor vehicle accident patients with neck and back pain who are also undergoing physical therapy.

267.    As part of the fraudulent protocol established by the Defendants, Covered Persons that were purportedly given chiropractic examinations were practically always diagnosed with identical conditions that were documented in the same way on pre-printed initial reports prepared by Defendant Shirazi and/or one or more chiropractors in HS Diagnostic Chiro's employ (the "Initial Chiropractic Reports").   In furtherance of the fraudulent protocol, Covered Persons received chiropractic treatment at the same time they received physical therapy and regardless of the result or efficacy of the physical therapy treatment.

268.    On information and belief, the Initial Chiropractic Reports were utilized by the Defendant Shirazi and/or one or more chiropractors in HS Diagnostic Chiro's employ for no other purpose than to "document" the purported injuries of Covered Persons in a manner which would fraudulently induce payment from insurers in general, and Allstate in particular, as well as to feign the existence of injuries which could justify further chiropractic treatment.

269.    The Initial Chiropractic Reports contained pre-printed text which could be circled or underlined, and rarely, if ever, were utilized by the Defendant Shirazi and/or one or more chiropractors in HS Diagnostic Chiro's employ to document specific findings related to any individual Covered Person.

270.    In furtherance of the scheme to defraud, the Initial Chiropractic Reports, as a matter of pattern, practice and protocol, routinely:

- Reported Complaints of Covered Persons including but not limited to pain in all three regions of the spine, and limited cervical and lumbar ranges of motion accompanied by pain;

- Reported a diagnosis of Covered Persons with one or more generalized conditions of the spine, including but not limited to spinal pain in one or more regions of the spine, sprains of one or more regions of the spine, and/or subluxation of more than one region of the spine; and

- Identified the same treatment plan for most, if not all Covered Persons, which included (i) chiropractic manipulation three times a week for four to

six weeks; (ii) referrals for x-rays and/or MRIs of the spine; and (iii) Trigger Point Myofascial Release Therapy.

271.    In furtherance of the scheme to defraud alleged herein, the chiropractic examinations purportedly performed on Covered Persons nearly always resulted in the same common diagnoses and treatment plans which did not vary from patient to patient or amongst dates of service. A representative sample of the aforementioned Initial Chiropractic Reports is annexed hereto as Exhibit "15."

272.    On information and belief, Initial Chiropractic Reports were used for no other purpose than as a vehicle through which the Defendant Shirazi and/or one or more chiropractors in HS Diagnostic Chiro's employ could document fictitious Covered Person injuries in order to justify the purported performance of, and billing for, medically unnecessary chiropractic treatments.

273.    Once Covered Persons began their courses of additional chiropractic treatment, Covered Persons' purported progress was documented in Subjective, Objective, Assessment, and Plan notes (the "Chiropractic SOAP Notes"), which, as with the Initial Chiropractic Reports, contained pre-printed text which could be circled or underlined, and rarely, if ever, were utilized by Defendant Shirazi and/or one or more chiropractors in HS Diagnostic Chiro's employ to document specific findings related to any individual Covered Person. By way of example and not limitation, as a matter of pattern, practice and protocol, the Chiropractic SOAP Notes routinely:

- Documented most, if not all Covered Persons as having complaints of neck pain, mid-back pain; and/or low-back pain;

- Documented that most Covered Persons' treatment plans should "Continue as Planned";

- Documented that most Covered Persons had objective findings of "Myospasm" or "spasm" in the spine, "tenderness" in the spine, and/or dysfunction in multiple regions of the spine;

- Documented that irrespective of the outcome of a Covered Person's initial evaluation, most, if not all Covered Persons routinely received the same treatment, consisting of chiropractic manipulation of three to four regions of the spine; and

- Rarely, if ever, documented the written name of the chiropractor that purportedly provided the chiropractic treatment.

274. On information and belief, the Chiropractic SOAP Notes were used for no other purpose than as a vehicle through which Defendant Shirazi and/or one or more chiropractors in HS Diagnostic Chiro's employ, could document medically unnecessary treatment in order to justify the purported performance of, and billing for, further chiropractic treatment which was rarely, if ever, effective in alleviating the purported injury for the Covered Persons or tailored to the needs of any individual Covered Person. A representative sample of the aforementioned Chiropractic SOAP Notes is annexed hereto as Exhibit "16".

275. By way of example and not limitation, as a matter of pattern, practice and protocol, Defendant Shirazi and/or one or more chiropractors in HS Diagnostic Chiro's employ routinely provided Covered Persons with chiropractic manipulations that did not change in type depending on whether the Covered Persons' purported injury improved or did not improve.

276. As part of the fraudulent protocol established by the Defendants, Covered Persons that began a course of chiropractic "treatment" with HS Diagnostic Chiro were routinely, if not always, referred for a follow-up examination following a course of chiropractic treatment at the 79-09B Northern Boulevard and/or Medical Mill Clinics.

277. As a matter of pattern, practice and protocol, the follow-up examinations purportedly performed by Defendant Shirazi and/or one or more chiropractors in HS Diagnostic Chiro's employ at the 79-09B Northern Boulevard and/or Medical Mill Clinics were routinely performed for no other purpose than to justify the performance of, and billing for, additional and

medically unnecessary chiropractic services in furtherance of the Fraudulent Treatment Protocol which was established at the 79-09B Northern Boulevard and/or Medical Mill Clinics.

278.    In particular, reports of follow-up examinations, which consist of two to four page forms with preprinted content, routinely indicate that, despite having undergone a course of purported chiropractic care, patients continue to complain of cervical and/or lower back pain and recommend continuation of the same treatment plan and the patient thereafter continues the Predetermined Treatment Protocol, often including several more weeks of chiropractic manipulations. A representative sample of follow-up chiropractic examination reports is annexed hereto as Exhibit "17".

### 4.    The Fraudulent Acupuncture Services

279.    In furtherance of the scheme to defraud alleged herein, Defendant Kiner, through Gentle Care Acupuncture, billed Allstate for acupuncture services pursuant to a fraudulent pre-determined treatment protocol, irrespective of medical necessity, on virtually all, if not all, Covered Persons who were purportedly treated at the 79-09B Northern Boulevard and/or Medical Mill Clinics during all times relevant to the Complaint.

280.    Defendant Kiner, through Gentle Care Acupuncture, purportedly performed acupuncture on Covered Persons on the same days that such Covered Persons purportedly received medical services from one or more additional providers at the 79-09B Northern Boulevard and/or Medical Mill Clinics, including but not limited to physical therapy and chiropractic services.

281.    On information and belief, acupuncture services are premised upon the theory that each individual has a unique life energy ("Qi") which flows along paths called meridians and impact an individual's mental and physical health. There are twelve main meridians ("the Meridians") in the human body through which Qi flows. When that Qi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to

very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's Qi. There are three main steps in an acupuncture treatment regimen.

282.     On information and belief, to the extent that acupuncture treatment is ever effective, a point which is widely debated, the first step in any legitimate acupuncture regimen is an examination of the patient, which includes an examination of the appearance of the patient's tongue's color, shape, and texture, and measurements of the rate, rhythm, and strength of the patient's pulse. Competently performing these components of the physical examination is necessary to accurately diagnose the patient and thereby determine an acupuncture treatment plan designed to benefit the patient by restoring their unique Qi.

283.     On information and belief, the second step in any legitimate acupuncture regimen is the development of a specific acupuncture treatment plan, which requires the insertion of needles into particular Acupuncture Points along the Meridians, including local points at the injury sites, proximal Acupuncture Points (i.e., near the affected areas of the involved Meridian) and distal Acupuncture Points (i.e., distant from the affected areas of the involved Meridian).

284.     On information and belief, the third step in any legitimate acupuncture regimen is the implementation of the acupuncture treatment plan.  The acupuncturist inserts generally 10 but more typically 20 or more acupuncture needles, for a minimum of approximately twenty minutes into each of the selected Acupuncture Points, with the number and location of the Acupuncture Points varying based upon the individualized circumstances presented by each patient, and each patient's therapeutic response to each acupuncture treatment.

285.     On information and belief, the greater the severity a patient's condition is, the greater frequency that patient is treated and at a greater number of Acupuncture Points. As patients improve, treatment frequency and the number of points used should decrease.

286.     On information and belief, a meaningful assessment of each patient is required before a licensed acupuncturist begins treatment to ascertain the patient's condition and determine whether acupuncture treatment is necessary and will benefit the patient.

287.     On information and belief, legitimate acupuncture protocols permit up to four treatment sessions during the first two weeks of treatment. Following the first two weeks of treatment, the frequency of sessions typically decreases, providing time to assess how long the patient remains pain free between treatments and/or how long the therapeutic effect of such treatments can be maintained between treatments.

288.     On information and belief, as treatments progress, an acupuncturist evaluates whether and when treatments are no longer beneficial and/or necessary for each patient.

289.     On information and belief, any legitimate acupuncture regimen requires meaningful documentation of the: (1) patient's medical history; (2) physical examination; (3) diagnosis; (4) treatment plan; (5) results of each treatment session; and (6) the patient's progress throughout the course of treatment.

290.     On information and belief, legitimate acupuncture regimens require the continuous assessment of the patients' condition and energy flow as well as the therapeutic effect of previous treatments. Acupuncture treatment plans, like most treatments, are fluid and should evolve over time. Therefore, over the course of legitimate acupuncture treatment plans, the acupuncturist makes adjustments to improve the therapeutic effectiveness of each treatment and eventually return the patient to maximum health by restoring his or her unique Qi.

291.     Because Kiner's and Gentle Care Acupuncture's purported services were provided pursuant to an illegal protocol of treatment irrespective of medical necessity, Kiner's and Gentle Care Acupuncture's evaluation and treatment of Covered Persons did not bear any of the hallmarks of a legitimate acupuncture regimen.

292.    Rather than providing acupuncture services within the prevailing standard of care, and in furtherance of their scheme to defraud, to the extent any Covered Person received purported acupuncture treatment at all at Gentle Care Acupuncture, such treatment was performed on every Covered Person the same way, consistent with providing purported acupuncture treatments pursuant to a pre-determined protocol, with no regard to any particular Covered Person's medical history, physical examination, diagnosis, treatment plan or progress throughout the course of treatment.

293.    Following the pre-determined treatment protocol, Kiner, through Gentle Care Acupuncture, documented Covered Persons' purported initial acupuncture examinations on pre-printed boilerplate forms which indicated that virtually every Covered Person examined was:

- Reported to have a tongue that was "deep red," "purple" or "blueish" in color, and having a coating that was either "yellow" or "white;"

- Reported to have injuries that had "a direct causal relationship between the accident described and the patient's current injuries;"

- Indicated a "Prognosis" of guarded for every Covered Person;

- Diagnosed with the same two channels of either (1) Chi-blood stagnation and/or (2) Qi Blood Deficiency, notwithstanding that Gentle Care Acupuncture's initial evaluation form has more than 8 preprinted channel options that can be selected;

- Diagnosed with conditions in one or more regions of the spine, as well other conditions, including but not limited to those involving the knee, shoulder, or headaches;

- Prescribed an acupuncture treatment plan consisting of treatment two to three times per week without indicating a duration. Notwithstanding, virtually every Covered Persons was purportedly treated for four weeks; and

- Found to require acupuncture services in order to (1) "[p]rovide symptomatic relief in acute and sub-acute stages of injury condition"; (2) "[a]ssist joint inhibition to reduce inflammatory response to affected tissues"; (3) "[r]eflexively subside painful muscle contraction reversing the pain-spams-muscle cycle"; and (4) "[d]ecrease irritation of nerve tissues."

294.   In furtherance of the scheme to defraud alleged herein, the acupuncture initial examinations purportedly performed on Covered Persons generally always resulted in the same common diagnoses and treatment plans which did not vary from patient to patient or amongst dates of service.

295.   On information and belief, in furtherance of the scheme to defraud alleged herein, the initial acupuncture evaluations were used for no other purpose than as a vehicle through which Kiner, through Gentle Care Acupuncture, could document fictitious Covered Person injuries in order to justify the purported performance of, and billing for, medically unnecessary acupuncture services.  A representative sample of initial evaluation reports is annexed hereto as Exhibit "18".

296.   Once Covered Persons began their courses of acupuncture based upon their fraudulent initial evaluations, Covered Persons' purported progress was documented in Subjective, Objective, Assessment, and Plan notes ("the "Acupuncture SOAP Notes"), which contained pre-printed text which could be circled or underlined, and rarely, if ever, were utilized by Kiner to document specific findings related to any individual Covered Person. By way of example and not limitation, as a matter of pattern, practice and protocol, the Acupuncture SOAP Notes routinely:

- Documented that virtually every Covered Person presented with neck and/or back pain.

- Failed to document the condition of Covered Persons' tongue or pulse, notwithstanding that such conditions are documented at Covered Persons' purported initial acupuncture evaluations, and that, on information and belief, the ongoing evaluation of such conditions is important for the evaluations of a Covered Person's condition and need for further acupuncture treatment.

- Documented treatment that continued without any change or improvement in Covered Persons' condition from a Covered Person's first treatment to their final treatment.

297.   The Acupuncture SOAP Notes were used for no other purpose than as a vehicle through which Kiner, through Gentle Care Acupuncture, could document medically unnecessary

Covered Person acupuncture services in order to justify the purported performance of, and billing for, further acupuncture services which were rarely, if ever, tailored to the needs of any individual Covered Person. A representative sample of the aforementioned Acupuncture SOAP Notes is annexed hereto as Exhibit "19".

298.    At all relevant times mentioned herein, Gentle Care Acupuncture initially recommended that every Covered Person receive acupuncture treatments 3-4 times per week without recommending a duration of the treatment plan.

299.    Thereafter, Gentle Care Acupuncture failed to perform re-evaluations of Covered Persons on any regular or reasoned timetable, allowing anywhere between three to nine weeks to elapse between evaluations.

300.    However, regardless of when, or how frequently Gentle Care Acupuncture actually re-evaluated Covered Persons, Gentle Care Acupuncture routinely recommended additional treatments 2-3 and/or 3-4 times per week when evaluated thereafter.

301.    While Covered Persons at the 79-09B Northern Boulevard and/or Medical Mill Clinics received chiropractic, acupuncture, and physical therapy treatments from multiple professionals on the same dates of service over the same periods of time, on information and belief, neither Kiner nor any other employee of Gentle Care Acupuncture communicated with the other providers rendering services on each Covered Person in an attempt to coordinate their treatment.

302.    On information and belief, in furtherance of their scheme to defraud, Kiner, through Gentle Care Acupuncture, systematically submitted bills and reports for identical or nearly identical combinations of acupuncture services purportedly performed on each Claimant who was purportedly treated at the 79-09B Northern Boulevard and/or Medical Mill Clinics to Allstate, according to a pre-determined billing protocol irrespective of medical necessity.

303.     On information and belief, because the New York State Fee Schedule applicable to No-fault claims limits reimbursement of acupuncture services (the insertion of needles) to one billing unit for the first 15 minutes of treatment and a second billing unit for the next 15 minutes of treatment irrespective of the number of needles inserted, Defendants devised a scheme to maximize reimbursement through billing for Cupping, a treatment in which a local suction is created on the skin using a glass, ceramic, bamboo, or plastic cup, while negative pressure is created in the cup either by applying a flame to the cup to remove oxygen before placing it on the skin or by attaching a suction device to the cup after it is placed on the skin.

304.     On information and belief, Cupping is an unproven and often dangerous treatment that has never been scientifically proven to provide any significant health benefits.

305.     By way of example and not limitation, the United States Government's National Center for Complementary and Integrative Medicine (NCCIM), which is part of the National Institute of Health, has concluded that: (i) most research regarding the utility of Cupping in pain management is of low quality; (ii) evidence that Cupping can reduce pain is not strong; and that (iii) Cupping can cause side effects such as persistent skin discoloration, scars, burns, and infections, and may worsen eczema or psoriasis.

306.     Notwithstanding that Cupping is an unproven and often dangerous treatment, Kiner, through Gentle Care Acupuncture, as a matter of pattern, practice and protocol, routinely billed Allstate for Cupping treatment purportedly performed on Covered Persons, notwithstanding that Cupping is rarely, if ever, recommended as part of the treatment plan in Covered Persons' initial acupuncture evaluation reports.

307.     Cupping is not listed as a treatment modality pursuant to the Fee Schedule, and was therefore billed by Kiner, through Gentle Care Acupuncture, pursuant to CPT Code 97799 as an "unlisted physical medicine/rehabilitation service or procedure" which allowed Kiner, through

Gentle Care Acupuncture, to choose his own rate for reimbursement and circumvent the limit of the Fee Schedule that he would otherwise be allowed to bill for traditional acupuncture services. A chart identifying a representative sample of claims billed under CPT Code 97799 is annexed hereto as Exhibit "20".

**5.      The Fraudulent Electrodiagnostic Testing**

308.    In furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure and protocol, Defendants Morley Medical, Sage Medical and Spike Medical billed Allstate for Electrodiagnostic Testing when in fact such services were medically unnecessary and/or of no diagnostic or treatment value.

309.    The Electrodiagnostic Testing was purportedly performed, if at all, in a manner that Defendants Morley Medical, Sage Medical and Spike Medical knew or should have known was contrary to the prevailing standard of care and would produce invalid data, findings and diagnoses that endangered the welfare of the Covered Persons, putting them at risk of having undiagnosed medical conditions and diseases and/or the wrong diagnosis and wrong treatment.

310.    By submitting fictitious bills and reports for Electrodiagnostic Testing to Allstate, Defendants Morley Medical, Sage Medical and Spike Medical misrepresented the actual medical status of the Covered Persons and the services purportedly rendered, which were not provided as billed, if provided at all.

311.    The American Medical Association (AMA) is the publisher of the CPT Code Book, which is the definitive medical source used by licensed medical professionals to accurately describe, among other things, medical and diagnostic services performed and billed to third-party payors, such as insurance companies.

312.    Pursuant to Section 5108 of the Insurance Law, the Department of Insurance has adopted the Fee Schedule published by the Workers' Compensation Board, which sets forth the

charges for professional health services that are reimbursable under the No-fault Law. The Fee Schedule incorporates the CPT codes published by the AMA, and the coding rules and regulations set forth by the AMA (collectively the "AMA Guidelines).

313.    At all relevant times mentioned herein, Defendants Morley Medical, Sage Medical and Spike Medical submitted bills to Allstate for Electrodiagnostic Tests, wherein using CPT codes that intentionally and materially misrepresented the services, if any, performed and for which they sought reimbursement and were paid.

314.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendants Morley Medical, Sage Medical and Spike Medical routinely referred Covered Persons treated at PR Medical and/or other Medical Mill Clinics for evaluations billed through PR Medical and/or other Medical Mill Clinics that Defendants Morley Medical, Sage Medical and Spike Medical knew or should have known were medically unnecessary and/or would produce medically invalid recommendations for Electrodiagnostic Testing, also billed through PR Medical and/or other Medical Mill Clinics, that were of no clinical or diagnostic value.

315.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendants Morley Medical, Sage Medical and Spike Medical submitted boilerplate reports of purported evaluations to falsely justify Electrodiagnostic Testing which was not indicated by the Covered Persons' examination findings.

316.    The nervous system is divided into two major anatomical divisions: the central nervous system and the peripheral nervous system. The central nervous system includes the brain and the spinal cord, while the peripheral nervous system includes the peripheral nerves. The purpose of a neurological examination is to identify the presence of any abnormality in the nervous system. The standard neurological examination checks the function and integrity of each component of the nervous system, including examination for the presence of generalized diseases

of the peripheral nerves, known as neuropathy. Neuropathy can result from many diseases such as diabetes, kidney failure, cancer, AIDs and from systemic inflammatory disease of the small arteries of the body. In accordance with accepted medical practice, when a physician conducts an examination of a patient where the complained of symptoms may affect the nervous system or where the examination shows findings suggestive of nervous system disease or injury, it is essential that the physician rule out the existence of neuropathy, which can, for most patients, be accomplished utilizing simple neurological tests including but not limited to testing the patient's reflexes, pinprick sensation, vibration sensation, proprioceptive sensation, and muscle strength, with the performance of an NCV needed in only a minority of cases.

317.    Radiculopathy is defined as injury or dysfunction of spinal nerve roots, which may affect the nerve root of a sensory nerve, motor nerve or both. With respect to trauma cases, such as those suffered as a result of automobile accidents, for the few cases in which radiculopathy occurs, the usual cause of radiculopathy is direct pressure on the nerve root by a herniated intervertebral disc causing inflammation of the nerve root. In the context of Electrodiagnostic Testing, for most patients the presence or absence of radiculopathy can be determined by neurological examination, with EMG performed to find and confirm radiculopathy in the minority of cases in which the neurological examination is not definitive.

318.    On information and belief, to confirm or rule out a diagnosis through an NCV and EMG, the data and results produced from the testing must be performed and interpreted in a medically valid manner according to the standard of practice. Similarly, it is impossible to correctly interpret an EMG unless the NCV is properly performed and interpreted in accordance with the prevailing standard of practice.

319.    On information and belief, in numerous instances, the reported results associated with the Electrodiagnostic Testing were fictitious, meaning that Defendants Morley Medical, Sage

Medical and Spike Medical routinely and as an integral element of their scheme to defraud submitted bogus reports, findings and data to insurance companies, in general, and Plaintiffs, in particular, to substantiate their fraudulent claims and induce payment.

### a) Misrepresentation of Electrodiagnostic Findings and Diagnoses

### i. Over-Diagnosis of Radiculopathy

320.    Accepted medical literature and published studies have determined that the rate of radiculopathy confirmed by Electrodiagnostic Testing typically seen in patients who have been involved in motor vehicular accidents, such as those purportedly treated by Morley Medical, Sage Medical and Spike Medical, is in the range of 8% for cervical radiculopathy, 12% for lumbar radiculopathy, and 19% for either cervical or lumbar radiculopathy. *See, e.g.,* Braddom RL, Spitz L and Rivner MH. Frequency of Radiculopathies in Motor Vehicle Accidents. *Muscle & Nerve,* 39: 545-547, 2009.

321.    Contrary to published reports and medically accepted rates concerning patients diagnosed with radiculopathy post motor vehicle accident, a representative review of 40 patient files submitted by Defendants to Plaintiffs for reimbursement of Electrodiagnostic Testing consisting of 71 studies, reveals that Defendants diagnosed cervical radiculopathy and/or lumbosacral radiculopathy in 36 studies (51%) from 24 patients (60%). By way of example and not limitation, a table identifying the patients with radiculopathy diagnoses in the sampled claim files is annexed hereto as Exhibit "21".

322.    The differences in the frequency of radiculopathy diagnoses between what is typically found in ambulatory post-motor vehicle accident patients and the radiculopathy rate purportedly found by Defendants is strongly indicative of fraud and an intentional misrepresentation of the Electrodiagnostic Testing for which Defendants billed Plaintiffs. This consistent over-diagnosis of cervical and lumbar radiculopathy demonstrates that the

Electrodiagnostic Testing was either not performed as billed, was fabricated, and/or was of no diagnostic value. Moreover, the false diagnosis of radiculopathy by Defendants reflects a disregard for the welfare of the patients since the wrong diagnosis could result in selection of the wrong treatment plan.

## ii.   Over-Diagnosis of Multi-Level Radiculopathy

323.   Accepted medical literature and published studies have determined that the majority of radiculopathies occur at only one level, and that single root level involvement can be diagnosed by clinical means 75%-80% of the time. *See, e.g.*, Dumitru, *Electrodiagnostic Medicine.* (1st Ed., Hanley and Belfus, Philadelphia, 1995, p. 557).

324.   Contrary to the medically accepted literature regarding single root level radiculopathy, a review of the 40 patient files submitted by Defendants to Plaintiffs for reimbursement of Electrodiagnostic Testing described above, in which 36 studies in 24 patient files purported to record diagnoses of radiculopathy where Covered Persons purportedly underwent EMG testing, Defendants diagnosed multi-level radiculopathy in 34 out of 36 studies (94%), from 23 of the 24 patients (96%). By way of example and not limitation, a table identifying diagnoses of multi-level radiculopathy in the sampled claim files is annexed hereto as Exhibit "22."

325.   The consistent over-diagnosis of multi-level radiculopathy, finding multi-level radiculopathy in every single study despite the medically accepted standard that the vast majority of those studies should have yielded a single-root diagnosis, demonstrates that the Electrodiagnostic Testing was either not performed as billed, was fabricated, and/or was of no diagnostic value.

326.   The consistent over-diagnosis of multi-level radiculopathy, finding multi-level radiculopathy in every single study despite the medically accepted standard that the vast majority

83

of those studies should have yielded a single-root diagnosis, demonstrates Defendants' disregard for the welfare of the patients and could result in the subsequent selection of improper and unnecessary invasive treatments by other providers that might rely on these diagnoses.

### iii.    Over-Diagnosis of Bilateral Radiculopathy

327.    Accepted medical literature and published studies have determined that only about 1%-6% of patients diagnosed with either cervical or lumbar radiculopathy suffer from bilateral radiculopathy.

328.    Accepted medical literature and published studies advise that bilateral radiculopathy is rarely caused by compressive injuries such as those experienced in motor vehicle accidents, but rather, indicates other conditions, including osteomyelitis, tuberculous meningitis, vertebrae metastasis, lymphoma, leptomeningeal carcinomatosis, sarcoidosis, spinal cord ischemia, and multiple sclerosis, and represents a need for further exploration by the treating physician in order to rule out more serious conditions.

329.    Contrary to the medically accepted literature regarding the infrequency of bilateral radiculopathy, a review of the 40 patient files submitted by Defendants to Plaintiffs for reimbursement of Electrodiagnostic Testing described above, in which 36 studies in 24 patient files purported to record diagnoses of radiculopathy where Covered Persons purportedly underwent EMG testing, Defendants diagnosed bilateral radiculopathy in 9 out of 24 patients (38%). By way of example and not limitation, a table identifying sample claim files where Defendants diagnosed bilateral radiculopathy is annexed hereto as Exhibit "23."

330.    Defendants' over-diagnosis of bilateral radiculopathy, combined with their failure to follow-up and rule out more serious conditions, demonstrates that the Electrodiagnostic Testing was either not performed as billed, was fabricated, and/or was of no diagnostic value.

331.    On information and belief, Defendants' disregard for patient health in failing to investigate serious conditions could have resulted in the patients suffering permanent nerve or muscle damage or unchecked progression of the underlying disease with potentially serious or life-threatening consequences.

332.    Defendants did not investigate the potential existence of more serious medical and life-threatening conditions because they knew the results were the product of fraudulent Electrodiagnostic Testing and therefore it was unnecessary to rule out a serious underlying condition or they willfully ignore such results, exhibiting a gross reckless indifference to the care and wellbeing of their patients.

### iv.    Diagnoses Not Justified By Reported Findings

333.    Defendants Morley Medical, Sage Medical and Spike Medical routinely made final diagnoses, missed diagnoses or inaccurately categorized diagnoses that could not be justified by the reported electrodiagnostic data, including but not limited to the provision of a final diagnosis that does not take into account or is contrary to H-reflex data; does not take into account the presence of conduction blocks; and/or an insufficient number of limb muscles being studied; providing diagnoses that are not supported by the NCV studies/EMG findings.

334.    By way of example and not limitation, in a review of 71 electrodiagnostic studies purportedly performed by the Defendants, 38 of 71 (54%) of these studies clearly did not provide the well-supported diagnosis that was expected. By way of example and not limitation, a table identifying sample claim files where Defendants' diagnoses are not justified by the reported findings is annexed hereto as Exhibit "24."

### v.    Failure to Take into Account Other Possible Pathologies

335.    Defendants Morley Medical, Sage Medical and Spike Medical routinely purportedly performed Electrodiagnostic Testing that demonstrated significant abnormal findings

which the Defendants failed to document, address, explain or otherwise account for despite a medical professional purportedly interpreting the data and providing a final diagnosis on behalf of the Defendants.

336.    By way of example and not limitation, in a review of 71 electrodiagnostic studies purportedly performed by the Defendants, those providers failed to consider other diagnostic possibilities or pathologies in 39 of 71 (55%) of studies performed.

337.    The failure to document, address, explain or otherwise account for abnormal findings was evidenced by the providers' failure to give a diagnostic explanation for: 1) the presence of abnormal NCV study results; 2) the diagnoses of multilevel radiculopathy when a single level radiculopathy was more likely; and 3) the presence of undiagnosed conduction blocks. By way of example and not limitation, a table identifying sample claim files where Defendants failed to take into account other possible pathologies is annexed hereto as Exhibit "25."

338.    It is the duty of an interpreting physician to determine if the nerve conduction studies abnormalities have clinical significance, and to provide an explanation for the apparent nerve conduction studies, which the physicians who purportedly interpreted nerve conduction studies on behalf of the Defendants failed to do.

339.    Failure to take into account abnormalities that indicate that other diagnoses were potentially present was a misrepresentation of the services rendered by the Defendants, and could potentially harm patients by failing to identify a potential medical condition that requires further evaluation and/or treatment, or by resulting in recommendations for the wrong additional diagnostic studies or the wrong treatment(s).

340.    On information and belief, by failing to take into account other possible pathologies, the Defendants showed blatant disregard for the standard of medical care and for the welfare of their patients.

### b)  NCV Fraud

341.    Defendants Morley Medical, Sage Medical and Spike Medical routinely submitted bills for reimbursement to Plaintiffs for expensive NCV tests that reflected services (to the extent any were performed) that were materially misrepresented, fabricated and/or never performed or performed in a way that could not possibly produce valid data or results.

### i.    Overutilization of NCVs

342.    Standards set forth by the American Medical Association, the American Association of Electrodiagnostic Medicine, and the American Academy of Neurology establish that approximately five (5) NCVs are necessary in order to diagnose radiculopathy in 90% of cases: three (3) motor NCVs and two (2) Sensory NCVs. These same guidelines strongly caution against using more NCVs than necessary in order to diagnose the patient.

343.    On information and belief, because NCV testing is reimbursed for each nerve tested, Defendants Morley Medical, Sage Medical and Spike Medical intentionally over-utilized NCV testing and/or fraudulently misrepresented that the NCV testing purportedly rendered was performed, when in fact, it was not, in order to maximize payments from Plaintiffs and profit the Defendants.

344.    Despite the official position of the AMA and medically accepted standards establishing that 90% of all radiculopathy cases can be diagnosed with five NCVs, a review of 71 sample NCV studies submitted by Defendants to Plaintiffs for reimbursement of Electrodiagnostic Testing reveals the use of excessive NCVs in 57 of 71 (80%) studies, and in 78% of the studies where a diagnosis of radiculopathy was made. By way of example and not limitation, a table identifying sample claims where NCVs were over-utilized is annexed hereto as Exhibit "26."

345.    On information and belief, assuming that Defendants actually performed the billed-for studies, the over utilization of NCVs served no purpose other than to enrich Defendants through

higher reimbursement, while needlessly exposing their "patients" to increased pain associated with the electrical stimulations required by the testing.

346.    On information and belief, as a matter of practice, procedure, and protocol, Defendants Morley Medical, Sage Medical and Spike Medical over-utilized NCV studies in order to fraudulently bill Plaintiffs for services that were excessive, unnecessary, unreasonable, and performed, if at all, solely to maximize profits.

### ii.    Failure to Diagnostically Account for Abnormal NCV Parameters

347.    When NCV studies are performed, the results are compared to normal standards for that EDX laboratory. These standards are often included on the NCV study data table, and when a result falls outside of the normal expected value, it must be noted and addressed.

348.    In numerous instances, the Defendants failed to note and account for abnormal NCV studies (NCV study results falling outside the normal values).

349.    By way of example and not limitation, in the lower limb study of Covered Person J.B., claim number 341477107-02, notwithstanding that the "Sensory: Right Sural amplitude" of 5.7 mV was below the listed norm of 10 mV, Defendant Spike Medical failed to document, explain, or otherwise account for the abnormal NCV parameter.

350.    The failure of the Defendants to account for the abnormal NCV parameters demonstrated a complete disregard for the actual results of these studies and a misrepresentation that the NCV studies purportedly performed.

### iii.    Unreported Conduction Block Falsely Interpreted as Normal

351.    By way of further example of Defendants' NCV fraud, in numerous instances Defendant Morley Medical submitted electrodiagnostic testing reports in support of claims for reimbursement that included NCV data and waveforms which demonstrated a significant drop in proximally evoked motor nerve amplitude responses as compared to distal, indicative of

conduction block, an electrodiagnostic finding suggestive of a serious medical problem, which Defendant Morley Medical failed to report was present, and failed to incorporate in the diagnosis of each NCV study in which the conduction block occurred.

352.   According to the AMA, conduction block is an important pathologic finding.  NCV studies are performed to assess the integrity of and diagnose diseases of the peripheral nervous system and an NCV report should document the nerves evaluated, the distance between the stimulation and recording sites, conduction velocity, latency values, and amplitude, and include a final diagnosis.

353.   By failing to indicate that a conduction block was present in the studies in which it occurred, Defendant Morley Medical's reports failed to meet the basic criteria of the CPT code, and thereby such services were not rendered as billed and in accordance with the applicable CPT code.

354.   In addition to failing to report and/or diagnose the presence of conduction block, in numerous instances, the NCV studies submitted by Defendant Morley Medical were falsely interpreted by them to be within normal limits, when in fact, the data they submitted, upon which these interpretations were purportedly based, contained data values and abnormal electrodiagnostic findings indicative of conduction block, that if taken at face value are suggestive or diagnostic of an underlying neuropathy that were entirely ignored. By ignoring these obvious abnormalities, Defendant Morley Medical failed to provide the fundamental professional medical services for which they fraudulently submitted and/or conspired to submit bills to Allstate for reimbursement under the No-fault Law.

355.   Representative examples of claims in which conduction block was present but failed to be noted and properly interpreted include Covered Persons: A.R., claim number 435639414-01; M.C., claim number 441434602-01; and V.T., claim number 441447679-03.

356.    On information and belief, were the reported abnormal data values submitted by Defendant Morley Medical to Allstate true and the cause of the apparent neuropathy not diagnosed and treated, the patients would be placed at risk for progressive neurological disorders and/or underlying disease.

357.    On information and belief, were the reported abnormal data values submitted by Defendants Morley Medical to Allstate true, emergent diagnostic workups were required to identify the cause of said neuropathy or other nerve injury. In each instance, Defendant Morley Medical failed to perform the required follow-up or diagnostic testing consistent with the abnormal findings. Rather, the abnormal findings were often reported as being within "normal" variance or were otherwise ignored.

358.    On information and belief, the abnormal data values were ignored because they were known to be fictitious and therefore not indicative of any underlying condition warranting additional examination or diagnostic testing.

359.    On information and belief, if the abnormal data values reported by Defendant Morley Medical were true and went untreated, the "Covered Persons" would have been left to suffer from various neuropathies, including potentially grave neuropathies and undiagnosed systemic diseases, such as Guillain-Barre syndrome (GBS), chronic inflammatory demyelinating polyneuropathy (CIDP) and multifocal motor neuropathy with persistent conduction block (MMN).

360.    Defendant Morley Medical did not either rule out conduction blocks or diagnose the potentially serious conditions that cause conduction blocks in the aforementioned studies because they knew that the studies were bogus, fictitious, and therefore not indicative of any underlying condition warranting additional examination or diagnostic testing.

### iv.    **Overutilization of F-wave Tests**

361.    The F-wave is a late combined motor action potential resulting from the backfiring of antidromically activated motor neurons by a supramaximal stimulus.

362.    On information and belief, Defendants Morley Medical, Sage Medical and Spike Medical, as a matter of pattern and practice, routinely over-utilized F-wave tests to fraudulently bill Allstate for services that were performed, if at all, solely to maximize reimbursement to Defendants Morley Medical, Sage Medical and Spike Medical.

363.    In numerous instances, Defendants Morley Medical, Sage Medical and Spike Medical submitted Electrodiagnostic Testing reports to Allstate in support of claims for reimbursement, which demonstrated that Defendants Morley Medical, Sage Medical and Spike Medical purportedly performed four (4) F-wave tests in each upper and lower limb NCV of the Covered Persons.

364.    By way of example and not limitation, representative claims submitted by Defendants Morley Medical, Sage Medical and Spike Medical to Allstate for reimbursement in which Defendants purportedly performed four (4) F-wave tests in each upper and lower limb NCV of the Covered Persons include but are not limited to Covered Persons: J.B., claim number 341477107-02; F.L., claim number 363374927-02; S.C., claim number 392463105-02; A.H., claim number 408989390-03; A.R., claim number 419715734-08; and M.T., claim number 451077739-01.

365.    Performing four (4) F-waves tests in all NCV studies of Covered Persons who have been involved in automobile accidents, or even Covered Persons with suspected radiculopathy, is contrary to accepted medical practice, which dictates the use of an EMG to diagnose radiculopathy, as opposed to the F-wave tests that were purportedly performed by Defendants Morley Medical, Sage Medical and Spike Medical.

366.    On information and belief, the over-utilization of F-wave tests by Defendants Morley Medical, Sage Medical and Spike Medical was intentionally designed to fraudulently increase reimbursement from Allstate through Defendants Morley Medical, Sage Medical and Spike Medical's purported routine performance of unnecessary, excessive testing. Assuming that Defendants Morley Medical, Sage Medical and Spike Medical actually performed the billed for tests, the over utilization of F-wave tests served no purpose other than to enrich Defendants Morley Medical, Sage Medical and Spike Medical through higher reimbursement, while needlessly exposing Covered Persons to increased pain associated with a minimum of forty uncomfortable electrical stimulations required by the testing.

367.    Billing for the F-wave tests was a misrepresentation by Defendants Morley Medical, Sage Medical and Spike Medical that the tests were medically indicated or within the standard of care for proper treatment, when in fact they were not, and knowingly administering this unnecessary testing to Covered Persons evidenced a wanton disregard by Defendants Morley Medical, Sage Medical and Spike Medical for their welfare.

### v.    Improper Performance of F-wave Tests and Misrepresented Findings

368.    In addition to the intentional and fraudulent over utilization of F-wave tests, on information and belief, in numerous instances, Defendants Morley Medical, Sage Medical and Spike Medical knowingly failed to administer F-wave testing in accordance with the prevailing standard of care and the requirements of the applicable CPT code, rendering the F-wave test results invalid and unusable for clinical purposes.

369.    In that regard, Defendants Morley Medical, Sage Medical and Spike Medical routinely, intentionally and fraudulently billed Allstate for F-wave tests that were not medically necessary, purportedly to diagnose radiculopathy (the ostensible justification for the test in the first place), despite F-wave tests lacking proven medical efficacy for such diagnoses, and then, in

performing this wholly unnecessary test, routinely failed to conduct a sufficient number of stimulations per each nerve tested in order to observe the required number of ten (10) F-wave responses per test.

370.    According to the AMA, who owns and defines the meaning of the CPT codes under which Defendants Morley Medical, Sage Medical and Spike Medical billed for nerve conduction studies, at least ten (10) F-waves should be assessed to arrive at a reasonably accurate F-wave latency. Performing enough stimulations to observe a minimum of ten (10) F-waves is also a requirement of the CPT code.

371.    Nearly every F-wave waveform submitted by Defendants Morley Medical, Sage Medical and Spike Medical to Allstate in support of claims for reimbursement failed to reflect the performance of a sufficient number of stimulations to produce the required ten (10) F-waves and fail to identify ten (10) visible F-waves in each nerve tested.

372.    By way of example and not limitation, representative claims submitted by Defendants Morley Medical, Sage Medical and Spike Medical to Allstate for reimbursement which fail to identify ten (10) visible F-waves in each nerve tested include Covered Persons: J.B., claim number 341477107-02; F.L., claim number 363374927-02; A.L., claim number 413236050-01; F.N., claim number 425873411-01; B.R., claim number 424433829-02; and G.J., claim number 454693755-01.

373.    By failing to perform the F-wave testing within the requirements of the CPT code and the prevailing standard of care, Defendants Morley Medical, Sage Medical and Spike Medical failed to provide the fundamental professional medical services for which they fraudulently submitted and/or conspired to submit bills related thereto, to Allstate for reimbursement under the No-fault Law.

374.    Additionally, notwithstanding that Defendants Morley Medical, Sage Medical and Spike Medical knew or should have known that the F-wave tests were invalid, on information and belief, Defendants Morley Medical, Sage Medical and Spike Medical knowingly submitted NCV studies to Allstate in which the data and findings related to the F-wave tests were, in part or wholly, fictitious and contrived, meaning that Defendants Morley Medical, Sage Medical and Spike Medical routinely submitted to Allstate F-wave findings that contained material misrepresentations to substantiate their fraudulent claims and induce payment.

375.    By way of example and not limitation, in numerous instances, Defendants Morley Medical, Sage Medical and Spike Medical submitted Electrodiagnostic Testing reports to Allstate which contained findings falsely representing that there were normal F-wave latencies of all nerves tested, when in fact the number of F-wave responses was insufficient to measure latency. Representative examples of these claims include Covered Persons: G.J., claim number 454693755-01; A.L., claim number 456041508-01; L.H., claim number 390434835-01; R.S., claim number 414942978-02; C.B.L., claim number 323528562-01; I.K., claim number 358421048-01; and D.L., claim number 421045568-01.

376.    By misrepresenting the F-wave findings, Defendants Morley Medical, Sage Medical and Spike Medical knowingly endangered the welfare of the Covered Persons, putting them at risk of having undiagnosed medical conditions and diseases, and/or the wrong diagnosis and wrong treatment, as well as billed Allstate for services that were not rendered as billed and were of no diagnostic value.

### vi.    Medically Unnecessary H-Reflex Tests

377.    Submaximal stimulation of some mixed nerves (nerves that contain both motor and sensory fibers) causes an H-reflex to occur. When a submaximal stimulus is delivered to the mixed nerve, the sensory fibers are stimulated and the resulting wave of depolarization travels up the

sensory nerve, makes a synapse (connection) in the spinal cord, and then comes back down the motor fibers to give a muscle response. This is most easily done at the S1 level when stimulating the tibial nerve behind the knee (popliteal fossa) and recording over the soleus muscle (in the calf). The H-reflex can be performed in other mixed nerves but is most practical clinically at S1 using the tibial nerve. A latency difference of 2.0 milliseconds or more be-tween the two sides indicates a problem in the slower side's H-reflex arc, with S1 radiculopathy the most frequent cause of the slowing.

378.    Despite its utility in the diagnosis of unilateral S1 radiculopathy, it is not medically necessary to perform H-reflex testing in every lower limb electrodiagnostic study, as standard EMG and NCVs are more than adequate for the diagnosis of unilateral S1 radiculopathy in the great majority of cases. Additionally, it should only be performed when there is a suspicion for S1 radiculopathy, based on the patient's clinical picture (their symptoms and physical exam findings). *See, e.g.,* Utility of Electrodiagnostic Testing in Evaluating Patients With Lumbosacral Radiculopathy: An Evidence-Based Review (Muscle & Nerve. August 2010).

379.    Despite the absence of any medical need to conduct H-reflex testing in addition to standard Electrodiagnostic Testing, as part of their fraudulent protocol, Defendants Morley Medical, Sage Medical and Spike Medical submitted medical reports reflecting the performance of H-reflex tests in addition to standard EMG and NCV testing, in order to fraudulently bill and receive payment from Plaintiffs for testing that was not performed as billed, not medically necessary, and/or was of no diagnostic value.

380.    By way of example and not limitation, in a review of 36 lower limb electrodiagnostic studies purportedly performed on Covered Persons by Defendants Morley Medical, Sage Medical and Spike Medical, H-reflex was performed bilaterally on all 36 (100%). There was no attempt to determine in each case whether H-reflex testing was needed or not.  By

way of example and not limitation, a table identifying claims submitted by Defendants Morley Medical, Sage Medical and Spike Medical to Plaintiffs for reimbursement, in which H-reflex testing was performed without suspicion of S1 radiculopathy, is annexed hereto as Exhibit "27."

381.    The fact that the tibial H-reflex tests were done bilaterally in all of the lower limb studies demonstrates that the Defendants used the H-reflex as part of their protocol of lower limb studies.

382.    The systematic and intentional billing for unnecessary H-reflex testing by the Defendants was, and is, contrary to widely accepted medical practices and intentionally designed to fraudulently maximize reimbursement from Plaintiffs.

383.    The over-utilization of H-reflex testing by Defendants regardless of patient symptoms further indicates the use of a protocol approach to NCV testing, whereby Defendants Morley Medical, Sage Medical and Spike Medical routinely and as a matter of course billed for unnecessary and diagnostically worthless testing in order to artificially inflate the reimbursement received from Plaintiffs.

### vii.    Diagnoses Incompatible with H-Reflex Data

384.    Published studies and accepted medical authorities indicate that when an H-reflex study is conducted at the S-1 level, a latency difference of 2.0 milliseconds or more between the two sides indicates a high likelihood of radiculopathy on the side showing the longer latency.

385.    In numerous instances, Defendants diagnosed S1 radiculopathy despite normal and symmetric H-reflex latencies. By way of example but not limitation, Defendant Morley Medical diagnosed Covered Person F.V., claim number 439942862-02 with right L5-S1 radiculopathy notwithstanding a latency difference recorded on the NCV study report submitted to Plaintiffs of only 0.18 milliseconds.

386.    A prolonged H-reflex may be the first, and only, abnormality in an S1 radiculopathy. Diagnosing an S1 radiculopathy in the setting of a normal H-reflex is an incompatibility that should be addressed by the physician, which the Defendants failed to do.

387.    Moreover, in numerous instances Defendants Morley Medical, Sage Medical and Spike Medical diagnosed S1 radiculopathy on the wrong side of the body.  By way of example but not limitation, Defendant Morley Medical diagnosed Covered Person M.P., claim number 437219173-02 with right L5-S1, meaning that the H-reflex should have been longer by at least 2.0 msec on the right side, notwithstanding a latency difference recorded on the NCV study report submitted to Plaintiffs indicated that the H-reflex was longer on the left side.

388.    By failing to account for the incompatibility of H-reflex data with the stated diagnosis, Defendants potentially endangered Covered Persons by providing the wrong or inaccurate diagnosis, which usually leads to incorrect or inappropriate treatments, some of which can result in significant morbidity (i.e. epidural steroid injections, lumbar spine surgery, etc.). This is a misrepresentation that the H-reflexes were performed and interpreted at the standard of care.

389.    Defendants' rendering of diagnoses incompatible with the H-reflex data indicate that they knew or should have known that the tests were bogus, fictitious, and not intended to actually diagnose a Covered Person's medical condition, but instead, intended solely to generate payments from insurance companies, in general, and Plaintiffs, in particular.

390.    By submitting reports for purported H-reflex testing in which the diagnosis was incompatible with the test data, Defendants fraudulently billed and/or received payment from Plaintiffs for testing that was not performed as billed, was not medically necessary, and/or was of no diagnostic value.

### viii.    Protocol Approach to NCV Testing

391.    By way of example and not limitation, as a matter of practice and procedure, Defendants Morley Medical, Sage Medical and Spike Medical used what is known as the "protocol approach" to perform NCVs, when in fact accepted medical practice and the AMA requirement is that such tests be performed using what is known as a "dynamic" examination or approach as a prerequisite for billing under NCV CPT codes.

392.    Unlike the protocol approach utilized by Defendants Morley Medical, Sage Medical and Spike Medical that resulted in the same set of nerves and muscles purportedly being tested regardless of the Covered Persons' symptoms and findings, the dynamic approach (also known as a "progressive" examination) actually takes into account the individual symptoms and the results and findings of each nerve and muscle tested, resulting in a logical, coherent and constantly evolving electrodiagnostic evaluation, evidenced by variation of the nerves and muscles tested on a case-by-case basis.

393.    Even though NCVs must be performed dynamically, Defendants Morley Medical, Sage Medical and Spike Medical used the protocol approach, which fails to recognize that the nerves and muscles studied should change from case to case and evolve within a case as the study proceeds.

394.    Use of the dynamic approach is a prerequisite for the use of the electrodiagnostic CPT codes and, in using the protocol approach as a matter of practice, procedure and protocol, Defendants Morley Medical, Sage Medical and Spike Medical submitted bills to Allstate for reimbursement of NCVs wherein they represented the services were validly performed and reimbursable under the No-fault Law, when in fact they were not.

395.    Even though Defendants Morley Medical, Sage Medical and Spike Medical's utilization of a protocol approach to the selection of NCVs was violative of the requirements of

the applicable CPT codes, Defendants Morley Medical, Sage Medical and Spike Medical sought

reimbursement, and were paid by Allstate, for such services that they knew or should have known

were not validly performed, were of no diagnostic value and were fraudulent and not reimbursable

under the No-fault Law. By way of example and not limitation:

- Representative examples of claims wherein the Defendants purportedly sampled the same 10 nerves (Bilateral Motor Median and Ulnar, Bilateral Sensory Median, Radial and Ulnar, and Bilateral Median and Ulnar F-waves) in the upper limb nerve conduction tests include Covered Persons: C.B.L., claim number 323528562-01; H.R., claim number 381020411-02; M.M., claim number 391046695-02; H.V., claim number 403606544-02; E.G., claim number 427096861-03; and G.A., claim number 444075162-03.

- Representative examples of claims wherein the Defendants purportedly sampled the same 8 nerves (Bilateral Motor Peroneal and Tibial, Bilateral Sensory Superficial Peroneal and Sural, Bilateral Peroneal and Tibial F-waves, and Bilateral tibial H reflexes) in the lower limb nerve conduction tests include Covered Persons: C.B.L., claim number 323528562-01; H.R., claim number 381020411-02; M.M., claim number 391046695-02; H.V., claim number 403606544-02; E.G., claim number 427096861-03; and G.A., claim number 444075162-03.

396.    The use of the "protocol approach," which, if administered at all, was uniformly

employed by Defendants Morley Medical, Sage Medical and Spike Medical increases the

likelihood of invalid diagnoses and unreasonable and unnecessary testing.

397.    The use of the "protocol approach," by Defendants Morley Medical, Sage Medical

and Spike Medical virtually assured the likelihood of medically unreasonable and unnecessary

Electrodiagnostic Testing.

398.    Defendants Morley Medical, Sage Medical and Spike Medical's purported use of

the "protocol approach" (as opposed to utilizing the "progressive" or "dynamic" examination

approach) in performing NCVs is contrary to the well accepted practices of the medical

community.

399.    Defendants Morley Medical, Sage Medical and Spike Medical's use of the "protocol approach" is contrary to the requirements for billing for electrodiagnostic services under the CPT codes used by the Defendants in seeking reimbursement from Allstate, and reflects a pattern and practice of billing for services that were bogus, medically necessary and/or of no diagnostic value.

400.    Since the NCV and EMG testing was substantially or routinely performed in a manner that could not possibly produce medically valid results, none of the medically accepted electrodiagnostic procedures were followed, rendering the purported services billed by Defendants Morley Medical, Sage Medical and Spike Medical to Allstate of no diagnostic value and fraudulent.

401.    By submitting to Allstate fictitious bills and documentation for NCV and EMG testing, Defendants Morley Medical, Sage Medical and Spike Medical misrepresented the services purportedly rendered and billed for services which were not rendered, or services performed in an invalid manner, rendering the results of no diagnostic value.

402.    A protocol approach to electrodiagnostic studies is clinically unacceptable and does not meet the standard required for billing for services under the applicable CPT code, and therefore bills submitted by Defendants Morley Medical, Sage Medical and Spike Medical to Allstate in connection therewith were fraudulent and potentially exposed the Covered Persons to an incorrect diagnosis and treatment plan.

**c)  EMG Fraud**

403.    The Defendants routinely submitted bills for reimbursement to Plaintiffs for expensive EMG tests that reflected services (to the extent any were performed) that were materially misrepresented, fabricated and/or never performed or performed in a way that could not possibly produce valid data or results.

### i.   **Improper Performance of EMG Studies**

404.    On information and belief, Defendants routinely failed to perform EMG studies at the standard of care and reported final diagnoses that could not be justified based on Defendants' failure to perform the EMG in a valid manner.

405.    The standard practice in electromyography is to sample a minimum of five muscles per limb to screen for the presence or absence of radiculopathy. By way of example and not limitation, in numerous instances, Defendants submitted Electrodiagnostic Testing reports to Allstate which contained diagnoses of radiculopathy in the upper and/or lower limb studies that could not be justified because an insufficient number of muscles were tested per limb.

406.    Defendants' failure to test a sufficient number of limb muscles required for a screening EMG renders the EMG studies invalid and of no diagnostic value and does not adequately support the given diagnoses. Representative examples of these claims include Covered Persons: C.T., claim number 431151653-01; A.R., claim number 441447679-03; E.G., claim number 390765212-02; J.C., claim number 409083672-02; and C.B.L., claim number 323528562-01.

407.    In addition, despite their failure to test a sufficient number of limb muscles, Defendants fraudulently billed for a full limb of EMG in order to maximize their reimbursement. According to the AMA, who owned and defines the meaning of the CPT codes under which Defendants billed for EMG studies, in order to bill for EMG studies under CPT Codes 95860-95866 (the CPT codes used by Defendants), at least 5 limb muscles or 4 limb muscles plus paraspinal muscles must be studied per limb.

408.    Many of the EMG reports submitted by Defendants to Allstate failed to reflect the performance of the required number of limb muscles to constitute a full limb of EMG for which Defendants billed and constitute a willful misrepresentation of the services provided.

### ii.  Failure to Extend EMG from a Screening to Diagnostic Study

409.    By way of further example of Defendants Morley Medical, Sage Medical and Spike Medical's EMG fraud, on information and belief, in numerous instances Defendants Morley Medical, Sage Medical and Spike Medical submitted electrodiagnostic testing reports in support of claims for reimbursement which demonstrated that Defendants failed to extend the EMG studies from screening to diagnostic EMGs when radiculopathy was detected.

410.    As alleged above, the standard practice in electromyography is to sample a minimum of five muscles per limb to screen for the presence or absence of radiculopathy. However, if abnormalities suggestive of radiculopathy are found, the EMG study is extended, and additional muscles are tested in order to establish an accurate diagnosis by defining the radiculopathy to the correct root level.

411.    On information and belief, Defendants Morley Medical, Sage Medical and Spike Medical's failure to extend the EMG from screening to diagnostic studies renders the EMG studies invalid and of no diagnostic value and was a material misrepresentation of the services provided.

412.    By way of example and not limitation, representative examples of claims where Defendants Morley Medical, Sage Medical and Spike Medical failed to extend the EMG from screening to diagnostic studies include Covered Person: C.B.L., claim number 323528562-01; M.S., claim number 395157092-01; Y.C., claim number 411138992-01; R.M., claim number 433530375-01; and F.V., claim number 439942862-02.

### iii.  Overutilization of EMG Testing

413.    By way of further example of Defendants Morley Medical, Sage Medical and Spike Medical's EMG fraud, in numerous instances Defendants Morley Medical, Sage Medical and Spike Medical submitted electrodiagnostic testing reports in support of claims for reimbursement which demonstrated that Defendants purportedly performed medically unnecessary EMG studies

in violation of the American Association of Neuromuscular & Electrodiagnostic Medicine (AANEM) guidelines.

414.    Performing a four extremity EMG is not medically necessary for the diagnosis of radiculopathies.

415.    In that regard the Professional Practice Committee (PPC) of the AANEM recommends as follows:

> Don't do a four limb needle EMG/nerve conduction study (NCS) testing for neck and back pain after trauma.  Although techniques such as needle EMG and NCS can be helpful to diagnose pinched nerve in the neck or back (cervical or lumbar radiculopathy), four limb needle EMG/NCS is not needed and is not considered appropriate testing but does increase costs.

"AANEM's Top Five Choosing Wisely Recommendations" (April 2015, *Muscle & Nerve*, p. 617-619).

416.    Notwithstanding that four extremity EMG is not indicated for post-trauma neck and back pain, and thus medically unnecessary, Defendants routinely submitted claims to Plaintiffs for Electrodiagnostic Testing in which Defendants purportedly performed four extremity EMG on the same day.

417.    By way of example and not limitation, in a review of patient records for 41 Covered Persons upon whom EMG testing was purportedly performed, Defendants Morley Medical, Sage Medical, and Spike Medical performed medically unnecessary four extremity EMG on 28 of 40 (70%) Covered Persons. By way of example and not limitation, a table identifying claims submitted by Defendants Morley Medical, Sage Medical and Spike Medical to Plaintiffs for reimbursement, in which four extremity EMG testing was performed on the same day, is annexed hereto as Exhibit "28."

6.     **The Fraudulent pf-NCS Testing**

418.    In furtherance of the scheme to defraud alleged herein, Shirazi, through HS Diagnostic Chiro, purportedly performed pf-NCS Testing to diagnose abnormalities in the Covered Persons' peripheral nerves. Peripheral nerves consist of bundles of fibers which are capable of detecting sensation, with the largest and fastest fibers known as A-Alpha and A-Beta fibers, and the smaller and slower conducting fibers that transmit feelings of pain known as C-fibers and A-Delta fibers.

419.    At all relevant times mentioned herein, Shirazi, through HS Diagnostic Chiro, purported to selectively stimulate a Covered Person's nerve's A-Delta fibers through pf-NCS Testing in order to diagnose abnormalities within the nerves.

420.    The speed, or velocity, with which a nerve fires is proportional to its diameter and the nature of its myelin covering.  Conversely, the intensity of an electrical stimulus required to cause a fiber to activate is inversely proportional to its diameter. Thus, the intensity of electrical shock required to excite the C or A-Delta pain fibers is at least four times that required to stimulate the significantly larger A-Beta fibers.

421.    The amount of external stimulus (amplitude) that must be applied to a nerve before it fires is different than the amplitude of the nerve's resulting compound action potential. The stimulus threshold is the amount of external electricity that must be delivered to a nerve fiber before it fires. In contrast, the amplitude of the nerve's compound action potential represents the strength of the nerve's response to that external shock.

422.    The other factor determining the susceptibility of a nerve fiber to fire, aside from the intensity of an external shock, is the distance of the fiber from the source of the shock. Fibers closer to the source of the shock receive more current, and therefore reach their stimulus threshold (i.e., the amplitude required to generate a response) sooner than the fibers on the opposite side of

the nerve. As the amplitude of the stimulus is gradually increased, more of the fibers begin to activate until all of the fibers capable of activation, are activated.

423.    At the lowest amplitude level, the only fibers that activate are the large-diameter A-Alpha fibers. As the intensity of the stimulus increases, more A-Alpha, and some A-Beta (touch/pressure) fibers begin to activate.

424.    The point at which all the fibers including the smallest A-Delta and C-fibers are eventually activated is referred to as "maximal stimulation," meaning the point at which all functioning fibers within a nerve are being simultaneously activated.

425.    Activation of the A-Delta fibers requires a level of stimulus that will be perceived by the subject as painful as opposed to the "slight tickle" called for in the pf-NCS testing protocol.

426.    In furtherance of the scheme to defraud alleged herein, Shirazi, through HS Diagnostic Chiro, purportedly performed pf-NCS Testing on the Covered Persons in order to diagnose nerve abnormalities.

427.    Abnormalities in the peripheral nerves are known as neuropathies. There are several methods for diagnosing the existence, nature, extent, and specific location of these abnormalities, including but not limited to standard Nerve Conduction Studies ("NCS") and Quantitative Sensory Testing ("QST").

428.    NCS are the standard and most widely accepted methods for testing the health and integrity of the peripheral nerves; that is, for recording the compound action potential resulting from an external stimulus.

429.    Separate and apart from NCS, Quantitative Sensory Testing ("QST"), also known as Sensory Nerve Conduction Testing ("sNCT"), is a form of testing which purports to diagnose sensory peripheral neuropathies by identifying areas of relative numbness by stimulating the skin with different intensities of stimulus and asking the subject to indicate when they feel the stimulus

(a psychophysical response from the person being tested). QST is entirely dependent upon the subject's subjective, psychophysical recognition of a stimulus applied to a physical area.  When QST is performed with an electric device, it is often referred to as "Sensory Nerve Conduction Threshold Testing" ("sNCT Testing").

430.    Current Perception Threshold Testing ("CPT Testing") and pf-NCS Testing are both forms of sNCT Testing which are performed by administering an electrical current to specific sites through electrodes placed on the surface of the skin, and identifying the minimum electrical stimulus necessary for the subject to perceive the stimulus and indicate that they feel the stimulus. These tests serve only to confirm the patient's subjective complaints of numbness and are not capable of providing any diagnostic information concerning the nature of the abnormalities in the nerves. They can be useful in the clinical setting to track the progression and severity of the patient's numbness in progressive conditions such as diabetic peripheral neuropathy.

431.    pf-NCS Testing purports to measure the voltage intensity entering the body from the testing device, and consequently, the intensity of the stimulus necessary to elicit a discernable nerve impulse in order to purportedly diagnose peripheral neuropathies.

432.    Effective July 1, 2005, the AMA assigned CPT Category III Code 0110T to pf-NCS Testing.  Category III codes are a set of temporary codes that allow for data collection on emerging technology, services and procedures.  These codes are intended to be used for data collection to substantiate widespread usage or to provide documentation for the FDA approval process.

433.    The assignment of a Category III Code to a procedure does not imply or endorse clinical efficacy of that procedure, and the Fee Schedule provides that all Category III Codes are "By Report" (BR) procedures, meaning that to the extent that a Category III procedure is reimbursable, an "operative report" of the procedure is required.

434.     The Fee Schedule mandates that bills for Category III procedures not accompanied by the required operative report are to be deemed not properly submitted, unless and until an operative report is received by the payer.

435.     On or about January 7, 2008, CMS reiterated and clarified that pf-NCS Testing must be billed using CPT Category III 0110T.

436.     Defendants, including but not limited to Shirazi, through HS Diagnostic Chiro, routinely billed Plaintiffs for pf-NCS Testing under CPT Codes 95904 which, during the relevant dates of service was reserved for "Nerve conduction, amplitude latency/velocity study, each nerve; sensory" and/or 95999, which is reserved for "unlisted neurological or neuromuscular diagnostic procedures," when in fact, such services, if reimbursable at all, were required to be billed pursuant to CPT Category III Code 0110T.

437.     The billing of pf-NCS Testing pursuant to CPT Codes 95904 and/or 95999 was a knowing misrepresentation of the facts. A chart identifying a representative sample of claims billing under CPT Codes 95904 and/or 95999 is annexed hereto as Exhibit "29."

438.     On information and belief, pf-NCS Testing is not required for the diagnosis or treatment of injuries caused by motor vehicle accidents, such as radiculopathy, plexopathy and nerve entrapment, all which can be diagnosed with the standard methods of neurological examination and/or standard EMG/NCV testing.

439.     Shirazi, through HS Diagnostic Chiro, sought reimbursement of No-fault benefits from Allstate through the submission of medical records, reports and bills which contained false and material misrepresentations as to the medical necessity of the pf-NCS Testing and the actual services rendered.

440.     On information and belief, in order to obfuscate the fact that the billed for pf-NCS Testing was medically unnecessary, not rendered as billed and/or of no diagnostic value, Shirazi,

through HS Diagnostic Chiro, made material misrepresentations in documentation submitted in support of their claims for reimbursement.

441.    On information and belief, demonstrative of the fact that the pf-NCS purportedly performed by Shirazi and HS Diagnostic Chiro was fraudulent, the clinical presentation of Covered Persons, as documented in Shirazi and HS Diagnostic Chiro's own medical records, was routinely inconsistent with the reported results of the pf-NCS Testing. By way of example and not limitation, in many instances, Covered Persons reported that they were not having any pain, while the related pf-NCS Testing reports purport to identify evidence of radiculopathy at multiple levels.

442.    In numerous instances, Shirazi and HS Diagnostic also failed to submit "operative reports" for pf-NCS Testing as is required under the Fee Schedule for Category III Codes in order for such services to be properly submitted and eligible for reimbursement.

### a)  Presumptive Diagnosis

443.    On information and belief, Defendants, including but not limited to Shirazi, through HS Diagnostic Chiro, routinely misrepresented in bogus medical reports submitted to Allstate in support of claims for reimbursement that Covered Persons had a "Presumptive Diagnosis" (or reason why the pf-NCS Testing was being performed) of "Cervical plexopathy without motor deficit," and/or "lumbosacral plexopathy without motor deficit," or substantially similar language.

444.    On information and belief, plexus disorder is an injured or disordered condition of a plexus and especially a nerve plexus.

445.    On information and belief, Defendants, including but not limited to Shirazi through HS Diagnostic Chiro, included "cervical plexopathy without motor deficit" and/or "lumbosacral plexopathy without motor deficit[,]" or substantially similar language as a presumptive diagnosis in their medical reports to indicate that pf-NCS Testing was being performed in order to evaluate

for the possibility of a cervical or lumbosacral plexus disorder that has resulted in injury or damage to the sensory fibers, but not to the motor fibers.

446.    On information and belief, rarely if ever does a plexus disorder involve exclusively sensory fibers, without motor deficit.

447.    On information and belief, cervical plexus and lumbosacral plexus disorders involve injury to major peripheral nerves, which carry both motor and sensory nerve fibers of all types and sizes.

448.    On information and belief, it would be extremely unlikely for any patient, anatomically and/or physiologically, to injure only the sensory nerve fibers of a plexus without injuring the motor nerves.

449.    Defendants' representations that pf-NCS Testing is useful for evaluating a presumptive diagnosis of "cervical" or "lumbosacral plexopathy without motor deficit" were knowing and willful misrepresentations of the facts designed to induce Plaintiffs into paying for pf-NCS Testing that was not performed as billed, was medically unnecessary and/or was of no diagnostic value.

**b)  pf-NCS Graphs Misrepresented as Showing Nerve Conduction Velocity**

450.    Defendants, including but not limited to Shirazi through HS Diagnostic Chiro, included printed graphs with their reports submitted to Plaintiffs in support of reimbursement which misrepresented that the pf-NCS Testing measured nerve conduction velocity/latency (Vel./Lat.), when in fact, it did not.

451.    On information and belief, velocity, or speed, is a measure of distance over time.

452.    In electrodiagnostic medicine, velocity is measured as meters per second (m/s), and to measure the conduction velocity of a nerve, one must know the time and distance it takes for a nerve impulse to travel from one point in a nerve to another point.

453.     In electrodiagnostic medicine, distal peak or onset latency can also be a measure of conduction speed, or velocity, but only because certain studies are performed at standard distances, so the distances are already known. By way of example and not limitation, when performing a standard antidromic median sensory nerve conduction study at the wrist, the stimulus point is typically 14 cm proximal to the recording over the nerve at the finger. Because the distance is fixed, the time it takes to get from point A to point B (distal latency) is a useful and valid measure of conduction speed. Therefore, a distal latency is only valid if the standard distance is used (and recorded on the report). Notwithstanding the foregoing, in the graphs submitted by Defendants in connection with their claims for reimbursement, which are clearly labeled as measuring velocity and/or latency, there are no measurements of distance, making it impossible to measure velocity, or speed.

454.     Therefore, these graphs misrepresent that they are measuring the nerve conduction velocity/latency.

**7.     The Fraudulent Computerized Range of Motion and Manual Muscle Testing**

455.     On information and belief, in furtherance of the scheme to defraud alleged herein, and as a matter of practice, procedure and protocol, numerous patients treated at the Northern Boulevard Clinic were subjected to medically unnecessary computerized Range of Motion and Muscle Tests that Defendants knew, or should have known, were medically unnecessary and/or of no clinical or diagnostic value, often performed on multiple occasions six to twelve weeks apart, and billed for through Defendant PR Medical.

456.     On information and belief, the measurement of the ability for each joint to fully perform its anatomical function is a patient's range of motion for each joint.

457.     On information and belief, traditional, or manual range of motion testing consists of the non-electronic measurement of a joint's ability to move through various angles within its

arc of motion with a manual inclinometer or goniometer, compared to the generally agreed upon values for the full ranges of motion of the unimpaired or ideal joint, as published in standard texts.

458.    On information and belief, active range of motion testing refers to range of motion testing where the clinician directs the patient to move a joint to the full extent the patient is capable.

459.    On information and belief, active range of motion testing can be inaccurate if the patient does not provide full effort.

460.    On information and belief, passive range of motion testing refers to range of motion testing where the clinician moves a patient's joints to identify restrictions of movement, pain caused by movement, and whether grating sound or sensation is produced with the joint's movement, and is only performed when the patient is unable to actively perform an active range of motion exam or if there is obvious pain with active motion of the joint.

461.    On information and belief, manual muscle strength test consists of a non-electronic measurement of muscle strength, by having the patient move a joint against resistance applied by the clinician, and grading the patient's tolerance to the resistance according what is known as the Oxford Scale or Medical Research Council Manual Muscle Testing Scale, which rates the patient's tolerance on a scale of 0 to 5. For example, if a physician were to measure a person's knee flexion strength, he or she would first determine whether the patient could flex their knee against the force of gravity without additional resistance, and if the patient is capable, apply resistance against the person's posterior foreleg while having them flex their knee.

**a)    PR Medical's Computerized Range of Motion and Computerized Muscle Testing Medically Unnecessary When Manual Testing Performed as Part of Initial and Follow-Up Examinations**

462.    On information and belief, a physical examination performed on a person to diagnose a patient presenting with soft-tissue injuries will typically require manual range of motion

testing and muscle strength testing to assess injury and develop a treatment plan. These documented range of motion and strength impairment measurements provide an objective frame of reference as it pertains to functional tasks, which allows the doctor to monitor progress.

463.    On information and belief, manual range of motion and strength tests are regularly performed on patients as part of their initial evaluation and any follow-up examination, and accordingly are billed as part of the charge, and under the CPT code for the initial or follow-up evaluation.

464.    On information and belief, computerized range of motion testing is purportedly performed by the placement of a digital inclinometer on various parts of a patient's body while the patient is asked to move the related joint through its available motion. Computerized range of motion testing is nearly identical to the traditional or manual range of motion testing except that a digital reading is gained rather than a manual one. To the extent a clinician performs active computerized range of motion testing, this test is dependent upon patient cooperation and effort, and whether active or passive, is likewise dependent on the skill of the examiner.

465.    On information and belief, computerized muscle testing is purportedly performed through the placement of a digital device against a limb to be tested while the patient attempts to flex the muscle against resistance applied by the clinician, and is nearly identical to the traditional or manual muscle strength testing performed by clinicians during an initial and/or follow-up examination, except that a digital reading is gained identifying the pounds of pressure that the patient exerts as opposed to a 0 to 5 scale.

466.    On information and belief, the digital recordings do not take into account whether the patient is applying full effort, and thus, the accuracy of computerized muscle testing is dependent upon patient cooperation, effort, and the skill of the examiner.

467.     On information and belief, when the computerized range of motion and muscle tests are performed, the decision of which joints to test for range of motion and which muscles to test in the computerized muscle test should be tailored to the unique clinical findings of that individual patient., and accordingly, the particular joints and muscles tested should be individualized for each patient.

468.     On information and belief, while the computerized range of motion and muscle testing performed separately from traditional or manual testing as part of initial and follow-up exams may be useful tools in assessing spinal cord injuries, neurological conditions, movement disorders, or as part of medical research studies, under the circumstances employed at the Northern Boulevard Clinic, they were medically unnecessary and, to the extent they were performed at all, were performed and billed for pursuant to a pre-determined treatment protocol irrespective of medical necessity, designed solely to maximize profits.

469.     In particular, most patients at the Northern Boulevard Clinic purportedly underwent traditional, manual range of motion testing and muscle strength testing as part of their initial and/or follow-up examinations with the medical, and/or chiropractic practices at the Northern Boulevard Clinic.

470.     Each form filled out in connection with each initial examination billed for by PR Medical, which contain PR Medical's conclusions concerning the manual range of motion and manual muscle testing purportedly conducted during these examinations, also contains the option to include "Range of Motion and Muscle tests" within each patient's diagnostic plan.

471.     On each form, PR Medical invariably circles the option for "Range of Motion and Muscle tests" irrespective of the patient's physical condition.

472.     Defendants regularly submitted bills to Allstate for reimbursement for medically unnecessary computerized range of motion and muscle tests purportedly performed on Covered Persons.

473.     On information and belief, the computerized range of motion and muscle tests were not tailored to each Covered Person's individual needs, did not provide any additional actionable data over the manual range of motion and muscle strength tests that were allegedly performed, and were irrelevant to the monitoring of the restoration of function for purposes of treatment.

474.     On information and belief, in the relatively minor soft-tissue injuries allegedly sustained by the patients, the difference of a few degrees in the patients' range of motion reading or pounds of resistance in the patients' muscle strength testing is unimportant to the diagnosis or treatment of such patients.

475.     Even if there was a reason to perform computerized range of motion and muscle tests, on information and belief, the methods in which the tests are performed were not tailored to the individual Covered Persons, are not intended to identify or diagnose particular conditions, and do not facilitate treatment or result in change in a treatment program.

476.     On information and belief, while a clinician can take measurements of a variety of limb movements in each test, Defendants' tests never tested many joints in the body, while other joints in the body are tested repeatedly irrespective of the Covered Person's specific complaints or conditions, and irrespective of whether or not the joints were previously diagnosed with any pain, deformity, or functional deficit.

   b)  **PR Medical's Computerized Muscle Testing is of No Diagnostic Value Due to Testing Inaccuracies**

477.     Moreover, the computerized range of muscle testing purportedly performed by PR Medical, for which PR Medical submitted claims to Plaintiffs for reimbursement were if no diagnostic value due to apparent inaccuracies in testing results.

478.    In that regard, numerous computerized muscle testing reports submitted by PR Medical recorded inaccurate maximum neck flexion and maximum neck extension strengths that were necessarily inaccurate given the Covered Person's physical condition as otherwise indicated in the Covered Person's medical records.

479.    By way of example but not limitation, the computerized muscle testing report submitted by PR Medical to Plaintiffs in connection with Covered Person J.B., claim number 341477107-02, purported to record a maximum neck flexion strength of 3.3 pounds, and a maximum neck extension strength of 3.9 pounds.

480.    On information and belief, the human head weighs approximately ten pounds.

481.    On information and belief, were the recordings on the computerized muscle testing report accurate for Covered Person J.B., it would have been impossible for the Covered Person to lift their head off a bed, control their neck while standing, or hold their neck in extension while standing, yet there was no documentation in the Covered Person's chart that the Covered Person was unable to lift their head or control their neck.

482.    In addition, numerous computerized muscle testing reports submitted by PR also contained inaccurate knee extension strength recordings given the Covered Person's physical condition as otherwise indicated in the Covered Person's medical records.

483.    By way of example but not limitation, the computerized muscle testing report submitted by PR Medical to Plaintiffs in connection with Covered Person I.K., claim number 358421048-01, purported to record a maximum knee extension strength of 5.3 pounds for the left knee and 4.9 pounds for the right knee, for a combined knee extension strength of 10.2 pounds.

484.    On information and belief, the amount of knee extension force necessary to be able to stand up from a chair without the use of the hands is 67.4 pounds of combined force of the left and right knees.

485.     On information and belief, were the recordings on the computerized muscle testing report accurate for Covered Person I.K., the covered person would not have been able to stand up from a chair unassisted, yet there was no documentation in the Covered Person's chart that the Covered Person was unable to stand from a chair unassisted.

486.     Due to glaring inaccuracies in the strength values recorded in the computerized muscle testing reports submitted by PR Medical to Plaintiffs, such testing had no diagnostic value.

**c)  PR Medical's Fraudulent Unbundling of Computerized Range of Motion and Computerized Muscle Testing**

487.     Moreover, irrespective of whether Defendants' computerized range of motion and muscle testing was conducted in a diagnostically useful manner, or was medically necessary, Defendants fraudulently unbundled charges for such services.

488.     In that regard, the CPT Assistant sets forth the circumstances in which muscle testing and range of motion testing may be billed separately under CPT codes 95831 or 95833, and 95851 respectively, and when such services must be included in testing that should be billed under CPT code 97750.

489.     According to the CPT assistant, to the extent the computerized muscle testing like that purportedly performed, and billed for, by PR Medical, was performed in a diagnostically useful manner or was medically necessary, which it was not, such services would properly be billed under CPT code 97750.

490.     However, many of the bills for computerized muscle tests submitted by PR Medical listed multiple charges under 95831, which is designated for ""Muscle testing, manual (separate procedure) with report; extremity (excluding hand) or trunk; along with multiple charges for computerized range of motion testing under code 95851, to represent as many as seven separate measurements had been performed on each patient for each type of test.

491.     Alternatively, many bills for the same type of computerized range of motion testing and computerized muscle testing submitted by PR Medical listed multiple charges under CPT Code 95831 to represent that as many as seven separate measurements had been performed on each patient, as well as a separate charge for CPT Code 95833 which is designated for "Muscle testing, manual (separate procedure) with report; total evaluation of body, excluding hands."

492.     Most recently, many bills for the same type of computerized range of motion testing and computerized muscle testing submitted by PR Medical listed a single charge under CPT Code 95833.

493.     According to the applicable fee schedule, a healthcare provider seeking reimbursement for range of motion testing may bill under the CPT Code 95851 for a maximum of 5.41 relative units—or $45.72—for each individual "extremity" or "trunk section" which is tested.

494.     According to the applicable fee schedule, a healthcare provider seeking reimbursement for manual muscle tests may bill under CPT Code 95831 for a maximum of 5.16 relative units—or $43.60—for each individual "extremity" or "trunk section" which is tested, and should bill under CPT Code 95833 for a maximum of 13.55 relative units—or $114.32—if the entire body is tested.

495.     According to the applicable fee schedule, a healthcare provider seeking reimbursement under CPT Code 97750, the appropriate code for computerized muscle testing either alone or along with computerized range of motion testing, may bill for a maximum of 5.41 relative units—or $45.71—for each fifteen-minute period it took to perform the testing.

496.     However, by billing for each measurement of each test separately, and often billing for a total evaluation of the body as well, Defendants misrepresented to Allstate that they were entitled to bill for separate measurements independent of each other, resulting in charges ranging from $265.82 to $644.55 per patient per test, rather than the maximum allowable charge of $$45.71

for every 15 minutes performing the testing. A chart identifying a representative sample of claims billing under CPT Codes 95831, 95833, and/or 95851 is annexed hereto as Exhibit "30."

497. As a result of the misrepresentations, even if the computerized range of motion and computerized muscle testing had diagnostic value and were properly reimbursable—which they were not—by submitting bills seeking payment for the testing of multiple extremities, and often additionally billing for a full body evaluation, Defendants defrauded Allstate into paying more than Defendants were entitled to be paid.

498. Nonetheless, on information and belief, the test results and supporting documentation submitted in connection with Defendants' claims for reimbursement for computerized range of motion and muscle testing reflected services that, if performed at all, were medically unnecessary and performed pursuant to a pre-determined treatment protocol irrespective of medical necessity.

### 10. The Fraudulent Outcome Assessment Testing

499. On information and belief, in furtherance of the scheme to defraud alleged herein, one or more of the PC Defendants, including but not limited to PR Medical, routinely performed medically unnecessary Outcome Assessment Testing on Covered Persons for no other reasons than to fraudulently bill insurers in general, and Plaintiffs in particular.

500. On information a belief, outcome assessment testing is, among other things, a type of measurement, based on a report that may come directly from the patient, about the status of the patient's health condition without amendment or interpretation of the patient's response by a clinician or anyone else. Symptoms or other unobservable concepts known only to the patient can be measured by an outcome assessment test, and such tests may also properly be used to assess the patient perspective on functioning or activities that may also be observable by others.

501.    On information and belief, the Outcome Assessment Testing purportedly performed by one or more of the PC Defendants, including but not limited to PR Medical, consisted of a homemade version of an "outcome assessment instrument" wherein Covered Persons filled out a multiple page, multiple choice and fill-in-the-blank preprinted survey (the "Outcome Assessment Testing Survey") during their initial evaluations that asks them to report their symptoms, including the impact of those symptoms on their lives.

502.    On information and belief, the Outcome Assessment Testing Survey has never been assessed for any kind of validity in peer-reviewed literature and is not one of the currently standardized outcome assessment instruments available in the medical marketplace.

503.    There is no documentation in the medical records of Covered Persons that the Outcome Assessment Testing Surveys were ever used in any way to help guide or alter the treatment plan for any Covered Person, or that the Outcome Assessment Testing Surveys were ever even read by a medical professional (or anyone else) associated with the PC Defendants.

504.    On information and belief, the Outcome Assessment Testing purportedly performed by one or more of the PC Defendants, including but not limited to PR Medical, was medically unnecessary and, at best, duplicative of information that should be documented and billed for as part of Covered Persons' initial evaluations.

505.    On information and belief, the Outcome Assessment Testing purportedly performed by one or more of the PC Defendants, including but not limited to PR Medical, was performed, if at all, pursuant to a fraudulent treatment protocol and illegal kickback agreement with the No-fault Clinics and/or John Does, and was designed solely to enrich the Defendants.

506.    Notwithstanding that the Outcome Assessment Testing purportedly performed by one or more of the PC Defendants, including but not limited to PR Medical, was medically unnecessary and duplicative of information that should have been documented and as part of

Covered Persons' initial evaluations, those PC Defendants routinely billed Plaintiffs for Outcome Assessment Testing pursuant to CPT Code 99358 in addition to billing Plaintiffs under separate CPT codes for Covered Persons' initial evaluations that occurred contemporaneously with the Outcome Assessment Testing. A table identifying representative examples of instances where PR Medical billed Plaintiffs for medically unnecessary Outcome Assessment Testing is annexed hereto as Exhibit "31."

507.    On information and belief, the CPT Assistant sets forth the circumstances under which CPT Code 99358 may be used, and the only such circumstance which could apply to the Covered Persons purportedly examined by the PC Defendants is "... prolonged review of extensive health record and diagnostic tests regarding the patient."

508.    On information and belief, the Outcome Assessment Testing Surveys would take a competent physician no more than a few minutes to review.

509.    On information and belief, the Outcome Assessment Testing purportedly performed by one or more of the PC Defendants, including but not limited to PR Medical, would have been reimbursable, if at all, as a part of a medically necessary initial evaluation and not as a separate reimbursable service.

510.    On information and belief, the PC Defendants, including but not limited to PR Medical, did not document, in any of their medical records of Covered Persons, anything that supports the use of CPT Code 99358.

511.    On information and belief, PR Medical's billing of Plaintiffs for Outcome Assessment Testing on Covered Persons pursuant to CPT Code 99358 represented fraudulent misstatements of the services actually rendered.

## DISCOVERY OF THE FRAUD

512.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud, described above, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before this complaint was filed.

## STATEMENT OF CLAIMS

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS SHAPSON, NISNEVICH, DELALEU, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

## [RICO, pursuant to 18 U.S.C. § 1962(c)]

513.    The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

514.    At all times relevant herein, SD Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

515.    From in or about 2003 through the date of the filing of this Complaint, Defendants Shapson, Nisnevich, and/or others unknown to Plaintiffs knowingly conducted and participated in the affairs of the SD Medical Enterprise through a pattern of racketeering activity, including the numerous of acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

516.    At all relevant times mentioned herein, Defendants Shapson and Nisnevich, together with others unknown to Plaintiffs, were the controllers of, exerted control over, and directed the operations of the SD Medical Enterprise. Defendants Shapson and Nisnevich, along

with others unknown to Plaintiffs, and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that SD Medical was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Covered Persons.

517. At all relevant times mentioned herein, Defendant Delaleu was employed by or associated with the SD Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. In addition, Defendant Delaleu furnished his name and professional license to the SD Medical Enterprise and provided the essential means for the SD Medical Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

518. On information and belief, one or more of John Does 1 through 20 were associated with the SD Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

519. On information and belief, one or more of the ABC Corporations were associated with the SD Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY

## (RACKETEERING ACTS)

520.     The racketeering acts set forth herein were carried out over a nineteen year period, were related and similar, and were committed as part of Defendants' scheme to use their control of SD Medical to defraud insurers and if not stopped will continue into the future.

521.     This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as SD Medical continues to pursue collection on the fraudulent bills to the present day.

522.     As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the SD Medical Enterprise based upon materially false and misleading information.

523.     Through the SD Medical Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for health services provided to Covered Persons.  The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

524.     A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

525.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

526.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

527.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Property & Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $270,700.00, the exact amount to be determined at trial.

528.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Shapson, Nisnevich, Delaleu, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS SHAPSON, NISNEVICH, QURESHI, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

## [RICO, pursuant to 18 U.S.C. § 1962(c)]

529.    The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

530.    At all times relevant herein, PR Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

531.    From in or about 2009 through the date of the filing of this Complaint, Defendants Shapson, Nisnevich, and/or others unknown to Plaintiffs knowingly conducted and participated in the affairs of the PR Medical Enterprise through a pattern of racketeering activity, including the hundreds of acts of mail fraud described herein, in the representative list of predicate acts set forth

in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

532.   At all relevant times mentioned herein, Defendants Shapson and Nisnevich, together with others unknown to Plaintiffs, were the controllers of, exerted control over, and directed the operations of the PR Medical Enterprise. Defendants Shapson and Nisnevich, along with others unknown to Plaintiffs, and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that PR Medical was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Covered Persons.

533.   At all relevant times mentioned herein, Defendant Qureshi was employed by or associated with the PR Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. In addition, Defendant Qureshi furnished his name and professional license to the PR Medical Enterprise and provided the essential means for the PR Medical Enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

534.   On information and belief, one or more of John Does 1 through 20 were associated with the PR Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

535.    On information and belief, one or more of the ABC Corporations were associated with the PR Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

536.    The racketeering acts set forth herein were carried out over a thirteen-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of PR Medical to defraud insurers.

537.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as PR Medical continues to pursue collection on the fraudulent bills to the present day.

538.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the PR Medical Enterprise based upon materially false and misleading information.

539.    Through the PR Medical Enterprise, Defendants submitted or caused to be submitted hundreds of fraudulent claim forms seeking payment for health services provided to Covered Persons.  The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

540.     A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

541.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

542.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

543.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Indemnity Company and Allstate Property & Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $511,100.00, the exact amount to be determined at trial.

544.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Shapson, Nisnevich, Qureshi, John Does 1 through 20, and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF

### AGAINST DEFENDANTS PIKE, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

545.     The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

**THE RICO ENTERPRISE**

546.    At all times relevant herein, Spike Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

547.    From in or about 2011 through the date of the filing of this Complaint, Defendants Pike, John Does 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Spike Medical enterprise through a pattern of racketeering activity, including hundreds of acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

548.    At all relevant times mentioned herein, one or more of the John Doe Defendants, were the Controllers of, exerted control over, and directed the operations of the Spike Medical enterprise. One or more of the John Doe Defendants, and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that Spike Medical was ineligible to receive because it (a) is fraudulently incorporated and/or owned and controlled by unlicensed laypersons; (b) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants without regard to medical necessity; and (d) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Covered Persons.

549.    At all relevant times mentioned herein, Defendant Pike was employed by or associated with the Spike Medical enterprise and participated in the conduct of its affairs through

a pattern of racketeering activity.  In addition, Defendant Pike furnished his name and professional license to the Spike Medical enterprise and provided the essential means for the Spike Medical enterprise to fraudulently incorporate and/or operate a bogus professional service corporation and fraudulently bill insurance companies.

550.    On information and belief, one or more of John Does 1 through 20 were associated with the Spike Medical enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

551.    On information and belief, one or more of the ABC Corporations were associated with the Spike Medical enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

552.    The racketeering acts set forth herein were carried out over a more than an eleven year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Spike Medical to defraud insurers.

553.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Spike Medical continues to pursue collection on the fraudulent bills to the present day.

554.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Allstate and to induce Allstate to issue checks to the Spike Medical enterprise based upon materially false and misleading information.

555.    Through the Spike Medical enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to Covered Persons.  The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

556.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

557.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

558.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

559.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Indemnity Company and Allstate Property & Casualty Insurance Company have been injured in their business and property and been damaged in the aggregate amount presently in excess of $121,200.00, the exact amount to be determined at trial.

560.    Pursuant to 18 U.S.C. § 1964(c), Allstate is entitled to recover from Defendants Pike, one or more of John Does 1 through 20 and one or more of the ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

**FOURTH CLAIM FOR RELIEF**

<u>**AGAINST DEFENDANTS SHAPSON, NISNEVICH, QURESHI, PR MEDICAL,
MORLEY, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20**</u>

**[RICO, pursuant to 18 U.S.C. § 1962(c)]**

561.    The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

**<u>THE RICO ENTERPRISE</u>**

562.    At all times relevant herein, Morley Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

563.    From in or about 2016 through the present, Defendant Morley, together with Defendants Shapson, Nisnevich, Qureshi, PR Medical, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Morley Medical Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

564.    At all relevant times mentioned herein, Defendant Morley exerted control over, and directed the operations of the Morley Medical Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that were (a) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (b) submitted as a result of an unlawful referral, kickback, and/or illegal fee-splitting scheme between the

Defendants without regard to medical necessity; and (c) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Covered Persons.

565.    At all relevant times mentioned herein, Defendants Shapson, Nisnevich and/or one or more of the John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 were associated with the Morley Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In particular, Shapson and Nisnevich, forged a relationship with the Morley Medical through which, in exchange for a kickback and/or other financial compensation, Morley Medical received referrals of patients for services provided pursuant to a predetermined course of treatment, irrespective of medical necessity.  In addition, Defendants Shapson and Nisnevich, provided the essential means for the Morley Medical Enterprise to fraudulently bill insurance companies for services rendered pursuant to an unlawful kickback scheme.

566.    It was both foreseeable and the intended consequence that the Covered Persons that were being referred to Morley Medical would be used as a source to submit bills and induce payment from insurers in general, and Plaintiffs in particular, in connection with fraudulent claims.

567.    On information and belief, Defendant Qureshi and PR Medical were associated with the Morley Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In addition, by abdicating ownership and control over PR Medical and agreeing to allow Shapson and Nisnevich to enter into illicit relationships on behalf of PR Medical, Defendant Qureshi provided the essential means for Defendants Shapson and Nisnevich to forge a relationship and/or agreement with Defendant Morley that ensured that the doctors associated with PR Medical and/or others under Defendants Shapson's and Nisnevich's direction, supervision and/or control directed and/or steered the PR Medical patient population to the Morley Medical Enterprise for services, irrespective of medical necessity, in exchange for a kickback and/or other

financial compensation, which resulted in fraudulent bill submissions to insurance companies, including but not limited to Plaintiffs.

## THE PATTERN OF RACKETEERING ACTIVITY

## (RACKETEERING ACTS)

568.    The racketeering acts set forth herein were carried out over a six-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Morley Medical to defraud insurers.

569.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Morley Medical continues to pursue collection on the fraudulent bills to the present day.

570.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Morley Medical Enterprise based upon materially false and misleading information.

571.    Through the Morley Medical Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

572.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

573.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

574.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

575.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, and Allstate Fire and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $78,600.00, the exact amount to be determined at trial.

576.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Shapson, Nisnevich, Morley, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS SHAPSON, NISNEVICH, QURESHI, PR MEDICAL, YELLIN, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

## [RICO, pursuant to 18 U.S.C. § 1962(c)]

577.   The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

578.   At all times relevant herein, Sage Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

579.   From in or about 2015 through the present, Defendant Yellin, together with Defendants Shapson, Nisnevich, Qureshi, PR Medical, John Doe Defendants 1 through 20 and

ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Sage Medical Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

580.   At all relevant times mentioned herein, Defendant Yellin exerted control over, and directed the operations of the Sage Medical Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that were (a) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (b) submitted as a result of an unlawful referral, kickback, and/or illegal fee-splitting scheme between the Defendants without regard to medical necessity; and (c) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Covered Persons.

581.   At all relevant times mentioned herein, Defendants Shapson, Nisnevich and/or one or more of the John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 were associated with the Sage Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In particular, Shapson and Nisnevich, forged a relationship with the Sage Medical Enterprise through which, in exchange for a kickback and/or other financial compensation, Sage Medical received referrals of patients for services provided pursuant to a predetermined course of treatment, irrespective of medical necessity.  In addition, Defendants Shapson and Nisnevich, provided the essential means for the Sage Medical Enterprise to fraudulently bill insurance companies for services rendered pursuant to an unlawful kickback scheme.

582.     It was both foreseeable and the intended consequence that the Covered Persons that were being referred to Sage Medical would be used as a source to submit bills and induce payment from insurers in general, and Plaintiffs in particular, in connection with fraudulent claims.

583.     Defendant Qureshi and PR Medical were associated with the Sage Medical Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. In addition, by abdicating ownership and control over PR Medical and agreeing to allow Shapson and Nisnevich to enter into illicit relationships on behalf of PR Medical, Defendant Qureshi provided the essential means for Defendants Shapson and Nisnevich to forge a relationship and/or agreement with Defendant Yellin that ensured that the doctors associated with PR Medical and/or others under Defendants Shapson's and Nisnevich's direction, supervision and/or control directed and/or steered the PR Medical patient population to the Sage Medical Enterprise for services, irrespective of medical necessity, in exchange for a kickback and/or other financial compensation, which resulted in fraudulent bill submissions to insurance companies, including but not limited to Plaintiffs.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

584.     The racketeering acts set forth herein were carried out over a six-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Sage Medical to defraud insurers.

585.     This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Sage Medical continues to pursue collection on the fraudulent bills to the present day.

586.     As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made

through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Sage Medical Enterprise based upon materially false and misleading information.

587.    Through the Sage Medical Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

588.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

589.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

590.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

591.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $87,900.00, the exact amount to be determined at trial.

592.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Shapson, Nisnevich, Yellin, John Does 1 through 20 and ABC Corporations 1 through 20, jointly

and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS SHAPSON, NISNEVICH, QURESHI, PR MEDICAL, SHIRAZI, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

593.    The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

594.    At all times relevant herein, HS Diagnostic Chiro was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

595.    From in or about 2012 through the present, Defendant Shirazi, together with Defendants Shapson, Nisnevich, Qureshi, PR Medical, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the HS Diagnostic Chiro Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

596.    At all relevant times mentioned herein, Defendant Shirazi exerted control over, and directed the operations of the HS Diagnostic Chiro Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that were (a) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (b) submitted as

a result of an unlawful referral, kickback, and/or illegal fee-splitting scheme between the Defendants without regard to medical necessity; and (c) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Covered Persons.

597.    At all relevant times mentioned herein, Defendants Shapson, Nisnevich and/or one or more of the John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 were associated with the HS Diagnostic Chiro Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.   In particular, Shapson and Nisnevich, forged a relationship with the HS Diagnostic Chiro Enterprise through which, in exchange for a kickback and/or other financial compensation, HS Diagnostic Chiro received referrals of patients for services provided pursuant to a predetermined course of treatment, irrespective of medical necessity.  In addition, Defendants Shapson and Nisnevich, provided the essential means for the HS Diagnostic Chiro Enterprise to fraudulently bill insurance companies for services rendered pursuant to an unlawful kickback scheme.

598.    It was both foreseeable and the intended consequence that the Covered Persons that were being referred to HS Diagnostic Chiro would be used as a source to submit bills and induce payment from insurers in general, and Plaintiffs in particular, in connection with fraudulent claims.

599.    Defendant Qureshi and PR Medical were associated with the HS Diagnostic Chiro Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. In addition, by abdicating ownership and control over PR Medical and agreeing to allow Shapson and Nisnevich to enter into illicit relationships on behalf of PR Medical, Defendant Qureshi provided the essential means for Defendants Shapson and Nisnevich to forge a relationship and/or agreement with Defendant Shirazi that ensured that the doctors associated with PR Medical and/or others under Defendants Shapson's and Nisnevich's direction, supervision and/or control directed and/or steered the PR Medical patient population to the HS Diagnostic Chiro Enterprise for

services, irrespective of medical necessity, in exchange for a kickback and/or other financial compensation, which resulted in fraudulent bill submissions to insurance companies, including but not limited to Plaintiffs.

## THE PATTERN OF RACKETEERING ACTIVITY

## (RACKETEERING ACTS)

600.     The racketeering acts set forth herein were carried out over a ten-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of HS Diagnostic Chiro to defraud insurers.

601.     This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as HS Diagnostic Chiro continues to pursue collection on the fraudulent bills to the present day.

602.     As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the HS Diagnostic Chiro Enterprise based upon materially false and misleading information.

603.     Through the HS Diagnostic Chiro Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

604.     A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

605.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

606.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

607.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $217,600.00, the exact amount to be determined at trial.

608.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Shapson, Nisnevich, Shirazi, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### SEVENTH CLAIM FOR RELIEF
### AGAINST DEFENDANTS SHAPSON, NISNEVICH, QURESHI, PR MEDICAL, KINER, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20
### [RICO, pursuant to 18 U.S.C. § 1962(c)]

609.     The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

610.    At all times relevant herein, Gentle Care Acupuncture was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

611.    From in or about 2009 through the present, Defendant Kiner, together with Defendants Shapson, Nisnevich, Qureshi, PR Medical, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Gentle Care Acupuncture Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

612.    At all relevant times mentioned herein, Defendant Kiner exerted control over, and directed the operations of the Gentle Care Acupuncture Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that were (a) submitted claims for medically unnecessary medical services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (b) submitted as a result of an unlawful referral, kickback, and/or illegal fee-splitting scheme between the Defendants without regard to medical necessity; and (c) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Covered Persons.

613.    At all relevant times mentioned herein, Defendants Shapson, Nisnevich and/or one or more of the John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 were associated with the Gentle Care Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  In particular, Shapson and Nisnevich, forged a

relationship with the Gentle Care Acupuncture Enterprise through which, in exchange for a kickback and/or other financial compensation, Gentle Care Acupuncture received referrals of patients for services provided pursuant to a predetermined course of treatment, irrespective of medical necessity. In addition, Defendants Shapson and Nisnevich, provided the essential means for the Gentle Care Acupuncture Enterprise to fraudulently bill insurance companies for services rendered pursuant to an unlawful kickback scheme.

614. It was both foreseeable and the intended consequence that the Covered Persons that were being referred to Gentle Care Acupuncture would be used as a source to submit bills and induce payment from insurers in general, and Plaintiffs in particular, in connection with fraudulent claims.

615. Defendant Qureshi and PR Medical were associated with the Gentle Care Acupuncture Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. In addition, by abdicating ownership and control over PR Medical and agreeing to allow Shapson and Nisnevich to enter into illicit relationships on behalf of PR Medical, Defendant Qureshi provided the essential means for Defendants Shapson and Nisnevich to forge a relationship and/or agreement with Defendant Kiner that ensured that the doctors associated with PR Medical and/or others under Defendants Shapson's and Nisnevich's direction, supervision and/or control directed and/or steered the PR Medical patient population to the Gentle Care Acupuncture Enterprise for services, irrespective of medical necessity, in exchange for a kickback and/or other financial compensation, which resulted in fraudulent bill submissions to insurance companies, including but not limited to Plaintiffs.

## THE PATTERN OF RACKETEERING ACTIVITY

## (RACKETEERING ACTS)

616.    The racketeering acts set forth herein were carried out over a thirteen year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Gentle Care Acupuncture to defraud insurers.

617.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Gentle Care Acupuncture continues to pursue collection on the fraudulent bills to the present day.

618.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Gentle Care Acupuncture Enterprise based upon materially false and misleading information.

619.    Through the Gentle Care Acupuncture Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

620.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

621.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

622.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

623.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $390,900.00, the exact amount to be determined at trial.

624.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Shapson, Nisnevich, Kiner, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### EIGHTH CLAIM FOR RELIEF

### AGAINST SHAPSON, NISNEVICH, DELALEU, QURESHI, SD MEDICAL, PR MEDICAL, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

**(Common Law Fraud)**
**(Fraudulent Incorporation of the Fraudulently Owned PCs)**

625.     The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

626.     Defendants Shapson, Nisnevich, Delaleu, Qureshi, SD Medical, PR Medical, John Does 1 through 10, and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made various misleading statements intended to hold out SD Medical and PR Medical as legal professional service corporations in compliance with core

licensing requirements when in fact they were not, thereby inducing Plaintiffs to make payments that Defendants were not entitled to because of their fraudulent incorporation and/or illegal corporate structure that rendered SD Medical and PR Medical not licensed in accordance with applicable New York state law. As part of the fraudulent scheme implemented by Defendants, SD Medical and PR Medical, with the assistance and knowledge of Defendants Delaleu, Qureshi, Shapson, Nisnevich, and others unknown to Plaintiffs, made material misrepresentations and/or omitted material statements in submitting no fault claims to Plaintiffs for payment.

627. Defendants Shapson, Nisnevich, Delaleu, Qureshi, SD Medical, PR Medical, John Does 1 through 10, and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, concealed the fact that Defendants Shapson, Nisnevich, and others unknown to Plaintiffs, not Defendants Delaleu and Qureshi, were the true owners of SD Medical and PR Medical, respectively, by making false representations of material facts, including, but not limited to, the following fraudulent misrepresentations:

   a. Each and every bill and report set forth the name of SD Medical and/or PR Medical as professional corporations owned by Defendants Delaleu or Qureshi, respectively, medical doctors, when in fact they were not. The submission of bills and reports containing the signatures of Defendants Delaleu and/or Qureshi were fraudulent misrepresentations, intended to deceive and mislead the Plaintiffs into believing that SD Medical and PR Medical were legal professional corporations when in fact they were not;

   b. False and misleading statements and information regarding who owned, controlled, and operated SD Medical and PR Medical;

   c. False and misleading statements and information intended to mislead Plaintiffs into believing that SD Medical and PR Medical were being operated by Defendants Delaleu and Qureshi, as indicated in their respective certificates of incorporation, when in fact they were not;

   d. False and misleading statements intended to mislead Plaintiffs that SD Medical and PR Medical were licensed in accordance with applicable New York state law when in fact they were not;

   e. False and misleading statements that SD Medical and PR Medical were properly licensed and therefore eligible to recover No-fault benefits

pursuant to Insurance Law 5102(a)(1) and 11 NYCRR 65-3.16(a)(12) when in fact they were not;

f.   False and misleading statements and information intended to circumvent Article 15 of the B.C.L., which prohibits ownership by individuals not licensed to practice the profession for which a professional corporation was incorporated;

g.   False and misleading statements and information, as contained in the signed medical reports and NYS N-F3s, that were intended to deceive and conceal the fact that SD Medical and PR Medical were engaged in the illegal corporate practice of medicine in contravention of New York State law, and that Shapson, Nisnevich, and/or others unknown to Plaintiffs, were billing for physician services through fraudulently incorporated professional corporations;

h.   False and misleading statements and information set forth in NYS N-F3 forms and medical reports indicating that Defendants Delaleu and Qureshi were actively involved in the operations of SD Medical and PR Medical, respectively, when in fact they were not; and

i.   False and misleading statements contained in each separate bill, medical record and report submitted by Defendants to Plaintiffs regarding the relationship between Shapson, Nisnevich, SD Medical and PR Medical; SD Medical and Delaleu, PR Medical and Qureshi; and Defendants Delaleu, Qureshi, Shapson and Nisnevich, which concealed or failed to disclose the actual relationships between said parties and the existence of a fraudulent corporate structures.

628.   Defendants knew the foregoing material misrepresentations to be false when made, particularly that SD Medical and PR Medical were properly licensed in accordance with New York state law and eligible to recover No-fault benefits and made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

629.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and/or omissions and upon a state of facts that Plaintiffs were led to believe existed as a result of Defendants' acts of fraud and deception, and which led to Plaintiffs making substantial payments to SD Medical and PR Medical.

630.   Had Plaintiffs known of SD Medical's and PR Medical's illegal corporate structures, which were contrary to all indications reflected in the medical reports, treatment

verifications, and bills for medical and/or Chiro services and other documents that they submitted in support of payment, Plaintiffs would not have paid SD Medical's and PR Medical's claims for No-fault insurance benefits submitted in connection therewith.

631.   Plaintiffs, thus, were injured as a proximate result and are entitled to recover and recoup from the Defendants payments they made to SD Medical and PR Medical, in accordance with the Court of Appeals' decision in *State Farm Mut. Auto. Ins. Co. v. Mallela,* 4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005).

632.   Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

633.   By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined but believed to be in excess of $781,800.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

## NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS PIKE, SPIKE MEDICAL, JOHN DOE DEFENDANTS 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### (Common Law Fraud)
### (Fraudulent Incorporation of the Defendant Spike Medical)

634.   The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

635.   Defendants Pike, Spike Medical, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20, intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made various misleading statements intended to hold out Spike Medical as a legal

professional service corporation in compliance with core licensing requirements when, in fact, it was not, thereby inducing Plaintiffs to make payments that Spike Medical was not entitled to because of its fraudulent incorporation and/or illegal corporate structure that rendered Spike Medical not licensed in accordance with applicable New York State Law. As part of the fraudulent scheme implemented by Defendants, Spike Medical, with the assistance and knowledge of Defendants Pike, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20, made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

636. Defendants Pike, Spike Medical, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, concealed the fact that one or more of the John Doe Defendants, not Defendant Pike, was the true owner of Spike Medical, by making false representations of material facts, including, but not limited to, the following fraudulent misrepresentations:

a) Each and every bill and report set forth Spike Medical as a professional corporation owned by Defendant Pike, when, in fact, it was not. The submission of bills and reports containing the signature of Defendant Pike was a fraudulent misrepresentation, intended to deceive and mislead Allstate into believing that Spike Medical was a legal professional corporation when, in fact, it was not;

b) False and misleading statements and information regarding who owned, controlled, and operated Spike Medical;

False and misleading statements and information intended to mislead Allstate into believing that Spike Medical was being operated by Defendant Pike, whose name was listed on the certificate of incorporation when, in fact, it was not;

c) False and misleading statements and information intended to mislead Plaintiffs that Spike Medical was licensed in accordance with applicable New York State Law, when, in fact, it was not;

d) False and misleading statements that Spike Medical was properly licensed and, therefore, eligible to recover No-fault benefits pursuant

to Insurance Law 5102(a)(1) and 11 NYCRR 65-3.16(a)(12) when, in fact, it was not;

e) False and misleading statements intended to circumvent Article 15 of the B.C.L., which prohibits ownership by individuals not licensed to practice the profession for which a professional corporation was incorporated;

f) False and misleading statements and information, as contained in the signed medical reports and NYS N-F3s, that were intended to deceive and conceal the fact that Spike Medical was engaged in the illegal corporate practice of medicine in contravention of New York State law, and that one or more unlicensed individuals, unknown to Plaintiffs, were billing for medical services through a fraudulently incorporated PC;

g) False and misleading statements and information set forth in NYS N-F3 forms and/or medical reports indicating that Defendant Pike was actively involved in the operation of Spike Medical when, in fact, it was not; and

h) False and misleading statements contained in each separate bill, medical record and report submitted by Defendants to Plaintiffs regarding the relationship between Spike Medical and Defendant Pike; Defendant Pike and one or more of the John Does; and Spike Medical and one or more of the John Does, which concealed or failed to disclose the actual relationships between said parties and the existence of a fraudulent corporate structure.

637.   Defendants knew the foregoing material misrepresentations to be false when made, particularly that Spike Medical was properly licensed in accordance with New York state law and eligible to recover No-fault benefits and made these false representations with the intention and purpose of inducing Allstate to rely thereon.

638.   Allstate did in fact reasonably and justifiably rely on the foregoing material misrepresentations and/or omissions and upon a state of facts that Allstate was led to believe existed as a result of Defendants' acts of fraud and deception, and which led to Allstate making substantial payments to Spike Medical.

639.   Had Allstate known of the illegal corporate structure, which were contrary to all indications reflected in the medical reports, treatment verifications, and bills for medical services

and other documents they submitted in support of payment, Plaintiffs would not have paid Spike Medical's claims for No-fault insurance benefits submitted in connection therewith.

640.    Plaintiffs were thus injured as a proximate result and are entitled to recover and recoup the payments they made to Spike Medical, which was fraudulently incorporated in violation of New York State Law, in accordance with the Court of Appeals' decision in *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005).

641.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

642.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determines but believed to be in excess of $126,500.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

**TENTH CLAIM FOR RELIEF**

**AGAINST SHAPSON, NISNEVICH, QURESHI,
PR MEDICAL, SHIRAZI, HS DIAGNOSTIC CHIRO,
KINER, GENTLE CARE ACUPUNCTURE, MORLEY, MORLEY
MEDICAL, YELLIN, SAGE MEDICAL, PIKE AND SPIKE MEDICAL**

**(Common Law Fraud)
(Kickback Scheme)**

643.    The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

644.    Defendants Shapson, Nisnevich, Qureshi, PR Medical, Shirazi, HS Diagnostic Chiro, Kiner, Gentle Care Acupuncture, Morley, Morley Medical, Yellin, Sage Medical, Pike, Spike Medical, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20,

intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made numerous false and misleading statements of material fact as to the necessity of the medical and other healthcare services purportedly rendered, thereby inducing Plaintiffs to make payments to the Ancillary Providers that the Ancillary Providers were not entitled to because of their fraudulent nature. As part of the fraudulent scheme implemented by Shapson, Nisnevich, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20, Qureshi PR Medical, Shirazi, HS Diagnostic Chiro, Gentle Care Acupuncture, Morley, Morley Medical, Yellin, Sage Medical, Pike and Spike Medical made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

645. Defendants Shapson, Nisnevich, Qureshi, PR Medical, Shirazi, HS Diagnostic Chiro, Kiner, Gentle Care Acupuncture, Morley, Morley Medical, Yellin, Sage Medical, Pike, Spike Medical, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20, intentionally knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the bills and referrals submitted to Plaintiffs in support of their claims for reimbursement of No-fault benefits medical and other healthcare services were misrepresented.

646. Defendants Shapson, Nisnevich, Qureshi, PR Medical, Shirazi, HS Diagnostic Chiro, Kiner, Gentle Care Acupuncture, Morley, Morley Medical, Yellin, Sage Medical, Pike, Spike Medical, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20, intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that, in many instances, the billed for medical and other healthcare services were medically unnecessary.

647. Defendants Shapson, Nisnevich, Qureshi, PR Medical, Shirazi, HS Diagnostic Chiro, Kiner, Gentle Care Acupuncture, Morley, Morley Medical, Yellin, Sage Medical, Pike,

Spike Medical, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20, intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the services were provided pursuant to a protocol that was intended to maximize Defendants' profit and reimbursement of payments from the Plaintiffs, as opposed to medical necessity.

648.   Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

a.   False and misleading statements and information designed to conceal the fact that the billed for medical and other healthcare services were not rendered as billed and/or misrepresented;

b.   False and misleading statements and information designed to conceal the fact that the Ancillary Providers received referrals for services from the Controllers and/or PR Medical in exchange for the payment of money;

c.   False and misleading statements and information designed to conceal that the Controllers, PR Medical and the Ancillary Providers had a "financial relationship" based on which PR Medical made and/or the Controllers caused to be made referrals to the Ancillary Providers for Covered Persons allegedly treated by such practitioners; and

d.   False and misleading statements and information designed to conceal that the Ancillary Providers submit claims to Plaintiffs for medical and/or other healthcare services medical services furnished pursuant to a prohibited referral.

649.   On information and belief, in numerous instances, the records, reports and bills submitted by the Ancillary Providers to Plaintiffs in connection with medical and other healthcare services set forth fictional representations intended to justify the medical necessity of the services provided.

650.   The foregoing was intended to deceive and mislead the Plaintiffs into believing that the Ancillary Providers, were providing medically necessary services when, in fact, they were not.

651.    Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

652.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which Plaintiffs was led to believe existed as a result of Defendants' acts of fraud and deception.

653.    Had Plaintiffs known of the fraudulent content of, and misrepresentations in, the records, reports, treatment verifications, and bills for medical and other healthcare services, it would not have paid the Ancillary Providers' claims for No-fault insurance benefits submitted in connection therewith.

654.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined but believed to be in excess of $485,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

## ELEVENTH CLAIM FOR RELIEF

### SHAPSON, NISNEVICH, QURESHI, PR MEDICAL, SHIRAZI, HS DIAGNOSTIC CHIRO, KINER, GENTLE CARE ACUPUNCTURE, MORLEY, MORLEY MEDICAL, YELLIN, SAGE MEDICAL, PIKE, SPIKE MEDICAL, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### (Common Law Fraud-Billing Fraud)

655.    The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

656.    Defendants Shapson, Nisnevich, Qureshi, PR Medical, Shirazi, HS Diagnostic Chiro, Kiner, Gentle Care Acupuncture, Morley, Morley Medical, Yellin, Sage Medical, Pike, Spike Medical, John Does 1 through 20 and ABC Corporations 1 through 20, intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made numerous false and

misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when in fact they were not provided as billed and exaggerated the level of service, if any, purportedly provided, thereby inducing Plaintiffs to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature.  As part of the fraudulent scheme, Shapson, Nisnevich, Qureshi, PR Medical, Shirazi, HS Diagnostic Chiro, Kiner, Gentle Care Acupuncture, Morley, Morley Medical, Yellin, Sage Medical, Pike, Spike Medical, John Does 1 through 20 and ABC Corporations 1 through 20 made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

657.    Defendants Shapson, Nisnevich, Qureshi, PR Medical, Shirazi, HS Diagnostic Chiro, Kiner, Gentle Care Acupuncture, Morley, Morley Medical, Yellin, Sage Medical, Pike, Spike Medical, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the bills submitted to Plaintiffs for reimbursement of No-fault benefits the Fraudulent Services were materially misrepresented.

658.    Defendants Shapson, Nisnevich, Qureshi, PR Medical, Shirazi, HS Diagnostic Chiro, Kiner, Gentle Care Acupuncture, Morley, Morley Medical, Yellin, Sage Medical, Pike, Spike Medical, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that, in many instances, the services relating to Fraudulent Services were provided pursuant to a pre-determined protocol that was intended to maximize Defendants' profit and reimbursement of payments from the Plaintiffs, as opposed to medical necessity.

659.    Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment

which contained false representations of material facts, including but not limited to the following

fraudulent material misrepresentations:

a)   False and misleading statements and information designed to conceal the fact that Defendants provided services according to a treatment protocol intended to fraudulently bill Plaintiffs for *inter alia,* medical evaluations, diagnostic tests, chiropractic treatment, acupuncture treatment, and physical therapy, irrespective of medical necessity;

b)   False and misleading statements and information in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement for services that were never rendered, not rendered as billed, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary;

c)   False and misleading statements made by one or more Defendants in which Defendants recorded incomplete and/or fabricated patient complaints and/or medical histories to support pre-determined diagnoses to justify the billing for initial and follow-up examinations and outcome assessment testing irrespective of medical necessity, and to justify referrals for diagnostic tests, acupuncture, physical therapy and chiropractic services with the intent to defraud Plaintiffs;

d)   False and misleading statements made by one or more Defendants concerning Covered Persons conditions in order to justify the billing almost identical physical therapy treatments to virtually every Covered Person irrespective of medical necessity;

e)   False and misleading statements made by one or more Defendants regarding Covered Persons' conditions in order to justify the provision of physical therapy services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

f)   False and misleading statements made by one or more Defendants through which they fraudulently diagnosed every Covered Person with spinal pain in one or more regions of the spine, sprains of one or more regions of the spine, and/or subluxation of more than one region of the spine in order to justify the provision of chiropractic services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

g)   False and misleading statements regarding the severity of Covered Persons' conditions in order to justify the provision of acupuncture services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

h)   False and misleading statements made by one or more Defendants in order to justify the billing for Electrodiagnostic Testing under CPT codes 95903,

95904, 95934, 95861 and/or 95886 when in fact such services were never provided, not provided as billed, medically unnecessary and/or of no diagnostic or treatment value;

i)      False and misleading statements made by one or more Defendants in order to justify the billing for pf-NCS under CPT codes 95904 and/or 95999 when in fact such services were never provided, not provided as billed, medically unnecessary and/or of no diagnostic or treatment value;

j)      False and misleading statements made by one or more Defendants in order to justify the billing for Computerized Range of Motion and Manual Muscle Testing under CPT Codes 95831, 95833, and/or 95851 when in fact such services were never provided, not provided as billed, medically unnecessary and/or of no diagnostic or treatment value;

k)      False and misleading statements contained in the initial and follow-up reports of one or more the Defendants concerning each patient's condition and/or diagnosis to justify the continued necessity of the Fraudulent Services irrespective of improvements in a Covered Person's condition; and

l)      Other misrepresentations, including but not limited to those contained in paragraphs a through k above.

660.      On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiffs in connection with the Fraudulent Services set forth fictional representations of each Covered Person's condition and services provided. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Covered Persons and the consumer public, particularly if the sham and fictional diagnoses were to be relied upon by any subsequent healthcare provider.

661.      The foregoing was intended to deceive and mislead the Plaintiffs into believing that Defendants were providing medically valid services when, in fact, they were not.

662.      Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

663.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which Plaintiffs were led to believe existed as a result of Defendants' acts of fraud and deception.

664.    Had Plaintiffs known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, they would not have paid Defendant's claims for No-fault insurance benefits submitted in connection therewith.

665.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

666.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined but believed to be in excess of $1,400,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

## TWELFTH CLAIM FOR RELIEF

## <u>AGAINST ALL DEFENDANTS</u>

### (Unjust Enrichment)

667.    The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

668.    By reason of their wrongdoing, Defendants have been unjustly enriched, in that they have, directly and/or indirectly, received substantial moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

669.    Plaintiffs are entitled to recover restitution for the amount that Defendants were unjustly enriched as a result of payments made by Plaintiffs to said Defendants.

670.   By reason of the foregoing, Plaintiffs have sustained compensatory damages and have been injured in their business and property in an amount as yet to be determined but believed to be in excess of $1,600,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

## THIRTEENTH CLAIM FOR RELIEF

## AGAINST THE FRAUDULENTLY OWNED PCS

### (Declaratory Judgment)
### (Corporate Practice of Medicine --- Business Corporation Law §§ 1501, *et seq.*)

671.   The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

672.   For a period of at least twenty years, the Defendants Shapson and Nisnevich have used the names and licenses of Defendants Delaleu and Qureshi to circumvent the strict tenets of Article 15 of the B.C.L. and fraudulently incorporate the Fraudulently Owned PCs and submit bills to insurers thereunder.

673.   Under New York law, a professional corporation is not eligible to recover No-fault benefits if it is not licensed in accordance with applicable New York State Law and any such entity does not have standing to seek reimbursement under the No-fault Law.  As a matter of eligibility and standing, the New York Court of Appeals held in *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005), that a fraudulently incorporated and/or professional corporation not licensed in accordance with New York State Law, such as the SD Medical and PR Medical, not formed and/or operated in accordance with Article 15 of the B.C.L., is not entitled to recover No-fault benefits.

674.   As SD Medical and PR Medical were fraudulently incorporated and/or not licensed and/or operated in accordance with applicable New York state law, with nominal owners listed on the certificate of incorporation filed with the Department of State, concealing the true owners, it is

respectfully requested that this Court issue an order declaring that Plaintiffs are under no obligation to pay any of Defendants SD Medical's' and PR Medical's No-fault claims because the SD Medical and PR Medical were not properly licensed in accordance with New York state law.

675.    As SD Medical and PR Medical were fraudulently incorporated and/or fraudulently licensed and/or operated, with nominal owners listed on the certificates of incorporation filed with the Department of State, concealing the true beneficial owners, it is respectfully requested that this Court issue an order declaring that SD Medical and PR Medical are ineligible to recover benefits under the New York State No-fault law, and Plaintiffs, therefore, are under no obligation to pay any of Defendants SD Medical's' and PR Medical's No-fault claims because of SD Medical's' and PR Medical's illegal corporate structure.

676.    Plaintiffs have no adequate remedy at law.

677.    SD Medical and PR Medical will continue to submit bills to and/or pursue collections actions against Plaintiffs for No-fault services despite their illegal corporate form and fraudulent incorporation absent a declaration by this Court that their activities are unlawful and that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied and any future No-fault claims submitted by SD Medical and PR Medical due to their fraudulent incorporation and operation.

## FOURTEENTH CLAIM FOR RELIEF

## AGAINST SPIKE MEDICAL

### (Declaratory Judgment)
### (Corporate Practice of Medicine --- Business Corporation Law §§ 1501, *et seq.*)

678.    The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

679.    For a period of at least eleven years, one or more of the John Doe Controllers have used the name and license of Defendant Pike to circumvent the strict tenets of Article 15 of the B.C.L. and fraudulently incorporate Spike Medical and submit bills to insurers thereunder.

680.    Under New York law, a professional corporation is not eligible to recover No-fault benefits if it is not licensed in accordance with applicable New York State Law and any such entity does not have standing to seek reimbursement under the No-fault Law.  As a matter of eligibility and standing, the New York Court of Appeals held in *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005), that a fraudulently incorporated and/or professional corporation not licensed in accordance with New York State Law, such as Spike Medical, not formed and/or operated in accordance with Article 15 of the B.C.L., is not entitled to recover No-fault benefits.

681.    As Spike Medical is/was fraudulently incorporated and/or not licensed and/or operated in accordance with applicable New York State Law, with nominal owners listed on the certificate of incorporation filed with the Department of State, concealing the true owners, it is respectfully requested that this Court issue an order declaring that Plaintiffs are under no obligation to pay any of Defendants' No-fault claims because Spike Medical was not properly licensed in accordance with New York State Law.

682.    As Spike Medical was fraudulently incorporated and/or fraudulently licensed and/or operated, with nominal owners listed on the certificates of incorporation filed with the Department of State, concealing the true beneficial owners, it is respectfully requested that this Court issue an order declaring that Spike Medical is ineligible to recover benefits under the New York State No-fault law, and Plaintiffs, therefore, are under no obligation to pay any of Defendants' No-fault claims because of Spike Medical's illegal corporate structure.

683.    Plaintiffs have no adequate remedy at law.

684.     Spike Medical will continue to submit bills to and/or pursue collections actions against Plaintiffs for No-fault services despite their illegal corporate form and fraudulent incorporation absent a declaration by this Court that their activities are unlawful and that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied and any future No-fault claims submitted by Spike Medical due to its fraudulent incorporation and operation.

## FIFTEENTH CLAIM FOR RELIEF

### AGAINST HS DIAGNOSTIC CHIRO, GENTLE CARE ACUPUNCTURE, MORLEY MEDICAL, SAGE MEDICAL AND SPIKE MEDICAL

**(Declaratory Judgment)**
**(Unlawful Kickback Scheme)**

685.     The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

686.     In order to be eligible to receive No-fault benefits, a provider must adhere to all applicable New York statutes, which grant the authority to provide health services in New York State.

687.     Section 6530(18) of New York's Education Law prohibits "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services…" N.Y. Educ. Law § 6530(18), (19); *see also* 8 N.Y.C.R.R. § 29.1(b)(3), (4).

688.     The payment by a healthcare practitioner or professional corporation to another party for the referral of a patient is a practice prohibited by New York State Law.

689.     Defendants engaged in a kickback scheme through which, in exchange for a kickback and/or other financial compensation to the Controllers and or PR Medical, PR Medical

referred patients to the Ancillary Providers for medical and/or other healthcare services pursuant to a predetermined course of treatment, irrespective of medical necessity.

690.    On information and belief, Shirazi, Kiner, Morley, Yellin and Pike, through HS Diagnostic Chiro, Gentle Care Acupuncture, Morley Medical, Sage Medical and Spike Medical, paid kickbacks and/or other financial compensation to PR Medical and/or the Controllers in order to receive referrals and be able to "treat" and/or "test" patients at the No-fault Clinic located at 79-09B Northern Boulevard.

691.    Once the referrals were made by PR Medical to the Ancillary Providers, the Ancillary Providers billed insurance companies, in general, and Plaintiffs, in particular, for performing purportedly performing medical and/or other healthcare services.

692.    At all relevant times mentioned herein, the referrals for medical and/or other healthcare services were made pursuant a pre-determined medical protocol, irrespective of medical necessity, that resulted from the financial arrangement or kickback scheme negotiated amongst the Defendants.

693.    Because the Covered Persons purportedly treated by the Ancillary Providers were referred for medical and/or other healthcare services as a result of a unlawful kickback scheme in furtherance of Defendants' scheme to defraud, any bills submitted to Plaintiffs for such services were fraudulent and, as such, never eligible for reimbursement.

694.    In view of the unlawful kickback scheme in violation of N.Y. Educ. Law § 6530(18), (19) and 8 N.Y.C.R.R. § 29.1(b)(3), (4), the Ancillary Providers are not entitled to recover No-fault benefits under New York state law.

695.    the Controllers and Ancillary Providers continue to engage in an unlawful kickback scheme.  The Ancillary Providers continue to challenge prior claim denials.

696.   A justiciable controversy exists between Plaintiffs and the Ancillary Providers since the Ancillary Providers challenge Plaintiffs' ability to deny such claims.

697.   Plaintiffs have no adequate remedy at law.

698.   The Ancillary Providers will continue to bill Plaintiffs for No-fault services and continue to engage in unlawful kickbacks for patient referrals absent a declaration by this Court that such activities are unlawful and that Plaintiffs have no obligation to pay the pending, previously-denied and any future No-fault claims submitted by HS Diagnostic Chiro, Gentle Care Acupuncture, Morley Medical, Sage Medical and Spike Medical referred to them out of the No-fault Clinic located at 79-09B Northern Boulevard, while they were engaged in an unlawful kickback scheme.

### SIXTEENTH CLAIM FOR RELIEF

### DEFENDANTS PR MEDICAL, HS DIAGNOSTIC CHIRO, GENTLE CARE ACUPUNCTURE, MORLEY MEDICAL, SAGE MEDICAL AND SPIKE MEDICAL

### (Declaratory Judgment under 28 U.S.C. § 2201)
### (Fraudulent Billing Scheme)

699.   The allegations of paragraphs 1 through 512 are hereby repeated and realleged as though fully set forth herein.

700.   At all relevant times mentioned herein, each and every bill mailed by the Defendants, to Plaintiffs sought reimbursement for services that were part of a protocol of treatment, never rendered, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary.

701.   At all times relevant herein, the Defendants exploited the No-fault Law through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of

fraudulent billing documents pursuant to a fraudulent treatment protocol irrespective of medical necessity.

702.    In view of the Defendants' submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Defendants have no right to receive payment for any pending bills they have submitted because:

- The Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement for services that were never rendered, not rendered as billed, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary;

- The Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs as to the medical necessity of billed-for services, when such services, if performed at all, were performed pursuant to a pre-determined treatment protocol designed solely to maximize reimbursement for the Defendants; and

- The Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for services performed pursuant to illegal referral and/or financial arrangement(s) between the Defendants.

703.    As the Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the services purportedly provided to Covered Persons and the amounts they were entitled to be reimbursed, it is respectfully requested that this Court issue an order declaring that the Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of Defendants' No-fault claims.

704.    Plaintiffs have no adequate remedy at law.

705.    The Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement and continue to bring and pursue collections actions against Plaintiffs on false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no

obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demands judgment as follows:

(i)     Compensatory damages in an amount in excess of $1,600,000.00, the exact amount to be determined at trial, together with prejudgment interest;

(ii)     Punitive damages in such amount as the Court deems just;

(iii)     Treble damages, costs, and reasonable attorneys' fees on the First through Seventh Claims for Relief, together with prejudgment interest;

(iv)     Compensatory and punitive damages on the Eighth through Eleventh Claims for Relief, together with prejudgment interest;

(v)     Compensatory damages on the Twelfth Claim for Relief, together with prejudgment interest;

(vi)     Declaratory relief on the Thirteenth Claim for Relief declaring that Plaintiffs are under no obligation to pay any of SD Medical's and/or PR Medical's No-fault claims because of its illegal corporate structure;

(vii)     Declaratory relief on the Fourteenth Claim for Relief declaring that Plaintiffs are under no obligation to pay any of Spike Medical's No-fault claims because of its illegal corporate structure;

(viii)     Declaratory relief on the Fifteenth Claim for Relief declaring that Plaintiffs are under no obligation to pay any of the Defendant Ancillary Providers' No-fault claims arising out of the No-Fault Clinic located at 79-09B Northern Boulevard because they were submitted pursuant to an unlawful kickback scheme;

(ix)     Declaratory Relief on the Sixteenth Claim for Relief declaring that Plaintiffs are under no obligation to pay any of the Defendants' No-fault claims that were for services that were part of a protocol of treatment, never rendered, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary; and

(x)     Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York
          November 22, 2022

Morrison Mahoney LLP


By: __/s/ Lee Pinzow_____
      Robert A. Stern
      James McKenney
      Kristy R. Eagan
      Lee Pinzow
      *Attorneys for Plaintiffs*
      88 Pine Street, Suite 1900
      New York, New York 10005
      (212) 825-1212

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY<br><br>PLAINTIFFS,<br><br>-against-<br><br>ISAAC SHAPSON, YURI NISNEVICH A/K/A YURY NISNEVICH, SERGE DELALEU, M.D., PERVAIZ IQBAL QURESHI M.D., HELEN SHIRAZI, D.C., ARKADY KINER, L.AC., TIMOTHY MORLEY, M.D., JOSEPH C. YELLIN, D.O., SHELDON PIKE, M.D., SD MEDICAL P.C., P.R. MEDICAL, P.C., HS DIAGNOSTIC CHIROPRACTIC P.C., GENTLE CARE ACUPUNCTURE, P.C., MORLEY MEDICAL SERVICES, P.C., SAGE MEDICAL, P.C., SPIKE MEDICAL P.C., JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20,<br><br>DEFENDANTS. | CIVIL ACTION<br><br>22-CV-7125<br><br><br>COMPLAINT<br><br><br>(TRIAL BY JURY DEMANDED) |

# COMPLAINT

**MORRISON MAHONEY LLP**
**ATTORNEYS FOR PLAINTIFFS**
**88 PINE STREET, SUITE 1900**
**NEW YORK, NY 10005**
**PHONE: 212-825-1212**
**FAX: 212-825-1313**